| | | |
|---|---|---|
| MAINSTREAM FASHIONS FRANCHISING, INC., a Minnesota corporation, | ) ) ) | CASE NO. _____ |
| | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| | ) | |
| ALL THESE THINGS, LLC, a North Carolina limited liability company; GRACE AND LOVE, LLC, a North Carolina limited liability company; CCP, LLC, a North Carolina limited liability company; CHARLOTTE COOPER PARRIS, a North Carolina resident; ANITRA MITCHELL, a North Carolina resident; and BRADLEY MITCHELL, a North Carolina resident, | ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** |
| | ) | |
| Defendants. | ) | |

_____

Plaintiff Mainstream Fashions Franchising, Inc. ("Mainstream"), for its Complaint against Defendants All These Things, LLC,[1] Grace and Love, LLC; CCP, LLC; Charlotte Parris; Anitra Mitchell; and Bradley Mitchell (collectively "Defendants"), states and alleges as follows:

## INTRODUCTION

1.    The All These Things Defendants used to operate two Mainstream Boutique® franchised businesses pursuant to two Mainstream Boutique® Franchise Agreements. Mainstream terminated the Franchise Agreements on November 5, 2019,

---

[1] Defendants All These Things, Charlotte Parris, Anitra Mitchell, and Bradley Mitchell are collectively referred to as the "All These Things Defendants."

after the All These Things Defendants refused to install a new point-of-sale system ("POS System") and abandoned their Franchised Businesses in violation of the Franchise Agreements.

2.      Following the termination of the Franchise Agreements, the All These Things Defendants failed to comply with their post-termination obligations, including the covenant not to compete.  Specifically, the All These Things Defendants have violated the Agreements by, among other things, (a) operating competing businesses at the same location as their former Mainstream Boutique® franchised businesses, (b) soliciting and diverting Mainstream's customers to their competing businesses, (c) failing to return Mainstream's customer list and related customer account information to Mainstream, (d) failing to transfer the telephone numbers associated with their former Mainstream Boutique® businesses to Mainstream, and (e) failing to provide Mainstream with a list of supplies, inventory, fixtures, equipment, and other assets from their former Mainstream Boutique® franchised businesses, which Mainstream may, at its discretion, purchase.

3.      Defendants Grace and Love, LLC and CCP, LLC are acting in concert and participation with the All These Things Defendants to circumvent the post-termination provisions of the Franchise Agreements.

4.      Defendants are brazenly operating competing women's clothing and accessories businesses under the names "Love + Well Boutique" and "Bliss by the Lake," selling the same Mac and Me® products (products that are exclusive to the Mainstream Boutique® franchise system) they sold as Mainstream Boutique® franchisees, and selling their products to Mainstream's customers.  Defendants' conduct is causing irreparable

harm to Mainstream. This harm includes (a) loss of goodwill associated with the Mainstream Boutique® Marks and System, (b) loss of customers to Defendants' competing businesses, (c) unfair competition by former franchisees trained in Mainstream's methods and procedures, (d) difficulty re-franchising the All These Things Defendants' former market area, and (e) the risk that other franchisees will abandon their franchised businesses. These harms are incalculable and cannot be remedied through damages. Therefore, as part of this action, Mainstream seeks an immediate and permanent injunction prohibiting Defendants from violating the post-termination obligations under the Franchise Agreements, including the non-compete agreement, as well as monetary damages related to Defendants' unlawful conduct.

## PARTIES

5.    Mainstream is a corporation organized under the laws of the state of Minnesota with its principal place of business located at 7900 International Drive, Suite 515, Minneapolis, Minnesota 55425.

6.    Mainstream is the franchisor of the Mainstream Boutique® franchise system ("Franchise System").   Mainstream Boutique® franchisees operate under franchise agreements with Mainstream.

7.    Defendant All These Things, LLC ("All These Things") is a North Carolina limited liability company with its principal place of business located at 110 Oakwood Drive, Suite D, Winston-Salem, North Carolina 27103.

8.      The sole members of All These Things are Defendants Anitra Mitchell and Bradley Mitchell, both of whom are residents and citizens of North Carolina, residing at 5531 Garden Park Lane, Winston-Salem, North Carolina 27106.

9.      Defendant Love and Grace, LLC ("Love and Grace") is a North Carolina limited liability company with its principal place of business place of business located at 5531 Garden Park Lane, Winston-Salem, North Carolina 27106.

10.     Defendants Anitra Mitchell and Bradley Mitchell are the sole members of Love and Grace.

11.     Defendant CCP, LLC ("CCP") is a North Carolina limited liability company with its principal place of business located at 1006 Southwest Drive, Davidson, North Carolina 28036.

12.     The sole member of CCP is Defendant Charlotte Paris, who is a resident and citizen North Carolina, residing at 1006 Southwest Drive, Davidson, North Carolina 28036.

## JURISDICTION AND VENUE

13.     This action involves breach of the two Franchise Agreements, breach of a Guaranty related to one of those Agreements, and fraudulent underreporting of sales by the All These Things Defendants.

14.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because (a) the parties are citizens of different states and (b) the amount in controversy exceeds $75,000.

15.     Venue is proper in this District because the All These Things Defendants voluntarily consented to venue in this Court pursuant to Article 20.4 of the Franchise Agreements and the Guaranty. Venue is also proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims plead in this Complaint occurred in this District.

16.     This Court has personal jurisdiction over the All These Things Defendants because they voluntarily consented to personal jurisdiction in the state of Minnesota pursuant to Articles 20.1 and 20.4 of the Franchise Agreements and the Guaranty described below. Further, this Court has personal jurisdiction over Defendants because they have purposefully availed themselves of the privilege of doing business in Minnesota, have intentionally done business in Minnesota, enjoying the privileges and benefits of Minnesota's laws and regulations, and have purposefully directed its actions toward Minnesota. Finally, Defendants Love and Grace and CCP are so closely related to the All These Things Defendants, and the contractual dispute arising from the Franchise Agreements, that it is foreseeable that they could and should be brought into this District to account for their actions.

## FACTUAL BACKGROUND

**A.     The Mainstream Boutique® Marks and Franchise System**

17.     Mainstream has developed a business concept and system ("Business System") for operating women's retail clothing and accessories businesses with their own distinct style and character.

18.     The Franchise System operates under the Mainstream Boutique®
trademarks, trade names, and trade dress, and sells products under the Mac and Me®
marks (collectively the "Mainstream Boutique® Marks," "Mac and Me® Marks," or
"Marks").

19.     The Mac and Me® brand is exclusive to Mainstream and its Business
System.

20.     Mainstream Boutique® franchisees enjoy a license that allows them to use
the Marks and Business System in connection with the operation of their Mainstream
Boutique® franchised businesses.

21.     Seventy-seven Mainstream Boutique® franchised units, and four corporate
units, exist and operate throughout the United States.

**B.      The All These Things Defendants' Franchise Agreements and Guaranty**

22.     The All These Things Defendants operated two Mainstream Boutique®
franchised businesses in North Carolina.

23.     Mainstream and All These Things entered into a Franchise Agreement with
an effective date of June 14, 2011 (the "Winston-Salem Franchise Agreement") granting
All These Things the right to operate a Mainstream Boutique® franchised business in
Winston-Salem, North Carolina ("Winston-Salem Franchised Business") using the Marks
and Business System for a period of 10 years. A true and correct copy of the Winston-
Salem Franchise Agreement is attached as Exhibit A.

24.     At or about the same time that Mainstream and All These Things executed
the Winston-Salem Franchise Agreement, Ms. Mitchell and Ms. Parris executed a

Personal Guaranty ("Guaranty") in which they guaranteed to Mainstream that they would be personally liable for All These Things' payment and performance obligations under the Winston-Salem Franchise Agreement. In addition, as part of the Franchise Agreement, Mr. Mitchell agreed to be bound by the Agreement's confidentiality and covenant not to compete provisions.

25.     The Winston-Salem Franchised Business operated at 110 Oakwood Drive, Suite D, Winston-Salem, North Carolina 27104, and used the telephone number 336-448-1485.

26.     Anitra Mitchell and Bradley Mitchell entered into a Franchise Agreement with Mainstream with an effective date of January 16, 2015 (the "Mooresville Franchise Agreement") granting the Mitchells the right to operate a Mainstream Boutique® franchised business in Mooresville, North Carolina ("Mooresville Franchised Business") using the Marks and Business System for a period of 10 years. A true and correct copy of the Mooresville Franchise Agreement is attached as Exhibit B.

27.     The Mooresville Franchised Business operated at 126 Mooresville Commons Way, Mooresville, North Carolina 28117, and used the telephone number 704-662-9306.

28.     The Winston-Salem Franchise Business and Mooresville Franchised Business are sometimes collectively referred to as the "Franchised Businesses."

29.     The Winston-Salem Franchise Agreement and the Mooresville Franchise Agreement are sometimes collectively referred to as the "Franchise Agreements."

30.     Pursuant to Articles 4 and 5 of the Franchise Agreements, the All These Things Defendants agreed to pay certain recurring fees to Mainstream over the term of the Franchise Agreements.

31.     Pursuant to Articles 4.2, 4.3, and 4.7 of the Winston-Salem Franchise Agreement, All These Things agreed to pay Mainstream the Continuing Fees equal to 8% of Net Revenue (as that term is defined in the Agreement) on a weekly basis during the term of the Agreement.

32.     Pursuant to Articles 4.2, 4.3, and 4.7 of the Mooresville Franchise Agreement, Anitra and Bradley Mitchell agreed to pay Mainstream the Continuing Fees equal to 7.5% of Net Revenue (as that term is defined in the Agreement) on a weekly basis during the term of the Agreement.

33.     Pursuant to Article 5.2 of the Winston-Salem Franchise Agreement, All These Things agreed to pay Mainstream annual Marketing Fees of $1,000, payable in two installments of $500 each on the first day of January and July of each year.

34.     Pursuant to Article 5.2 of the Mooresville Franchise Agreement, Anitra and Bradley Mitchell agreed to pay Mainstream Advertising Fund Contributions equal to .5% of Net Revenue on a weekly or monthly basis, as established in the Mainstream's confidential operations manual (the "Manual"), during the term of the Agreement.

35.     Under Article 4.6 of the Franchise Agreements, the All These Things Defendants agreed to pay Mainstream a Service Charge equal to $50 if they failed to pay any Continuing Fees or to submit a report of Net Revenues or other reports or financial statements within 10 days from the date they were due.

36.     Pursuant to Article 4.5 of the Franchise Agreements, the All These Things Defendants agreed to pay to Mainstream interest on any unpaid amounts at the maximum rate allowed by law not to exceed 18% per annum simple interest.

37.     Pursuant to Article 6.6 of the Franchise Agreements, the All These Things Defendants agreed to obtain and pay for equipment required by Mainstream, and agreed that the equipment used in the Franchised Businesses would conform to the standards and requirements established by Mainstream from time- to-time.

38.     Pursuant to Article 6.22 of the Winston-Salem Franchise Agreement and Article 6.21 of the Mooresville Franchise Agreement, the All These Things Defendants agreed to obtain such computer hardware, computer software, and other equipment as may from time-to-time be required by Mainstream for use in the operation of the Franchised Businesses. The All These Things Defendants further agreed that they must pay all costs associated with any updates, supplements, modifications, substitutions, or replacements that Mainstream required.

39.     Pursuant to Article 6.7 of the Franchise Agreements, the All These Things Defendants agreed to modernize and replace their equipment to conform with system standards prescribed by Mainstream from time-to-time. The All These Things Defendants further agreed that the requirements in Article 6.7 "are both reasonable and necessary to ensure continued public acceptance and patronage of [Mainstream Boutique]® Business and to avoid deterioration or obsolescence in connection with the operation of the [Franchised] Business[es]."

40.     Pursuant to Article 6.10 of the Franchise Agreements, Mainstream loaned the All These Things Defendants a copy of Mainstream's Manual, which Mainstream reserved the right to revise at any time during the term of the Franchise Agreements. Pursuant to that same Article, the All These Things Defendants agreed to conform to all changes and modifications made to the Manual deemed necessary by Mainstream to: (A) improve the standards of service and products offered for sale to the public under the Business System; (B) protect the goodwill associated with the Marks; (C) improve the operation of Mainstream Boutique® franchised businesses; or (D) maintain the product and service consistency required by Mainstream.

41.     Pursuant to Article 6.24 of the Winston-Salem Franchise Agreement and Article 6.23 of the Mooresville Franchise Agreement, the All These Things Defendants agreed that Mainstream owns the customer list and Protected Accounts (as that term is defined in the Agreements) and that Mainstream licensed to the All These Things Defendants the right to use the customer list and Protected Accounts during the term of the Agreements. The All These Things Defendants agreed that they may not use the customer list or Protected Account information for any purpose whatsoever other than in the normal conduct of their Franchised Businesses.

42.     Pursuant to Articles 7.1 and 7.2 of the Franchise Agreements, the All These Things Defendants acknowledged and agreed, among other things, that they received certain confidential information (including but not limited to the Manual) from Mainstream for use in their Franchised Businesses that may not be communicated,

divulged, or used for the benefit of any other person or entity. They further agreed that they would "use all reasonable means to keep such information secret and confidential."

43.     Pursuant to Article 12.1 of the Franchise Agreements, the All These Things Defendants agreed to provide Mainstream with accurate weekly statements of Net Revenue from their Franchised Businesses, and provide accurate weekly reports of merchandise sold at the Franchised Businesses.

44.     Pursuant to Article 12.2 of the Franchise Agreements, the All These Things Defendants agreed to provide Mainstream with accurate monthly income statements and annual financial statements for the Franchised Businesses.

45.     Pursuant to Article 12.5 of the Franchise Agreements, the All These Things Defendants agreed that Mainstream could audit their "books and financial records" pertaining to their Franchised Businesses. If an audit by Mainstream results in a determination that the All These Things Defendants have underreported Net Revenues by more than 2%, or underpaid Continuing Fees by more than $500, the All These Things Defendants agreed to pay any deficiencies and reimburse Mainstream for all costs and expenses incurred as a result of the audit.

46.     Pursuant to Articles 15.1(B) and 15.2 of the Franchise Agreements, the All These Things Defendants agreed that Mainstream may terminate the Agreements, upon 30 days' notice and opportunity to cure, if the All These Things Defendants violated any material provision, term, or condition of the Agreements, including but not limited to failing to conform to the Business System.

47.    Pursuant to Articles 15.4(B), the All These Things Defendants agreed that Mainstream may immediately terminate the Franchise Agreements, without providing an opportunity to cure, if the All These Things Defendants abandoned the Franchised Businesses.

48.    Pursuant to Articles 6 and 17 of the Franchise Agreements, the All These Things Defendants agreed that, upon termination of the Agreements, they would:

    a.  Cease using the locations of their Winston-Salem and Mooresville Franchise Businesses;

    b.  Pay all amounts due and owing to Mainstream or its affiliates within five days after termination;

    c.  Immediately and permanently discontinue use of the Marks and Business System;

    d.  Remove all Mainstream Boutique® signs and other distinctive internal or external characteristics from the Retail Locations (as defined by the Franchise Agreements) and vehicles and other equipment used in the Franchised Businesses, and alter the premise of the Franchised Business to differentiate them unmistakably from a Mainstream Boutique® business;

    e.  Deliver to Mainstream a complete list of current and former customers and all information (including corporate contact persons) respecting any accounts, including the names, telephone numbers, complete email addresses, and all other information Mainstream requests;

    f.  Return to Mainstream the Manual, advertising materials, any information respecting any accounts, and all other printed materials pertaining to their Franchised Businesses;

    g.  Assign all rights to each telephone number (including the 336-448-1485 and 704-662-9306 telephone numbers) and email address used in the Franchised Businesses to Mainstream; and

> h. Provide Mainstream with a list of all then-usable supplies, inventory, fixtures and equipment, and all other assets so that Mainstream may, at its discretion, purchase some or all of those assets.

49.    Pursuant to Article 18.2 of the Franchise Agreements, the All These Things Defendants agreed that, upon termination of the Agreements, they would comply with the post-termination non-compete provision, which states as follows:

> **<u>POST-TERM COVENANT NOT TO COMPETE</u>**. FRANCHISEE, FRANCHISEE'S owners and the Personal Guarantors will not, for a period of two years after the termination or expiration of this Agreement, on their own account or as an employee, independent contractor, agent, consultant, partner, officer, director or owner of any other person, firm, entity, partnership, limited liability company or corporation: (A) seek to employ or retain any employee or independent contractor who is at that time employed or retained by MAINSTREAM or by any other Mainstream Boutique franchisee, or induce any such employee or independent contractor to terminate his or her employment or relationship, (B) divert or attempt to divert any business, Protected Account or customers of the [Franchised] Business or of any other Mainstream Boutique business to any competing business; or (C) own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in any business that is in any way competitive with (including, but not limited to, over the Internet) or similar to the Mainstream Boutique businesses conducted by MAINSTREAM or MAINSTREAM'S franchisees, which is located (i) within a 25-mile radius of FRANCHISEE'S Retail location; (ii) within a 25-mile radius of any other Mainstream Boutique businesses operated by MAINSTREAM or any of MAINSTREAM'S franchisees pursuant to any franchise, development, license or other territorial agreement; or (iii) over the Internet. FRANCHISEE, FRANCHISEE'S owners and the Personal Guarantors expressly agree that the two-year period, the Internet and the geographical limits are the reasonable and necessary to protect MAINSTREAM and MAINSTREAM'S franchisees if this Agreement expires or is terminated for any reason, and that this covenant not to compete is necessary to permit MAINSTREAM the opportunity to resell and/or develop a new Mainstream Boutique business at or in the area surrounding the Designated Radius.

50.    Pursuant to Article 18.3 of the Franchise Agreements, the All These Things Defendants agreed that injunctive relief is essential to prevent any violation of the

foregoing non-compete provision, "that damages alone cannot adequately compensate" Mainstream for a breach of the covenants not to compete, and that injunctive relief "is essential for the protection of" Mainstream and its franchisees.

51. Pursuant to Article 20.1 of the Franchise Agreements, Mainstream has the right to seek injunctive relief in a court of competent jurisdiction, as follows:

> **INJUNCTIVE RELIEF**. In addition to the provisions of Article 19.5, MAINSTREAM will have the right to petition a Court of competent jurisdiction for the entry of temporary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement relating to: (A) FRANCHISEE'S improper or unauthorized use of the Marks and the Business System; (B) the obligations of FRANCHISEE upon termination or expiration of this Agreement; (C) the transfer or assignment of this Agreement, the franchised Business or substantially all of the assets employed in the franchised Business, or the ownership interests of FRANCHISEE; (D) FRANCHISEE'S violation of the provisions of this Agreement relating to confidentiality and covenants not to compete; and (E) any act or omission by FRANCHISEE or FRANCHISEE'S employees that, (1) constitutes a violation of any applicable law, ordinance or regulation, (2) is dishonest or misleading to customers of FRANCHISEE'S Mainstream Boutique Business or other Mainstream Boutique businesses, (3) constitutes a danger to the employees, public or customers of FRANCHISEE'S Mainstream Boutique Business, or (4) may impair the goodwill associated with the Marks and the Business System. In any action brought under this provision where MAINSTREAM prevails against FRANCHISEE, FRANCHISEE will indemnify MAINSTREAM for all costs that it incurs in any such proceedings including, without limitation, attorneys' fees actually incurred, expert witness fees, costs of investigation, court costs, travel and living expenses, and all other costs incurred by MAINSTREAM. Unless provided to the contrary by applicable law, MAINSTREAM will be entitled to obtain injunctive relief without the posting of any bond or security.

52. Pursuant to Articles 20.1 and 20.11 of the Franchise Agreements, the All These Things Defendants agreed to pay all costs and expenses, including attorneys' fees, deposition costs, expert witness fees, investigation costs, accounting fees, filing fees and

travel expenses actually incurred by Mainstream in enforcing any term, condition, or provision of the Agreements or in seeking to enjoin any violation of the Agreements by the All These Things Defendants.

**C.  Mainstream Terminated the Franchise Agreements due to the All These Things Defendants' Failure to Install the New POS System**

53.    On January 29, 2019, Mainstream informed its franchisees, including the All These Things Defendants, that the Mainstream Boutique® system was upgrading to a new POS System, and that franchisees would need to migrate to the new system pursuant to the terms of their franchise agreements.

54.    The new POS System is a cloud-based system that provides access to real-time sales, inventory, and other data that will drive sales and profitability, streamline operations, and enable Mainstream and its franchisees to take advantage of opportunities that require an internet connection.

55.    All of Mainstream's franchisees, except the All These Things Defendants, have installed, or have agreed to install, the new POS System.

56.    Between January and September, 2019, the All These Things Defendants were repeatedly informed of their obligation to migrate to the new POS System.

57.    By letters dated September 19, 2019, Mainstream warned the All These Things Defendants that if they failed to sign contracts with providers by September 26, 2019, failed to secure a migration date for the new POS System by September 26, 2019, and failed to install and operate the new POS System by October 19, 2019, Mainstream

would put the All These Things in formal default under the terms of the Franchise Agreements. True and correct copies of these letters are attached as Exhibit C.

58. The All These Things Defendants failed to sign contracts with providers, and failed to secure a migration date for the new POS System by September 26, 2019.

59. On September 27, 2019, the All These Things Defendants emailed Mainstream an undated letter stating that they would not install the required POS System. A true and correct copy of this letter is attached as Exhibit D.

60. By letters dated October 2, 2019 ("Notices of Default"), Mainstream informed the All These Things Defendants that they were in default of the Franchise Agreements for failing to install the new POS System. The Notices of Default gave the All These Things Defendants 30-days to cure the default by, among other things, installing the new POS System. The Notices of Default advised the All These Things Defendants that if the defaults were not cured, the Franchise Agreements would terminate effective 30 days from receipt of the Notices. True and correct copies of the Notices of Default are attached as Exhibit E.

61. By letter October 3, 2019, the All These Things Defendants informed Mainstream that they intended to terminate the Franchise Agreements effective November 3, 2019, and cease operating their Mainstream Boutique® Franchised Businesses due to Mainstream's alleged violations of the Franchise Agreements. A true and correct copy of the October 3, 2019, letter is attached as Exhibit F.

62. Mainstream responded by letter dated October 16, 2019, advising the All These Things Defendants that their attempt to terminate the Franchise Agreements was

not valid, because (a) Mainstream was not in breach of the Franchise Agreements, (b) the letter failed to state or describe how Mainstream breached the Franchise Agreements, (c) the letter failed to state or describe how, or in what way, Mainstream may cure the alleged breaches, and (d) the All These Things Defendants did not provide notice of the alleged breaches at the time they allegedly occurred, as required by the Franchise Agreements. A true and correct copy of the October 16, 2019 response letter is attached as Exhibit G.

63. By letters dated November 1, 2019, the All These Things Defendants purported to terminate the Franchise Agreements, effective on the same date, and stated that they would no longer be operating their Mainstream Boutique® Franchised Businesses. True and correct copies of the All These Things Defendants' November 1, 2019 letters are attached as Exhibit H.

64. By letters dated November 5, 2019 ("Notices of Termination"), Mainstream advised the All These Things Defendants that it was terminating the Franchise Agreements, effective immediately, due to their failure to migrate to the new POS System and their abandonment of the Franchised Businesses. True and correct copies of the Notices of Termination are attached as Exhibit I.

65. The Notices of Termination also demanded that All These Things Defendants perform the following post-termination obligations:

    a. Comply with all post-termination covenants against competition;

    b. Pay to Mainstream all amounts due and owing within five (5) days, including all Continuing Fees, Advertising Fund Contributions, and other amounts due for the remaining terms of the Franchise

Agreements, in estimated amounts of $168,480 for the Winston-Salem Franchised Business and $177,021 for the Mooresville Franchised Business;

c.  Not later than 24 hours after the date of the Notices of Termination, provide Mainstream with an accounting of all outstanding store credits, gift cards, and other credit amounts ("Outstanding Customer Credits") and pay Mainstream the total Outstanding Customer Credits for Mainstream to reimburse customers and other Mainstream Boutique® franchisees;

d.  Immediately cease using the Marks;

e.  Remove all Mainstream Boutique® signage and displays from the Franchised Businesses' premises and vehicles and alter the premises to differentiate them unmistakably from a Mainstream Boutique® business;

f.  Immediately cease using and return to Mainstream all copies of the Manual, the customer lists, and all other information respecting accounts (including Protected Accounts, as defined by the Franchise Agreements), advertising materials, and other materials pertaining to the former Franchised Businesses;

g.  Immediately assign to Mainstream all telephone numbers, email addresses, and directory listings used in the operation of the former Franchised Businesses; and

h.  No later than 24 hours from the date of the Notices of Termination, provide Mainstream with the login credentials to Constant Contact, Facebook, Instagram, and any other social media or messaging accounts used in connection with the Franchised Businesses.

66.  As part of the Notices of Termination, Mainstream advised the All These Things Defendants that if they failed to comply with the foregoing post-termination obligations, including the non-compete provision, Mainstream may take action to enforce the terms of the Franchise Agreements and, as part of that action, would seek: (a) an injunction requiring compliance with all post-termination obligations in the Franchise

Agreements, including the non-compete provisions; (b) disgorgement of all profits earned from any competing business; (c) damages resulting from their violations of the Franchise Agreements; and (d) lost future fees for the remaining term of the Franchise Agreements.

67.     As part of the Notices of Termination, Mainstream also requested a list of all usable supplies, inventory, fixtures, and equipment used in the Franchised Businesses, along with an estimate of the fair market value of each one of the listed assets, pursuant to Article 17.5 of the Franchise Agreements.

68.     By letters November 6, 2019 ("Notices of Audit"), Mainstream requested that the All These Things Defendants provide books and financial records pertaining to the Franchised Businesses, pursuant to the audit provisions of Article 12.5 of the Franchise Agreements. Mainstream made this request, in part, because Defendant Bradley Mitchell previously sent Mainstream an email stating that the Franchised Businesses had been doing better since the beginning of the prior year. However, at the time the email was sent, the All These Things Defendants' financial reports to Mainstream showed that their revenues were down approximately 22% from the prior year. They have also failed to consistently provide Mainstream with their financial statements, as required by the Franchise Agreements, and have turned the practice of avoidance in this area into an art form. True and correct copies of the Notices of Audit are attached as Exhibit J.

69.     The All These Things Defendants refused to comply with the audit request.

**D. The All These Things Defendants Failed to Comply with Their Post-Termination Obligations and are Operating Competing Businesses.**

70.     Following the termination of the Franchise Agreements, Mainstream discovered that the All These Things Defendants are continuing to operate competing retail businesses at their former Winston-Salem and Mooresville Mainstream Boutique® locations in violation of the Franchise Agreements.

71.     The location of the Winston-Salem Franchise Business is now the site of Defendants' competing "Love + Well Boutique" business.

72.     Defendants Anitra Mitchell and Bradley Mitchell formed Defendant Grace and Love for the purpose of operating the competing "Love + Well Boutique" business and to circumvent the post-termination non-compete provisions of the Winston-Salem Franchise Agreement.

73.     The location of the Mooresville Franchise Business is now the site of Defendants' competing "Bliss by the Lake" business.

74.     Defendant Charlotte Parris formed Defendant CCP for the purpose of operating the competing "Bliss by the Lake" business and to circumvent the post-termination non-compete provisions of the Mooresville Franchise Agreement.

75.     Defendants Charlotte Parris and Anitra Mitchell are working in these competing businesses. True and correct photographs of Defendants' competing businesses are attached as Exhibit K.

76.     Grace and Love and CCP are nothing more than the alter ego of the All These Things Defendants and are being used as an instrumentality to continue the All

These Things Defendants' women's clothing and accessories businesses and avoid their contractual obligations under the Franchise Agreements. Grace and Love and CCP are so closely related to the All These Things Defendants and the contractual dispute arising from the Franchise Agreements that it is foreseeable that they could and should be brought into this District to account for their actions. In particular, all Defendants are availing themselves of the benefits of the Franchise Agreements, in which the All These Things Defendants consented to jurisdiction in this District regarding any dispute related to those benefits.

77.    Defendants are selling Mainstream's Mac and Me® branded-products at their competing businesses, and are offering the same products and services as Mainstream Boutique® stores.

78.    The All These Things Defendants had approximately 60,000 followers on their various social media accounts for their former Franchised Businesses before they began operating their competing businesses. Defendants are currently advertising their new competing businesses by sending email advertisements to customers on the customer lists for their former Franchised Businesses. A true and correct copy of Ms. Mitchell's Facebook post for the competing business in Winston-Salem, North Carolina is attached as Exhibit L. A true and correct copy of Defendants' email advertisement for the competing "Love + Well Boutique" business is attached as Exhibit M.

79.    In addition to their non-compete obligations, the All These Things Defendants have failed to comply with other post-termination obligations under the Franchise Agreements, including as follows:

a. They have failed to pay annual Marketing Fees under Article 5.2 of the Winston-Salem Franchise Agreement in the sum of $4,500.00;

b. They have failed to pay all amounts due to Mainstream for the remaining terms of the Franchise Agreements;

c. They have failed to provide the required customer lists and customer accounts information pertaining to their former Franchised Businesses (including but limited to the requested accounting of Outstanding Customer Credits);

d. They have failed to assign the telephone numbers, email addresses, and directory listings used in the operation of their former Franchised Business; and

e. They have failed to provide a list of all usable supplies, inventory, fixtures, and equipment used in the Franchised Businesses, along with an estimate of the fair market value of each one of the listed assets, as required by the post-termination provisions of the Franchise Agreements.

80.     Customers of the All These Things Defendants' Franchised Businesses are contacting other Mainstream Boutique® stores in the area in a panic because these customers have open store credits from returns made at the Franchised Businesses. Because the All These Things Defendants have failed to provide Mainstream with an accounting of the Open Customer Credits, and failed to provide customer lists, Mainstream is unable to contact customers of the Franchised Businesses to preserve their goodwill and prevent dissatisfaction resulting from the Open Customer Credits.

81.     In addition, the All These Things Defendants have failed to provide to Mainstream books and financial records for the former Franchised Businesses.

82.     Defendants have no legal right to operate their competing businesses.

83.     Defendants are using the goodwill generated under Mainstream's Marks and Business System, which belong to Mainstream, to divert Mainstream's customers to competing businesses.

84.     Defendants are also using customer lists, account information, knowledge, and confidential information they obtained as Mainstream Boutique® franchisees to unfairly compete with Mainstream and its franchisees.

85.     Defendants' actions make it difficult for Mainstream to re-franchise the area, as the presence of Defendants' competing businesses in Winston-Salem and Mooresville, North Carolina will make it nearly impossible to attract a new franchisee to these areas.

86.     If the post-termination provisions of the Franchise Agreements are not enforced, other franchisees will believe they can abandon their franchised businesses and use Mainstream's Business System and goodwill to compete with Mainstream and its franchisees.

### COUNT I
### BREACH OF THE FRANCHISE AGREEMENTS AND GUARANTY
### FAILURE TO COMPLY WITH NON-COMPETE
### (All Defendants)

87.     Mainstream incorporates by reference all preceding paragraphs herein.

88.     The Franchise Agreements and Guaranty constitute lawful and binding contracts.

89.     Mainstream has performed all conditions, covenants, and promises required to be performed by it pursuant to the Franchise Agreements and Guaranty.

90.     Defendants have failed to comply with the post-termination non-compete provisions in Article 18.2 of the Franchise Agreements.

91.     Defendants' failure to comply with the non-compete provisions in the Franchise Agreements is causing irreparable harm and damage to Mainstream.

92.     Mainstream has no adequate remedy at law to protect its substantial business and property rights.  The damages from Defendants' failure to comply with the non-compete provision in Article 18.2 is considerable and continuing, and thus not capable of ascertainment at this time.

93.     Mainstream is entitled to immediate and permanent injunctive relief enforcing the non-compete provisions in Article 18.

94.     As a direct and proximate result of Defendants' actions, Mainstream has suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damages in an amount that has yet to be determined, plus costs, disbursements, interest, and attorneys' fees.

## COUNT II
### BREACH OF FRANCHISE AGREEMENTS AND GUARANTY
### FAILURE TO COMPLY WITH OTHER POST-TERMINATION OBLIGATIONS
### (All These Things Defendants)

95.     Mainstream incorporates by reference all preceding paragraphs herein.

96.     In addition to violating the non-compete provisions in Article 18 of the Franchise Agreements, the All These Things Defendants have failed to comply with the other post-termination obligations set forth in Articles 6 and 17 of the Franchise Agreements.

97.    The All These Things Defendants' failure to comply with the post-termination obligations set forth in the Franchise Agreements is causing irreparable harm and damage to Mainstream.

98.    Mainstream has no adequate remedy at law to protect its substantial business and property rights. The damages from the All These Things Defendants' failure to comply with the post-termination obligations are considerable and continuing, and thus not capable of ascertainment at this time.

99.    Mainstream is entitled to immediate and permanent injunctive relief enforcing all post-termination obligations of the Franchise Agreements.

100.    As a direct and proximate result of the All These Things Defendants' actions, Mainstream has suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damages in an amount that has yet to be determined, plus costs, disbursements, interest, and attorneys' fee.

### COUNT III
### BREACH OF FRANCHISE AGREEMENTS AND GUARANTY
### FAILURE TO ALLOW MAINSTREAM TO PURCHASE USABLE SUPPLIES, INVENTORY, FIXTURES AND EQUIPMENT
### (All These Things Defendants)

101.    Mainstream incorporates by reference all preceding paragraphs herein.

102.    The Franchise Agreements give Mainstream the right to purchase all then-usable suppliers, inventory, fixtures, and equipment, and all other assets that were used in the operation of the Franchised Businesses.

103.    The All These Things Defendants failed to sell to Mainstream usable suppliers, inventory, fixtures, and equipment, and all other assets.

104.    The All These Thing Defendants are instead using and/or selling usable supplies, inventory, fixtures, equipment, and other assets to third parties in violation of the Franchise Agreements.

105.    Mainstream has been damaged by the All These Things Defendants' breach of their obligations to sell to Mainstream all then-usable suppliers, inventory, fixtures, and equipment, and all other assets that are required to operate the Mainstream Boutique® Franchised Businesses.

106.    As a direct result of their breaches, Mainstream has been damaged in an amount to be proven at trial, plus costs, disbursements, interest, and attorney's fees.

**COUNT IV**
**BREACH OF FRANCHISE AGREEEMENT AND GUARANTY**
**FAILURE TO PAY MARKETING FEES**
**(All These Things, Charlotte Parris, and Anitra Mitchell)**

107.    Mainstream incorporates by reference all preceding paragraphs herein.

108.    All These Things had a contractual obligation under the Winston-Salem Franchise Agreement to pay annual Marketing Fees and other fees as set forth in the Agreement.

109.    Pursuant to the Guaranty, Charlotte Parris and Anitra Mitchell agreed to be personally liable to Mainstream for amounts owed by All These Things under the Winston-Salem Franchise Agreement.

110.    All These Things, Charlotte Parris, and Anitra Mitchell are in breach of the Winston-Salem Franchise Agreement and Guaranty as a result of their failure to pay annual Marketing Fees due and owing under the Franchise Agreement.

111.    As a direct result of All These Things, Charlotte Parris, and Anitra Mitchell's breach, Mainstream has been damaged in an amount to be proven at trial, but in no event less than $4,500.00, plus costs, disbursements, interest, and attorneys' fees.

## COUNT V
## BREACH OF FRANCHISE AGREEMENTS AND GUARANTY
## FAILURE TO PAY FUTURE LOST FEES
### (All These Things Defendants)

112.    Mainstream incorporates by reference all preceding paragraphs herein.

113.    The Franchise Agreements and Guaranty required the All These Things Defendants to pay Mainstream Continuing Fees, Advertising Fund Contributions, and other fees set forth in the Franchise Agreements, for the entire 10-year term of each of the Franchise Agreements.

114.    The All These Things Defendants caused the premature termination of the Franchise Agreements by, among other things, failing to install the required POS System and by abandoning their Mainstream Boutique® Franchised Businesses.

115.    By virtue of the All These Things Defendants' premature termination of the Franchise Agreements, Mainstream sustained a loss of future revenue over the remainder of the terms of the Franchise Agreements.

116.    Mainstream has been damaged by the All These Things Defendants' breach of their obligations to operate the Mainstream Boutique® franchises for the remaining terms of the Franchise Agreements.

117. As a direct result of their breaches, the All These Things Defendants are liable to Mainstream for damages in an amount to be proven at trial, but in no event less than $345,500, plus costs, disbursements, interest, and attorney's fees.

## COUNT VI
## SPECIFIC PERFORMANCE / INJUNCTIVE RELIEF
## AUDIT AND ACCOUNTING
### (All These Things Defendants)

118. Mainstream incorporates by reference all preceding paragraphs herein.

119. Under Article 12.5 of the Franchise Agreements, the All These Things Defendants agreed to make all of their "books and financial records" (as defined by the Franchise Agreements) for the Franchised Businesses available to Mainstream for inspection, auditing, and photocopying, and further agreed to photocopy these books and financial records and forward them to Mainstream upon Mainstream's request.

120. The All these Things Defendants breached the Franchise Agreements by failing to make the books and financial records available to Mainstream for inspection, auditing, and copying.

121. The damages from the All These Things Defendants' failure to comply with the audit requirements set forth in Article 12.5 of the Franchise Agreements are considerable and continuing, and thus not capable of ascertainment at this time.

122. Mainstream has the right to inspect, copy, and audit all of the All These Things Defendants' books and financial records for the Franchised Businesses for the purpose of determining unpaid and underpaid Continuing Fees and other fees set forth in the Franchise Agreements.

123.    Mainstream is entitled to specific performance and/or permanent injunctive relief directing the All These Things Defendants to comply with Mainstream's request to inspect, audit, and photocopy the books and financial records for the Franchised Businesses pursuant to the terms of the Franchise Agreements.

## COUNT VII
## CIVIL CONSPIRACY
### (All Defendants)

124.    Mainstream incorporates by reference all preceding paragraphs herein.

125.    Defendants were aware of the existence of the post-termination obligations under the Franchise Agreements, including the non-compete obligations.

126.    With full knowledge of the non-compete obligations contained in the Franchise Agreements, Defendants developed a plan and scheme to create Grace and Love, and CCP, for the specific purpose and intent of soliciting and diverting Mainstream's customers to "Love +Well Boutique" and "Bliss by the Lake" and evade the non-compete provisions in the Franchise Agreements.

127.    The purpose and objective of Defendants' conduct was to make Mainstream's customers cease doing business with Mainstream and transfer those customers to "Love + Well Boutique", "Bliss by the Lake," and/or another competing business while at the same time avoiding the obligations under the terms of the Franchise Agreements.

128.    In furtherance of the conspiracy described above, Defendants created "Love + Well Boutique" and "Bliss by the Lake," businesses that are owned and controlled by

Charlotte Parris, Anitra Mitchell, and/or Bradley Mitchell, for the purpose of avoiding the All These Things Defendants' obligations under the Franchise Agreements.

129. Defendants created, planned, and implemented their conspiracy in secret to deprive Mainstream of financial benefits, deprive Mainstream of benefits of the Franchise Agreements, and deprive Mainstream of the opportunity to retain the customer goodwill developed under the Marks and Business System.

130. As a result of Defendants' actions, Mainstream has been damaged in an amount in excess of $75,000, plus costs, disbursements, interest, and attorneys' fees.

**COUNT VIII**
**ATTORNEYS' FEES**
**(All These Things Defendants)**

131. Mainstream incorporates by reference all preceding paragraphs herein.

132. Pursuant to Articles 20.1 and 20.11 of the Franchise Agreements and the Guaranty, the All These Things Defendants agreed to pay Mainstream for any and all reasonable costs and expenses (including but not limited to attorneys' fees) incurred by Mainstream in enforcing any term, condition, or provision of the Franchise Agreements, and/or in seeking to enjoin any violation of the Franchise Agreements.

133. Mainstream commenced this action to obtain injunctive relief and enforce the provisions of the Franchise Agreements, and to recover damages incurred as a result of the All These Things Defendants' breaches of the Franchise Agreements. Mainstream is entitled to recover their attorneys' fees and costs in connection with this action, in an amount to be proven at trial.

WHEREFORE, Mainstream prays for judgment against Defendants as follows:

A. For an order ratifying and enforcing the termination of the Franchise Agreements;

B. For an order directing the All These Things Defendants, jointly and severally, to sell to Mainstream usable suppliers, inventory, fixtures, and equipment, and all other assets that are required to operate the Mainstream Boutique® Franchised Businesses, or award to Mainstream the proceeds from the sale of those assets, in an amount to be proven at trial;

C. For an award against All These Things, Charlotte Parris, and Anitra Parris, jointly and severally, for past due Marketing Fees under the Winston-Salem Franchise Agreement, plus interest, in an amount to be proven at trial, but in no event less than $4,500.00;

D. For an award against the All These Things Defendants, jointly and severally, for all lost future fees and profits resulting from their premature termination of the Franchise Agreements, plus accrued interest, in an amount to be proven at trial, but in no event less than $345,501, plus costs, disbursements, interest, and attorneys' fees.

E. For an order requiring the All These Things Defendants to make books and financial records for the Franchised Businesses available to Mainstream for inspection, audit, and photocopying;

F. For an order for a preliminary and permanent injunction directing that Defendants and their officers, directors, shareholders, members and/or partners, beneficial owners, investors, employees, consultants, representatives, attorneys and agents, and all others in active concert or participation with them, comply with all post-

termination obligations in Articles 6 and 17 of the Franchise Agreements, including but not limited to the obligations to (1) provide the customer lists and related accounts information pertaining to their Franchised Businesses (including but limited to the requested accounting of Outstanding Customer Credits); (2) assign the telephone numbers, email addresses, and directory listings used in the operation of their Franchised Businesses; and (3) alter the premises of the Franchised Businesses to differentiate them unmistakably from a Mainstream Boutique® business.

G.    For an order for a preliminary and permanent injunction directing that Defendants and their officers, directors, shareholders, members and/or partners, beneficial owners, investors, employees, consultants, representatives, attorneys and agents to assign to Mainstream all Constant Contact, Facebook, Instagram, and any other social media or messaging accounts used in connection with the Franchised Businesses;

H.    For an order for a preliminary and permanent injunction directing that Defendants and their officers, directors, shareholders, members and/or partners, beneficial owners, investors, employees, consultants, representatives, attorneys and agents, and all others in active concert or participation with them comply with the non-compete obligations in Article 18 of the Franchise Agreements, including but limited to an order directing Defendants to immediately cease from:

1. Diverting or attempting to divert any business, Protected Account, or customer of their Franchised Businesses or another Mainstream® franchisee to any competing business, including but not limited to "Love + Well Boutique" and "Bliss by the Lake," and

2. Owning, operating, leasing, franchising, conducting, engaging in, being connected with, having any interest in or assisting any person or entity engaged in any business that is in any way competitive with (including, but not limited to, over the Internet) or similar to the Mainstream Boutique® businesses conducted by Mainstream or Mainstream's franchisees, which is located (i) within a 25-mile radius of the Winston-Salem and Mooresville Retail locations; (ii) within a 25-mile radius of any other Mainstream Boutique® businesses operated by Mainstream or any of Mainstream's franchisees; or (iii) over the Internet for a period of two years.

I. For an award against the All These Things Defendants, jointly and severally, for damages Mainstream has sustained from the All These Things Defendants' failure to comply with the post-termination provisions in Articles 6 and 17 of the Franchise Agreements;

J. For an award against Defendants, jointly and severally, for the damages Mainstream has sustained and the profits Defendants have derived as a result of their operation of a competing business in violation of the non-compete provisions in the Franchise Agreements;

K. For an award against the All These Things Defendants, jointly and severally, for Mainstream's reasonable costs and expenses, including attorneys' fees, incurred in enforcing the provisions of the Franchise Agreements and Guaranty; and

L. For such other and further relief as the Court deems just and equitable.

DATED:  November 21, 2019      GRAY, PLANT, MOOTY,
                                       MOOTY & BENNETT, P.A.

                                  By:   s/ Craig P. Miller
                                      Craig P. Miller (#26961X)
                                  500 IDS Center
                                  80 South Eighth Street
                                  Minneapolis, MN 55402
                                  Telephone:  (612) 632-3000
                                  Facsimile: (612) 632-4258
                                  craig.miller@gpmlaw.com

                                  **ATTORNEY FOR PLAINTIFF**

GP:4828-0057-9501