| | | |
|---|---|---|
| MAINSTREAM FASHIONS FRANCHISING, INC., a Minnesota corporation, | ) ) ) | CASE NO. 19-CV-02953 SRN/HB |
| | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| | ) | |
| ALL THESE THINGS, LLC, a North Carolina limited liability company; GRACE AND LOVE, LLC, a North Carolina limited liability company; CCP, LLC, a North Carolina limited liability company; CHARLOTTE COOPER PARRIS, a North Carolina resident; ANITRA MITCHELL, a North Carolina resident; and BRADLEY MITCHELL, a North Carolina resident, | ) ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION** |
| | ) | |
| Defendants. | ) | |

## I.    INTRODUCTION

Defendants have collectively conspired to operate two competing women's retail clothing and accessories businesses, under the names "Love + Well Boutique" and "Bliss by the Lake," to circumvent the non-compete and other post-termination provisions set forth in two now-terminated Mainstream Boutique® Franchise Agreements.

Defendants All These Things, LLC ("All These Things"), Charlotte Parris, Anitra Mitchell, and Bradley Mitchell (collectively the "All These Things Defendants") owned and operated two Mainstream Boutique® franchised businesses in Winston-Salem and Mooresville, North Carolina (the "Franchised Businesses"). The Franchise Agreements

were terminated by Mainstream, effective November 5, 2019, after the All These Things Defendants' failed to install a new point-of-sale system ("POS System") in breach of the Agreements and abandoned their Franchised Businesses. The All These Things Defendants have now formed Defendants Grace and Love, LLC ("Grace and Love") and CCP, LLC ("CCP")[1] to operate competing businesses at the exact same locations as their former Franchised Businesses. Defendants are using Plaintiff Mainstream Fashions Franchising, Inc.'s ("Mainstream") customer lists and social media contacts they obtained as Mainstream Boutique® franchisees to divert customers away from Mainstream and its remaining franchisees.

Defendants' brazen conduct not only violates the express provisions of the Franchise Agreement, it is causing irreparable harm to Mainstream. Therefore, Mainstream seeks a preliminary injunction (1) prohibiting Defendants from operating their competing businesses, (2) prohibiting Defendants from diverting or attempting to divert customers to any competing business, (3) requiring Defendants to return to Mainstream all customer lists and related customer information that were obtained in the former Franchised Businesses, (4) requiring the All These Thing Defendants to assign the telephone numbers, email addresses, and directory listings used in their former Franchised Businesses to Mainstream; (5) requiring Defendants to assign all social media accounts to Mainstream; and (6) requiring the All These Thing Defendants to provide a

---

[1] The All These Things Defendants, Grace and Love, and CCP are collectively referred to as "Defendants."

list of usable supplies, inventory, fixtures, and equipment from their former Franchised Businesses (the "Business Assets") to Mainstream so that Mainstream may, in its discretion, purchase those Business Assets.

## II.     FACTUAL BACKGROUND

**A.     The Mainstream Boutique® Marks And Franchise System**

Mainstream is the franchisor of the Mainstream Boutique® franchise system ("Franchise System"). (November 21, 2019 Declaration of Corey DeNicola ("DeNicola" Decl.), ¶ 4.) Mainstream has developed a business concept and system ("Business System") for operating women's retail clothing and accessories businesses with their own distinct style and character. (DeNicola Decl., ¶ 5.) The Franchise System operates under the Mainstream Boutique® trademarks, trade names, and trade dress, and sells products under the Mac and Me® marks (collectively the "Mainstream Boutique® Marks," "Mac and Me® Marks," or "Marks"). (*Id.*) The Mac and Me® brand is exclusive to Mainstream. The brand name is a representation of Mainstream's mission of empowering women through fashion. (DeNicola Decl., ¶ 6.) The Mac and Me® brand was created by Mainstream's founder, Marie DeNicola, and inspired by her only daughter, Mikayla "Mac" DeNicola Ketterling. (*Id.*)

Mainstream Boutique® franchisees operate franchised retail locations under franchise agreements with Mainstream. (*Id.*, ¶ 7.) Those franchise agreements grant franchisees the right to use Mainstream's Marks and Business Systems in the operation of

their franchised businesses. (*Id.*) There are currently over 80 Mainstream Boutique® retail locations in operation across the United States, including franchised businesses operated by other franchisees in Charlotte and Kernersville, North Carolina. (*Id.*, ¶ 8.)

## B. The All These Things Defendants' Franchise Agreements And Guaranty

Until recently, the All These Things Defendants operated two Mainstream Boutique® franchised businesses in Winston-Salem and Mooresville, North Carolina, pursuant to two separate franchise agreements (collective "Franchise Agreements"). (DeNicola Decl., ¶¶ 9-13; DeNicola Decl., Exs. A and B.) Under both Franchise Agreements, the All These Thing Defendants were granted the right to operate Mainstream Boutique® franchised business using the Marks and Business System for a period of ten years. (DeNicola Decl., Exs. A and B, Art. 2.1.)

The Winston-Salem Franchise Agreement has an effective date of June 14, 2011 and was personally guaranteed by Defendants Charlotte Parris and Anitra Mitchell. (DeNicola Decl., Ex. A; DeNiCola Dec., ¶¶ 10-11.) The Winston-Salem Franchised Business was located at 110 Oakwood Drive, Suite D, Winston-Salem, North Carolina 27104, and used the telephone number 336-448-1485. (DeNicola Decl., ¶ 12.)

The Mooresville Franchise Agreement has an effective date of January 16, 2015. (DeNicola Decl., Ex. B.) The Mooresville Franchised Business was located at 126 Mooresville Commons Way, Mooresville, North Carolina 28117, and used the telephone number 704-662-9306. (DeNicola Decl., ¶ 14.)

1. **The Mainstream Boutique® Franchise System Adopted A New POS System, Which The All These Things Defendants Were Required To Install**

Under the terms of the Franchise Agreements, the All These Thing Defendants agreed to pay for and use all computer hardware, computer software, and other equipment required by Mainstream for use in the operation of their Franchised Businesses, as well as any updates, supplements, modifications, substitutions, or replacements to such hardware, software, and equipment required by Mainstream from time to time. (DeNicola Decl., Ex. A, Arts. 6.6 and 6.22; DeNicola Decl. Ex. B, Arts. 6.6 and 6.21.) Indeed, under Article 6.7, the All These Things Defendants agreed to modernize and replace their equipment to conform with Mainstream's Business System. (DeNicola Decl., Exs. A and B, Art. 6.7.)

2. **The All These Things Defendants Were Trained By Mainstream, And Received Mainstream's Confidential Information**

As Mainstream Boutique® franchisees, the All These Things Defendants received proprietary and commercially sensitive confidential information from Mainstream. (DeNicola Decl., ¶ 15.) Mainstream provided classroom instruction and on-the-job training to the All These Things Defendants on various subjects. This included orientation on the Business System and training on basic operating skills such as daily operational procedures, booking and conducting Shows, inventory purchasing and control, merchandising, customer service, customer relations, basic computer operations and set-up, selling and marketing techniques, financial reporting, and other business and

marketing topics selected by Mainstream. (*Id.*, ¶ 16; DeNicola Decl., Exs. A and B, Art. 8.1.) As part of this training, Mainstream taught the All These Things Defendants how to purchase merchandise that is on-trend and in keeping with the latest fashions. (DeNicola Decl., ¶ 17.) Further, Mainstream trained the All These Things Defendants in selling merchandise through social media using live videos. (*Id.*)

Mainstream also loaned a copy of its confidential operations manual (the "Manual") to these Defendants, and made other confidential information (including but not limited to customer lists and certain accounts)[2] available to these Defendants. (DeNicola Decl., ¶ 18; DeNicola Decl., Ex. A and B, Art. 6.10.)

While operating under Mainstream's Marks, the All These Things Defendants maintained Constant Contact, Facebook, Instagram, and other social media accounts for their Franchised Businesses. (DeNicola Decl., ¶¶ 19 and 21.) There were approximately 60,000 followers or customers on these social media accounts, all of which belong to Mainstream under the express terms of the Franchise Agreements. (*Id.*)

---

[2] Under the terms of the Franchise Agreements, the All These Things Defendants agreed that Mainstream owns the customer list and Protected Accounts (as that term is defined in the Franchise Agreements). (DeNicola Decl., Ex. A, Art. 6.24; DeNicola Decl., Ex. B, Art. 6.23.) The All These Things Defendants agreed to keep such information secret and confidential. (*Id*. Arts. 7.1 and 7.2.)

3. **The Franchise Agreements Allow Mainstream To Terminate For Failure To Use The New POS System, And For Abandonment Of The Franchised Businesses**

The All These Things Defendants acknowledged and agreed that Mainstream could terminate the Franchise Agreements, upon 30 days' notice and opportunity to cure, if the All These Things Defendants violated any material provision, term, or condition of the Agreements, including but not limited to failing to conform to the Business System. (DeNicola Exs. A and B, Arts. 15.1(B) and 15.2.) Further, Pursuant to Article 15.4(B), Defendants agreed that Mainstream could immediately terminate the Franchise Agreements, without providing an opportunity to cure, if the All These Things Defendants abandoned their Franchised Businesses. (*Id.*, Art. 15.4(B).)

4. **The All These Things Defendants Agreed To Certain Obligations Upon Termination Of The Franchise Agreements**

Upon termination of the Franchise Agreements, the All These Things Defendants agreed that they would not operate a competing business, and would not divert or attempt to divert customers to a competing business, as follows:

> **POST-TERM COVENANT NOT TO COMPETE**. FRANCHISEE, FRANCHISEE'S owners and the Personal Guarantors will not, for a period of two years after the termination or expiration of this Agreement, on their own account or as an employee, independent contractor, agent, consultant, partner, officer, director or owner of any other person, firm, entity, partnership, limited liability company or corporation: … (B) divert or attempt to divert any business, Protected Account or customers of the Business or of any other Mainstream Boutique business to any competing business; or (C) own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in any business that is in any way competitive with (including, but not

limited to, over the Internet) or similar to the Mainstream Boutique businesses conducted by MAINSTREAM or MAINSTREAM'S franchisees, which is located (i) within a 25-mile radius of FRANCHISEE'S Retail location; (ii) within a 25-mile radius of any other Mainstream Boutique businesses operated by MAINSTREAM or any of MAINSTREAM'S franchisees pursuant to any franchise, development, license or other territorial agreement; or (iii) over the Internet.

(*Id.*, Art. 18.2; *see also id.* Art. 6.4 ("Subsequent to expiration or termination of this Agreement, FRANCHISEE shall not use the Retail Location premises in violation of Article 18 of this Agreement.").) Further, the All These Things Defendants expressly agreed that the time and geographic limitations of the covenant not to compete are:

reasonable and necessary to protect [Mainstream] and [Mainstream's] franchisees if this Agreement expires or is terminated for any reason, and that this covenant not to compete is necessary to permit [Mainstream] the opportunity to resell and/or develop a new Mainstream Boutique business at or in the area surrounding the Designated Radius.

(*Id.*) Under Article 18.3 of the Franchise Agreements, the All These Things Defendants also agreed that injunctive relief is essential to prevent any violation of the non-compete provisions. (*Id.*, Art. 18.3 ("damages alone cannot adequately compensate" Mainstream); *id.* (injunctive relief "is essential for the protection of" Mainstream and its franchisees.").)

Further, the All These Things Defendants agreed, upon termination, to deliver to Mainstream a complete list of current and former customers and all information (including corporate contact persons) respecting any customer accounts, with contact information for each customer and account. (DeNicola Decl., Ex. A, Arts. 6.24 and 17.1;

DeNicola Decl., Ex. B., Arts. 6.23 and 17.1.) The All These Things Defendants agreed that they may not use the customer list or Protected Account information for any purpose whatsoever other than in the normal conduct of their Franchised Businesses. (*Id.*)

The All These Things Defendants also agreed, upon termination, to assign to Mainstream (or its designee) all telephone numbers, email addresses, and directory listings used in the operation of their former Franchised Businesses. (*Id.*, Art. 17.4.) In addition, under Article 17.5, the All These Things Defendants agreed to provide a list of their Business Assets so that Mainstream could exercise its right to purchase those assets, as follows:

> **<u>RIGHT OF MAINSTREAM TO PURCHASE BUSINESS ASSETS</u>**. If this Agreement expires or is terminated by either MAINSTREAM or FRANCHISEE for any reason whatsoever, or if FRANCHISEE wrongfully terminates this Agreement by failing to comply with Article 16 or otherwise, then MAINSTREAM will have the right, but not the obligation, to purchase the then-usable supplies, inventory, fixtures and equipment, and all other assets that are required by MAINSTREAM for a standard Mainstream Boutique business and owned by FRANCHISEE in its Mainstream Boutique Business (the "Business Assets")… FRANCHISEE must give MAINSTREAM written notice listing the cost of each one of the Business Assets. If MAINSTREAM and FRANCHISEE cannot agree on the price of the Business Assets, then the price will be the fair market value of such assets and either party will have the right to demand that the fair market value of the Business Assets be determined by Arbitration in accordance with Article 19 below... Nothing in this Article will prohibit MAINSTREAM from enforcing the terms and conditions of this Agreement, including the covenants not to compete contained in Article 18.

(*Id.*, Art. 17.5) This provision ensures that former franchisees do not sell Mac and Me® merchandise or other products associated with Mainstream's Marks and Business System following the termination of their franchise rights. (DeNicola Decl., ¶ 23.)

Finally, under Articles 20.1 and 20.11 of the Franchise Agreements, the All These Things Defendants agreed to reimburse Mainstream for costs and expenses (including attorneys' fees) incurred in enforcing these rights. (DeNicola Decl., Exs. A and B, Arts. 20.1 and 20.11.)

## C. The Franchise Agreements Were Terminated Due To The All These Things Defendants' Failure To Install The New Point-of-Sale System And Abandonment Of The Franchised Businesses

In January 2019, Mainstream decided to switch to a new and improved POS System for the Business System. (DeNicola Decl., ¶ 24.) The new POS System is a cloud-based system that provides access to real-time sales, inventory, and other data that will drive sales and profitability, streamline operations, and enable Mainstream and its franchisees to take advantage of opportunities that require an internet connection. (*Id.*)

On January 29, 2019, Mainstream informed its franchisees, including the All These Things Defendants, that all franchisees would be required to migrate to the new POS System. (DeNicola Decl., ¶ 25.) All of Mainstream's franchisees, except for the All These Things Defendants, have installed or have agreed to install the new POS System. (*Id.*)

By letters dated October 2, 2019 ("Notices of Default"), Mainstream informed the All These Things Defendants that they were in default of the Franchise Agreements for failing to purchase and install the new POS System. (DeNicola Decl., Ex. C.) These Notices of Default gave the All These Things Defendants 30 days to cure the default. (*Id.*) The Notices also advised the All These Thing Defendants that if the defaults were not cured within 30 days, the Franchise Agreements would be terminated. (*Id.*)

The All These Things Defendants did not cure their defaults (*Id.*, ¶ 27.) Rather, by letter dated October 3, 2019, they alleged (incorrectly) that Mainstream did not have the right to require them to install the new POS System and that Mainstream was in default of the Franchise Agreements. (*Id.*; DeNicola Decl., Ex. D.) Mainstream responded by letter dated October 16, 2019, advising the All These Things Defendants that their October 3 default letter was deficient and invalid, because (1) Mainstream was not in breach of the Franchise Agreements, (2) the letter failed to state or describe how Mainstream breached the Franchise Agreements, (3) the letter failed to state or describe how, or in what way, Mainstream may cure the alleged breaches, and (4) the All These Things Defendants did not provide notice of the alleged breaches at the time they allegedly occurred, as required by the Franchise Agreements. (DeNicola Decl., Ex. E.) Mainstream's October 16 letter also reminded the All These Things Defendants that they still had an opportunity to cure their defaults. (*Id.*)

Despite their opportunity to do so, the All These Things Defendants failed to cure their defaults. Instead, these Defendants sent a letter to Mainstream dated November 1, 2019, purporting to terminate the Franchise Agreements. (DeNicola Decl., Ex. F.) However, because the All These Things Defendants had no basis for terminating the Agreements, had failed to cure the POS System default, and had abandoned their Franchised Businesses, Mainstream properly terminated the Franchise Agreements by letters dated November 5, 2019 ("Notices of Termination"), effective immediately. (DeNicola Decl., Ex. G.) As part of the Notices of Termination, Mainstream reminded the All These Things Defendants of their post-termination obligations and advised them that that if they failed to comply with those obligations (including the covenant not to compete), Mainstream would take legal action, including injunctive relief. (*Id.*) The Notices of Termination also demanded that the All These Things Defendants, among other things: (1) provide Mainstream with an accounting of all outstanding store credits, gift cards, and other credit amounts ("Outstanding Customer Credits"); (2) deliver to Mainstream all customer lists; (3) assign the telephone numbers, email addresses, and directory listings for their former Franchised Businesses to Mainstream; (4) provide Mainstream with the login credentials to Constant Contact, Facebook, Instagram, and any other social media or messaging accounts used in the operation of the Franchised Businesses; and (5) provide a list of the Business Assets. (*Id.*) The All These Things Defendants failed to comply with these demands. (DeNicola Decl., ¶ 31.) Instead, they

are operating competing businesses under the names "Love + Well Boutique" and "Bliss by the Lake," at the same locations as their former Franchised Businesses, using customer lists, account information, and social media contacts they acquired as Mainstream Boutique® franchisees to divert or attempt to divert customers to these competing businesses.

## D. Defendants Are Operating Competing Businesses In Violation Of The Franchise Agreements

Following the termination of the Franchise Agreements, Mainstream discovered that the All These Things Defendants are operating competing women's clothing and accessories businesses at their former Winston-Salem and Mooresville Mainstream Boutique® locations in violation of the Franchise Agreements. (*Id.*, ¶ 32.)

The location of the Winston-Salem Franchise Business is now the site of Defendants' competing "Love + Well Boutique" business. (DeNicola Decl., ¶ 33.) Meanwhile the Mooresville Franchise Business has been converted to a competing business operating as "Bliss by the Lake." (*Id.*, ¶ 36.) Photographs show Defendants Charlotte Parris and Anitra Mitchell working in these competing businesses. (DeNicola Decl., Ex. L.) Further, Defendants are selling Mainstream's Mac and Me® branded-products at their competing businesses, and offering other products and services that are sold at Mainstream Boutique® stores. (DeNicola Decl., ¶ 40; DeNicola Decl., Ex. M.) In addition, Defendants are advertising their competing businesses to the approximately 60,000 followers that the All These Things Defendants acquired under Mainstream's

Marks and Business System, and are sending email advertisements to customers on the customer lists for their former Franchised Businesses. (DeNicola Decl., Exs. O and P; DeNicola Decl., ¶ 42.)

Customers of the All These Things Defendants' Franchised Businesses are contacting other Mainstream Boutique® locations in the area with concerns about open store credits they have from returns made at the former Franchised Businesses. (DeNicola Decl., ¶ 43.) Mainstream estimates that there is approximately $64,000 in open credits relating to the All These Things Defendants' Franchised Businesses. (*Id.*) However, because the All These Things Defendants have failed to provide Mainstream with the Open Customer Credits and customer lists, Mainstream cannot contact these customers or resolve their concerns. (*Id.*)

## III.    ARGUMENT

Under *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981), a plaintiff seeking injunctive relief must establish the following:

1.      The threat of irreparable harm to the movant;

2.      The balance between the harm to the moving party and the injury that granting the injunction will inflict on the other party;

3.      The probability that the movant will succeed on the merits; and

4.      The public interest will be served by the injunction.

None of the above factors are dispositive; rather, the court must balance all four to determine "whether the balance of equities so favors the movant that justice requires the

court to intervene to preserve the status quo until the merits are determined." *Hill v. Xyquad, Inc.*, 939 F.2d 627, 630 (8th Cir. 1991) (quoting *Dataphase*). That said, "[t]he third factor, probable success on the merits, is frequently considered the most important," *Am. Dairy Queen Corp. v. New Line Prods., Inc.*, 35 F. Supp. 2d 727, 729 (D. Minn. 1998), and thus that factor will be considered first. *See also S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992).

## A. Mainstream Is Likely To Prevail On Its Breach Of Contract Claim (Failure To Comply With Post-Termination Obligations)

### 1. Mainstream Properly Terminated The Franchise Agreements

Under North Carolina law,[3] the elements of a breach of contract claim are "(1) existence of a valid contract and (2) breach of the terms of that contract." *Ahmadi v. Triangle Rent A Car, Inc.*, 203 N.C. App. 360, 691 S.E.2d 101, 103 (2010). Here, there is no dispute that the Franchise Agreements constitute valid and enforceable contracts and that Mainstream properly terminated the Agreements.

Pursuant to Article 6 of the Franchise Agreements, the All These Things Defendants were required to install and operate the new POS System designated by Mainstream. Despite being given more than nine months to do so, they failed to install the new POS System and, instead, abandoned their Mainstream Boutique® franchised businesses and began operating competing businesses. Their failure to install the new

---

[3] Under Article 20.10, the Franchise Agreements and the relationships between Mainstream and the All These Things Defendants are governed by the laws of the state in which the retail locations are located, which is North Carolina.

POS System, after being provided with the required notice and opportunity to cure, gave Mainstream the right to terminate the Franchise Agreements under Articles 15.1(B) and 15.2 of the Agreements. *See Marco's Franchising, LLC v. Soham, Inc.*, 365 F. Supp. 3d 891, 899 (N.D. Ohio 2019) (franchisees failure to replace POS System with new system designated by franchisor justified termination); *Kieland v. Rocky Mountain Chocolate Factory Inc.*, 2006 WL 2990336 (D. Minn. Oct. 18, 2006) (granting summary judgment in franchisor's favor regarding disputes arising from failure to use approved POS System).

In addition, during the 30-day period they were given to cure their defaults, the All These Things Defendants abandoned their Franchised Businesses, giving rise to an independent basis for immediate termination pursuant to Article 15.4(B) of the Franchise Agreements. *Cf.* W. Michael Garner, 1 Franch & Distr Law & Prac., § 3.42 ("Another major ground for immediate termination is franchisee abandonment of the business …"). For these reasons, Mainstream is likely to prevail on its claim it properly terminated the Franchise Agreements.

### 2. The Covenants Not To Compete Are Enforceable

A covenant not to compete is enforceable in North Carolina if: (1) it is reasonably necessary to protect the legitimate interests of the person seeking its enforcement; (2) it is reasonable with respect to both time and territory; and (3) it does not interfere with the interest of the public. *Meineke Car Care Centers, Inc. v. Bica*, 2011 WL 4829420, at *4

(W.D.N.C. October 12, 2011) (internal citation omitted).[4] Defendants have the burden to show that the covenants not to compete are unenforceable. *See*, *e.g.*, *Atl. Pinstriping, LLC v. Atl. Pinstriping Triad, LLC*, 2016 WL 5376294, at *5 (W.D.N.C. Sept. 23, 2016) (citation omitted)

### a. The Non-Compete Covenants Protect Mainstream's Legitimate Business Interests

Numerous courts and commentators have recognized that non-compete covenants protect franchisors' legitimate business interests. According to one commentator, "it is not an overstatement to suggest that the continued viability of the franchise system depends, in large part, on the enforceability of the covenant against competition." Ted P. Pearce et al., *The Enforcement of Post-Termination Remedies in the Franchise Contract*, 24 Okla. City U. L. Rev. 81, 94 (1999). And as one court observed:

> [The Franchisor] has expended substantial resources developing its processes, manuals, advertising materials, etc. and on building goodwill and obtaining a national reputation as a provider of automotive services. By signing the Franchise Agreement, Defendants recognized and took advantage of the value of the confidential and proprietary information [the franchisor] gave them. During the term of their agreement with [the franchisor], Defendants received training, assistance, and a protected territory in which to build a successful automotive business. If the Court

---

[4] Some courts have described two additional requirements, including that the covenant be in writing, and that it be based on adequate consideration. *See*, *e.g.*, *Atlantic Pinstriping, LLC*, 2016 WL 5376294, at *5. There is no question that the covenant at issue is in writing. Further, the All These Things Defendants received valuable consideration in the form of the right to operate as Mainstream Boutique® franchisees using Mainstream's Marks, Business System, specialized training, and confidential information. *Cf. id.* (confirming the right to operate franchises was adequate consideration to support the enforcement of a similar non-compete provision).

allows Defendants to continue operating their store in violation of the covenant not to compete, Defendants will be able to use the confidential and proprietary information they acquired from [the franchisor] to take business away from it.

*Bica*, 2011 WL 4829420, at *4; *see also Baskin-Robbins Inc.*, 2000 WL 35536665, at *5 (non-compete protects franchisor's goodwill and business methods, prevents break-away franchisees, and protects other franchisees).

Mainstream has a legitimate interest in preventing Defendants from wrongfully appropriating the customer goodwill associated with the Mainstream Boutique® Marks and Business System. By the very nature of the franchise business model, a franchisee receives the right to trade off the customer goodwill associated with the franchisor's trademarks. *See Scott v. Snelling & Snelling,* Inc., 732 F. Supp. 1034, 1041 (N.D. Cal. 1990) ("since the opportunity to utilize the goodwill by the franchisee is revocable, it is more like a lease than a sale of the goodwill; and the franchisor agrees that the franchisee may benefit from the goodwill for a specified period of time, and for a specified price."). If a terminated franchisee were permitted to continue operating a competitive business in the same territory as the previously franchised business, that former franchisee would be able to continue to capitalize impermissibly on the customer goodwill generated through its display of the franchisor's trademarks and use of the franchisor's business system. For that reason, many courts to consider this issue have determined that a franchisor has a legitimate need for restrictive covenants in franchise agreements. *See*, *e.g.*, *Baskin-Robbins, 2000 WL 35536665, at *5-6; Vantage Tech., LLC v. Cross*, 17 S.W.3d 637,

645–46 (Tenn. Ct. App. 1999); *Jiffy Lube Int'l, Inc. v. Weiss Bros.*, 834 F. Supp. 683, 691 (D.N.J. 1993) ("A restrictive covenant, reasonably crafted, is necessary to protect the goodwill …").

Here, the All These Things Defendants' Mainstream Boutique® Franchised Businesses developed substantial customer goodwill – for the benefit of Mainstream – through their display of the Mainstream Boutique® Marks and use of the Business System for over eight years. That goodwill belongs not to Defendants, but to Mainstream, whose tradename and Marks generated it. (*See* DeNicola Decl., Exs. A and B, Art. 3.1 (Mainstream "owns all right, title and interest in and to … the goodwill symbolized by" the Marks; *id.* Art. 3.2.) Defendants should not be permitted to wrongfully appropriate Mainstream's customer goodwill by operating competing businesses at the same locations as their former Franchised Businesses, using Mainstream's customer lists and social media contacts generated under the Marks to divert or attempt to divert Mainstream's customers to competing businesses.

Indeed, Defendants' actions are jeopardizing Mainstream's goodwill. Defendants are undercutting prices charged by Mainstream and its franchisees for the same products and services. (DeNicola Decl., ¶ 48.) Further, customers are calling Mainstream in a panic, concerned that their customer credits have evaporated. (*Id.*) This affects both Mainstream and neighboring franchisees, who have expressed concern to Mainstream

about the effect Defendants' actions are having on customer goodwill in North Carolina. (*Id.*)

Mainstream also has a legitimate interest in protecting its proprietary and confidential information (including customer lists and account information) and methods from Defendants' unfair use in competition. "There is a recognized danger that former franchisees will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the goodwill of the franchisor." *ServiceMaster Residential/Commercial Servs., L.P. v. Westchester Cleaning Servs., Inc.*, 2001 WL 396520, at *3 (S.D.N.Y. Apr. 19, 2001)). During their tenure as Mainstream Boutique® franchisees, Defendants learned much about how to operate a retail clothing and accessories business. It would be unfair to permit Defendants to now take the knowledge and confidential information gained from their association with Mainstream and use that knowledge to compete with Mainstream and its other franchisees. *See*, *e.g.*, *Outdoor Lighting Perspective Franchising, Inc. v. Home Amenities, Inc.*, 2012 WL 137808, at *2 (W.D.N.C. Jan. 18, 2012).

Further, Mainstream's interest in re-franchising provides support for enforcement of the restrictive covenant. *See*, *e.g.*, *Jiffy Lube*, 834 F. Supp. at 691 ("Jiffy Lube not only has a valid interest in protecting the goodwill it has developed over the years by having its franchisees do business at the Turnersville location, but it also has an interest in being

able to place a new franchisee at or near the same location where this goodwill has been created"). Courts have routinely held that the continued operation of a business by a former franchisee at the same location, even if under a different name, makes it virtually impossible for the franchisor to refranchise the area. *See*, *e.g.*, *Jiffy Lube, Inc.*, 834 F. Supp. at 692 ("at the very site" of the former franchise location, "even without" the franchisor's mark, "would greatly impair [the franchisor's] ability to establish another franchise in the area."); *Domino's Pizza, Inc. v. El-Tan, Inc.*, 1995 WL 367893, at *3 (N.D. Okla. Apr. 28, 1995) ("without injunctive relief, Domino's would suffer irreparable harm due to its inability to attract new franchisees to the area now serviced by" the former franchisee).

Here, any potential new franchisee would certainly be concerned by the existence of Defendants' competing businesses operating within that new franchisee's territory, especially because Defendants have knowledge of the business strategies that would be employed by the new franchisee, and are selling the same products and services at significantly reduced prices. (DeNicola Decl., ¶ 51.) Moreover, any new franchisee will face a substantial disadvantage, as Defendants developed extensive relationships with Mainstream's customers over the eight years they operated under the Marks and Business System as Mainstream Boutique® franchisees. (*Id.*) Any new franchisee should not be forced to compete with Defendants to retain those relationships.

Moreover, the covenants against competition prevent breakaway franchisees and protect the integrity of the Business System. A post-termination non-compete agreement helps prevent a franchise system from unraveling. *Amerispec, Inc.*, 2001 WL 770999, at *4 ("Courts have recognized the legitimate interest of franchisors in protecting their franchise systems"). "The value of [a franchisor's] franchise agreement would also be reduced if a former franchisee were allowed to ignore or circumvent the covenant against competition." *ServiceMaster Residential/Commercial Servs., L.P. v. Hooker*, Bus. Franchise Guide (CCH) ¶ 13, 457 (W.D. Tenn. 2006) (November 21, 2019 Declaration of Craig Miller ("Miller Decl."), Ex. 1.); *see also Rita's Water Ice Franchise Corp.,* 1996 WL 165518, at *5 ("Other franchisees might violate their franchise agreements in similar ways and use Rita's goodwill to establish competing businesses."). Defendants are not the only Mainstream Boutique® franchisees that executed franchise agreements containing a covenant against competition. (DeNicola Decl., ¶ 45.) Such covenants are the norm in most franchise systems, including the Mainstream Boutique® system. (*See id.*) Were Defendants permitted to continue operating a competing women's clothing and accessories retail business in the same geographic areas as their former Franchised Businesses, other franchisees would be inspired to do the same. Mainstream would face other defections by franchisees, who could take Mainstream's Business System, goodwill, and products to use in competing businesses. The loss of numerous franchisees,

who would then become well-trained competitors of Mainstream and its remaining franchisees, would seriously harm the entire franchise system.

Finally, "[n]oncompetition agreements between a franchisor and a franchisee are designed not only to protect the interests of the immediate parties but also to protect other franchisees against competitive activities. Thus, to the extent that such noncompetition agreements are exacted from all franchisees, each franchisee is thereby protected from competition from other franchisees." *Baskin-Robbins, Inc.*, 2000 WL 35536665, at *5 n.4 (quoting *Casey's Gen. Stores, Inc. v. Campbell Oil Co.*, 441 N.W.2d 758 (Iowa 1989)).

### b. The Non-Compete Provisions Are Reasonable In Scope

There is no dispute that the duration and geographic scope of the covenants not to compete are enforceable. North Carolina courts regularly uphold covenants for periods of two or more years. *See*, *e.g.*, *Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 229, 393 S.E.2d 854, 858 (1990) (two-year period upheld); *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 525–26, 379 S.E.2d 824, 826 (1989) (two-year period upheld); *Keith v. Day*, 81 N.C. App. 185, 343 S.E.2d 562, 567–68 (1986); *Lockhart v. Home-Grown Indus. of Georgia, Inc.*, 2007 WL 2688551, at *5 (W.D.N.C. Sept. 10, 2007).

Further, the geographic scope (within 25-miles of the former Franchised Businesses or within 25-miles of any other Mainstream Boutique® business) is well within the range of what North Carolina courts have deemed reasonable in similar circumstances. *See*, *e.g.*, *Atlantic Pinstriping*, 2016 WL 5376294, at *5 (upholding 25-

mile restriction and citing *Keith*, 81 N.C. App. at 193–94); *see also Forrest Paschal Mach. Co. v. Milholen*, 27 N.C. App. 678, 687, 220 S.E.2d 190, 197 (1975) (upholding 350 mile radius); *Outdoor Lighting*, 2012 WL 137808, at*3 (enjoining competitive business within 100 miles of former franchisee's territory or the territory of any other franchisee).

**c.      The Non-Compete Provisions Do Not Interfere With The Public Interest**

Covenants against competition in franchise agreements are not against public policy because "[i]t is as much a matter of public concern to see that valid [covenants] are observed as it is to frustrate oppressive ones." *Glover*, 2011 WL 240462, *3 (citations omitted). Indeed, "at the time of entering these contracts containing covenants not to compete both parties apparently regarded the restrictions as reasonable and desirable." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 370 S.E.2d 375, 380 (1988) (internal citations omitted); *see also id.* ("'by enforcing the restrictions [a] court is only requiring the defendants to do what they agreed to do.'" (internal citations omitted)).

**3.      Defendants Have Breached Several Other Post-Termination Obligations.**

In addition to the post-termination non-compete provisions, Articles 6 and 17 of the Franchise Agreements set forth the All These Things Defendants' other post-termination obligations, including but not limited to their obligations to do the following:

    a.      Provide Mainstream with an accounting of the Outstanding Customer Credits;

24

b.    Cease using the Winston-Salem and Mooresville retail locations;

c.    Deliver to Mainstream all customer lists and all information (including corporate contact persons) respecting any customer accounts, with contact information for each customer and account;

d.    Assign the telephone numbers (including the 336-448-1485, 980-722-4264, and 704 662-9306 telephone numbers), email addresses, and directory listings for the former Franchised Businesses to Mainstream; and

e.    Provide Mainstream with a list of the Business Assets for the Franchised Businesses, so Mainstream can purchase the Business Assets at its discretion.[5]

Defendants have failed to comply with each of these obligations. (DeNicola Decl., ¶ 44.) (*Id.*) Accordingly, Mainstream is likely to succeed on its claim that Defendants breached their post-termination obligations under Articles 6 and 17 of the Franchise Agreements.

**B.    Mainstream Is Suffering, And Will Continue To Suffer, Irreparable Harm**

Allowing Defendants to operate competing retail businesses in violation of the covenants not to compete would allow Defendant to compete unfairly with Mainstream and divert customers to competing businesses, causing an incalculable and continuing loss of customers and goodwill. *See Outdoor Lighting*, 2012 WL 137808, at *4. Further, as discussed above, if the covenants against competition are not enforced through an

---

[5] While the Franchise Agreements do not explicitly address Defendants' social media accounts, Defendants are using these accounts as advertising vehicles to divert customers from Mainstream and its franchisees. The social media accounts also include important customer information, which the All These Things Defendants are required to provide to Mainstream. (DeNicola Decl., ¶ 21.) Therefore, Mainstream requests an order directing Defendants to assign their social media accounts to Mainstream.

injunction, Mainstream's entire franchise system – and its relationships with other franchisees and potential franchisees in particular – will be irreparably harmed. Denying the requested injunctive relief would make it nearly impossible to re-franchise the area in which the Franchised Businesses are located, causing the franchise system to shrink. *Domino's Pizza*, 1995 WL 367893, at *3 ("[w]ithout injunctive relief, [the franchisor] would suffer irreparable harm due to its inability to attract new franchisees to the area now serviced by [the terminated franchisee]."). Additionally, the franchisor will likely suffer further irreparable harm due to customer confusion caused by the former franchisee operating the same type of business from the former franchise location. *Id.*

Allowing Defendants to disregard their promise not to compete would also send a message to Mainstream Boutique® franchisees that they can abandon their franchise agreements, stop paying fees, and convert their franchises to competing businesses, using the benefits of the Mainstream Boutique® Marks and System (including goodwill and confidential information) to compete with Mainstream and its franchisees. *See*, *e.g.*, *Jiffy Lube*, 834 F. Supp. at 693 (granting the plaintiffs' motion for a preliminary injunction in part based on not wanting to send the message that other franchisees could get away with violations of their franchise agreements). As the court recognized in *ATL International, Inc. v. Baradar*, Bus. Franchise Guide (CCH) ¶11,345 (D. Md. 1997) (Miller Decl. Ex. 2):

> I have no doubt that the plaintiff would suffer irreparable harm if I were to deny the preliminary injunction. As cases say, it is the franchise system

itself that is at issue. I do not take it as a parade of horribles argument at all. I think it is very realistic to expect that if a franchisee simply were to stop paying fees or stop other things that were due and then, after having operated under the franchise name for several years, were simply to then say okay, I'm breaking away, I'll stop using the various things that I've received as a franchisee and will go out on my own, that that would be a clear signal that other franchisees could do the same....I have little doubt that my failure to grant the injunction here might unravel the franchise system....Of course, Mr. Baradar is going to suffer harm because I am granting the injunction. He is not going to be able to do this kind of business within ten miles of where he is doing it now for two years, but that is exactly what he contracted for.

Allowing franchisees to violate the covenant not to compete likely would have the devastating effect of franchisees leaving the Mainstream Boutique® Franchise System, leading to the eventual un-raveling of that System. This result would not only cause irreparable harm to Mainstream, but would also cause irreparable harm to the Mainstream Boutique® Franchise System as a whole and the innocent Mainstream Boutique® franchisees whose businesses would suffer a tremendous loss of value from such occurrence. Thus, permitting Defendants to continue violating their covenant not to compete would reduce the value of Mainstream's franchises, irreparably harming Mainstream's authorized franchisees, and threatening Mainstream's on-going relationship with its authorized franchisees.

Accordingly, unless Defendants are enjoined from violating the covenant not to compete and other post-termination obligations, Mainstream and its authorized franchisees will suffer immediate and irreparable harm.

**C.** **Mainstream's Threatened Harm Outweighs the Threatened Harm to Defendants**

As discussed above, Mainstream suffers irreparable harm each day that Defendants are permitted to divert customers to their competing businesses and ignore their post-termination obligations. (DeNicola Decl., ¶¶ 54-60.) Unlike the harm Mainstream would suffer, any harm to Defendants would be compensable by monetary damages. *Petro Franchise Sys., LLC v. All Am. Properties, Inc.*, 607 F. Supp. 2d 781, 796–97 (W.D. Tex. 2009) (explaining that value of franchise can be calculated in several ways, and holding that, because terminated franchisees' threatened harm is compensable, the threatened harm to franchisor is greater); *S & R Corp.*, 968 F.2d at 379.

By contrast, Defendants will suffer only narrowly limited and entirely self-inflicted harm, should injunctive relief be granted. "Courts are generally unsympathetic to franchisees who blatantly disregard covenants not to compete." *I Can't Believe It's Yogurt v. Gunn*, 1997 WL 599391 (D. Colo. Apr. 15, 1997); *see also Total Car Franchising Corp. v. L & S Paint Works, Inc.*, 981 F. Supp. 1079, 1081 (M.D. Tenn. 1997) ("While the court is sympathetic to [Defendant's] difficulty at having to restrict the conduct of his small business, the rule of law simply requires that he comply with the terms of the Agreement that provided him with substantial benefits for more than two years."); *Jiffy Lube*, 834 F. Supp. at 693 ("To the extent that the defendants suffer significant … damage … this harm is a predictable consequence of their willful breach of contract and their misconduct.") Because any harm to Defendants is self-inflicted, that

harm is not a valid basis for denying Mainstream the relief to which it is legally entitled. *See id.*

**D.     The Public Interest Will Be Served By An Injunction**

The public derives substantial benefit from the services provided by those who, like Mainstream, train entrepreneurs and develop new businesses. *Meineke Car Care Centers, Inc. v. Big Jim's Muffler Shop, LLC*, 2012 WL 1289216, at *5 (W.D.N.C. Mar. 12, 2012). Communities benefit from the variety, competition, and quality of products and services made available to them through the efforts of franchisors such as Mainstream. *Id.* If franchisors such as Mainstream are unable to protect themselves and their systems from those who would take unfair advantage of the benefits of exposure to a franchised system, Mainstream and other franchisors may be forced to alter their way of doing business, to the detriment of the consuming public. *See Maaco Franchising*, 2016 WL 4746215, at *11. In addition, if this covenant is not enforced, Defendants will continue to mislead the public, unfairly compete with Mainstream and its nearby franchisees, unfairly capitalize on Mainstream's confidential information and customers, and unfairly piggyback on Mainstream's goodwill. *See S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir. 1992).

Finally, if individuals can enter into contracts and disregard the terms they do not like with impunity, then the sanctity of the contractual relationship will be severely undermined. *See Maaco Franchising*, 2016 WL 4746215, at *11. The enforcement of

these contractual covenants at issue sanctifies and continues to support the fundamental contractual arrangement between the parties.

**E.    The Court May Enjoin all of the Defendants from Violating the Non-compete Provision of the Franchise Agreement**

An injunction is binding on (1) the parties, (2), the parties' officers, agents, servants, employees, and attorneys, and (3) others who are in active concert or participation with such persons. Fed. R. Civ. P. 65(d); *see also United States v. Yielding*, 657 F.3d 722, 728 (8th Cir. 2011) ("[A] decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." (*quoting Thompson v. Freeman*, 648 F.2d 1144, 147 (8th Cir. 1981)). Courts across the country have similarly held that use of a thinly-veiled alter ego to "continue" the competing businesses will not prevent the court from enjoining others who violate the covenant, including non-signatories who assist or act in concert with the signatory in the violation of the covenant's terms. *See*, *e.g.*, *Standard Oil Co. v. Landmark Farm Bureau Co-op.*, 52 Ohio App. 2d 225, 369 N.E.2d 785, 792 (Ohio Ct. App. 1976) (post-termination non-compete clause enforced against former distributor's non-signatory son and new distributor that hired son); *Dad's Properties, Inc. v. Lucas*, 545 So. 2d 926, 928 (Fla. Dist. Ct. App. 1989) (granting injunction to enjoin wife of signatory to non-compete agreement from operating a competing business); *H&R Block Tax Serv., Inc. v. Sheets*, Bus. Franchise Guide (CCH) ¶ 13,299 (E.D. Ky. Mar. 3, 2006) (Miller Decl., Ex. 3) (the non-signatory corporation was

"merely a continuation" of an individual's former franchise, performing the same services for the same customers using the same assets, and thus was bound by the franchise agreement); *Chem. Fireproofing Corp. v. Bronska*, 542 S.W.2d 74, 80 (Mo. App. 1976) (enjoining wife and corporation of which husband was president from aiding husband in the breach of covenant not to compete, which only he had signed); *Quality Carriers, Inc. v. MJK Distribution, Inc.*, 2002 WL 506997, at *9 (S.D. Ill. Apr. 3, 2002) ("[A] party who has signed a non-compete agreement cannot be allowed to do indirectly, through his wife and her controlled corporation, that which he covenanted not to do himself"); *Day Companies v. Patat*, 440 F.2d 1343 (5th Cir. 1971) (preliminary injunction restraining both the covenantor and a third party was proper where the third party conspired with the covenantor to violate the covenant not to compete); *Bonus of Am., Inc. v. Angel Falls Servs., L.L.C.*, 2010 WL 2734218, at *6 (D. Minn. July 6, 2010) (Non-signatories "are in active concert and participation with Hart and Bonus in Minneapolis, and may properly be bound by the preliminary injunction.").

Mainstream anticipates that Defendants will argue that Grace and Love and CCP are not bound by the non-compete provisions because they did not execute the Franchise Agreements. However, because Grace and Love and CCP are acting in concert and participation with the All These Things Defendants, the provisions of Rule 65(d) should be extended to enjoin Grace and Love, and CCP, as well.

## IV.  CONCLUSION

For the above reasons, Mainstream requests that this Court enter a preliminary injunction restraining Defendants and its agents as requested.

DATED:  November 22, 2019.

**GRAY, PLANT, MOOTY,
   MOOTY & BENNETT, P.A.**


By:  s/ Craig P. Miller
        Craig P. Miller (#26961X)
500 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone:  (612) 632-3000
Facsimile:  (612) 632-4258
craig.miller@gpmlaw.com

**ATTORNEY FOR PLAINTIFF**

GP:4852-1499-1277 v4