# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| MAINSTREAM FASHIONS FRANCHISING, INC., a Minnesota corporation,<br><br>     Plaintiff,<br><br>v.<br><br>ALL THESE THINGS, LLC, a North Carolina limited liability company; GRACE AND LOVE, LLC, a North Carolina limited liability company; CCP, LLC, a North Carolina limited liability company; CHARLOTTE COOPER PARRIS, a North Carolina resident; ANITRA MITCHELL, a North Carolina resident; and BRADLEY MITCHELL, a North Carolina resident,<br><br>     Defendants. | CASE NO. 19-CV-02953 SRN/TNL<br><br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS** |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

### I.    Introduction

While Plaintiff Mainstream Fashions Franchising, Inc. (hereinafter "Mainstream" or "Plaintiff") filed this federal court action and, therefore, positioned itself to be the "Plaintiff," Mainstream is the party who has violated its contractual and statutory duties.[1]

Mainstream's Complaint should be dismissed for the following reasons, amongst others:

---

[1] It is important to remember that Defendants <u>first</u> filed an action related to this matter by submitting their initial Demand for Arbitration on November 15, 2019.

(1) Mainstream committed prior material breaches of the Franchise Agreements and the implied covenant of good faith and fair dealing; (2) Mainstream violated the Minnesota Franchise Act: (a) by terminating Defendants without the requisite statutory good cause, (b) by failing to provide the Defendants with the requisite statutory 90 days' notice of termination and 60 days to cure, and (c) by seeking to impose an unreasonable requirement on Defendants in violation of Minnesota Rule 2860.4400; and (3) Mainstream's post-termination non-compete provisions in the Franchise Agreements are overly broad because they extend far beyond the protection of Mainstream's legitimate interests and are, therefore, unenforceable on their face, as a matter of law.

In short, as explained in more detail below, the substance of Mainstream's entire case is based on a theory that is factually and legally incorrect. Specifically, Mainstream's Complaint is based on the <u>flawed premise</u> that the post-termination non-compete provisions are enforceable (which they are not), and that Defendants are bound by other post-termination obligations set forth in the Franchise Agreements (which they are not, because Mainstream committed prior material breaches and prior violations of the Minnesota Franchise Act).

Counts I through V of the Complaint all depend on this same flawed premise, and should be dismissed for this reason alone. Counts VI through VIII, as well as Counts I through V, have independent defects that require dismissal, so the Complaint should be dismissed in its entirety. And, because Mainstream's claims are based on an erroneous misunderstanding of the facts and interpretation of the contract which cannot be remedied through re-pleading, this case should be dismissed with prejudice.

## II.    Factual Background

Plaintiff is the franchisor of Mainstream Boutique®.  (Cmplt. ¶ 6).  Defendants Brad and Anitra Mitchell own Defendant All These Things, LLC and Defendant Love and Grace, LLC.  (Cmplt. ¶ 8, 10).  Defendant Charlotte Parris owns Defendant CCP, LLC.  (Cmplt. ¶ 12).

Mainstream and Defendant All These Things, LLC entered into a Franchise Agreement with an effective date of June 14, 2011, granting All These Things, LLC the right to operate a Mainstream Boutique® in Winston Salem, North Carolina.  (Cmplt. ¶ 23).  Mainstream and Defendants Anitra and Brad Mitchell entered into a Franchise Agreement with an effective date of January 16, 2015, granting them the right to operate a Mainstream Boutique® in Mooresville, North Carolina.  (Cmplt. ¶ 26).[2]

As part of its requirement as a franchisor under the Amended Federal Trade Commission Franchise Rule, 16 C.F.R. §§ 436.1–436.9, Mainstream provided Defendants All These Things, LLC, Brad and Anitra Mitchell, and Charlotte Parris with certain disclosures with respect to 23 different "Items" of information prior to the sale of their franchises.  The 23 Items were disclosed in what is referred to as a "Franchise Disclosure Document" or "FDD," which document is similar to a prospectus used in the sale of a security.

The applicable FDDs contained two identical Minnesota Addenda to the Franchise Agreements, as set forth at Exhibits F and G respectively of the applicable FDDs, which

---

[2] Collectively, the Winston Salem Franchise Agreement and the Mooresville Franchise Agreement are referred to as the "Franchise Agreements."

Addenda apply to "franchises sold in the State of Minnesota" and which incorporate the applicable provisions of the Minnesota Franchise Act into the Franchise Agreements thereunder "notwithstanding anything which may be contained in the body of the Franchise Agreement to the contrary."[3]  Because the franchises in dispute were "sold in the State of Minnesota," the Franchise Agreements were amended as follows:

> This Addendum will pertain to franchises sold in the State of Minnesota and will be for the purpose of complying with Minnesota statutes and regulations.  Notwithstanding anything which may be contained in the body of the Franchise Agreement to the contrary, the Agreement will be amended as follows:
>
> 1. Article 2 of this Agreement will be amended to provide that, except in certain circumstances specified by law, MAINSTREAM must provide FRANCHISEE with at least 180 days prior written notice of nonrenewal of the franchise;
>
> 2. Article 15.2 will be amended to require that, except as set forth in Article 15.4 and 15.5, in the event MAINSTREAM gives FRANCHISEE written notice that FRANCHISEE has breached this Agreement, such written notice will be given to FRANCHISEE at least 90 days prior to the date this Agreement is terminated by MAINSTREAM, and FRANCHISEE will have 60 days after having been given such written notice within which to correct the breach specified in the written notice; and
>
> 3. Notwithstanding any provision of this Agreement to the contrary, a court of competent jurisdiction will determine whether MAINSTREAM will be required to post a bond or other security, and the amount of such bond or other security, in any injunctive proceeding commenced by MAINSTREAM against FRANCHISEE or FRANCHISEE'S shareholders.

(*Id.*).

---

[3] Mainstream failed to attach to its Complaint complete copies of the Franchise Agreements, as Exhibits A and B to the Complaint fail to include the two Minnesota Addenda.  Therefore, Exhibits F and G to the FDDs are attached hereto as **<u>Exhibit A</u>**.

The Franchise Agreements contain a provision stating that North Carolina law governs because the Mitchell Defendants'[4] franchises were located in North Carolina and the Franchise Agreements provide that the parties' relationship will be governed by the state in which the franchises are located:

> Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. § 1051 et seq.), this Agreement and the relationship between MAINSTREAM and FRANCHISEE will be governed by the laws (statutory or otherwise) of the state in which the Retail Location is located . . . .

(Cmplt. Ex. A; § 20.10; Ex. B, § 20.10).

However, as is apparent from the "GP" coding on both of the Franchise Agreements at issue here, and the FDDs provided to the Mitchell Defendants in connection with their being asked to sign these two Franchise Agreements, all of these documents were prepared by Mainstream counsel's Gray Plant law firm. Accordingly, Mainstream's counsel and his law firm have long been aware of the fact that, since the origin of these two franchisor/franchisee relationships, the applicable state law to be applied in deciding all of the legal issues in this case, including the extent to which the post-termination non-competes are enforceable or not, is North Carolina law (*see, e.g.*, Section 20.10 of the two Franchise Agreements), <u>as augmented by the Minnesota Addenda to these two Franchise Agreements in Exhibit F and Exhibit G to the FDDs, which are mandatory Minnesota Addenda required for "franchises sold in the State of</u>

---

[4] Collectively, All These Things, LLC, Brad Mitchell, and Anitra Mitchell are hereinafter referred to as "the Mitchell Defendants."

Minnesota," as were these two franchises, which Addenda are part of the Franchise Agreements.

**—Mainstream's Purported Post-Termination Provisions**

The Franchise Agreements contain post-termination covenants not to compete, as follows:

> **POST-TERM COVENANT NOT TO COMPETE.** FRANCHISEE, FRANCHISEE'S owners and the Personal Guarantors will not, for a period of two years after the termination or expiration of this Agreement, on their own account or as an employee, independent contractor, agent, consultant, partner, officer, director or owner of any other person, firm, entity, partnership, limited liability company or corporation: (A) seek to employ or retain any employee or independent contractor who is at that time employed or retained by MAINSTREAM or by any other Mainstream Boutique franchisee, or induce any such employee or independent contractor to terminate his or her employment or relationship, (B) divert or attempt to divert any business, Protected Account or customers of the Business or of any other Mainstream Boutique business to any competing business; or (C) own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in **any business that is in any way competitive with (including, but not limited to, over the Internet) or similar to the Mainstream Boutique businesses** conducted by MAINSTREAM or MAINSTREAM'S franchisees, which is located (i) within a 25-mile radius of FRANCHISEE'S Retail location; (ii) within a 25-mile radius of any other Mainstream Boutique businesses operated by MAINSTREAM or any of MAINSTREAM'S franchisees pursuant to any franchise, development, license or other territorial agreement; or (iii) over the Internet. FRANCHISEE, FRANCHISEE'S owners and the Personal Guarantors expressly agree that the two-year period, the Internet and the geographical limits are [sic] reasonable and necessary to protect MAINSTREAM and MAINSTREAM'S franchisees if this Agreement expires or is terminated for any reason, and that this covenant not to compete is necessary to permit MAINSTREAM the opportunity to resell and/or develop a new Mainstream Boutique business at or in the area surrounding the Designated Radius.

(Cmplt. Ex. A, § 18.2; Ex. B, § 18.2) (emphasis added).

Likewise, Section 17 of the Franchise Agreements contains the Mitchell Defendants' purported obligations upon termination or expiration. (*See* Cmplt. Ex. A, § 17; Ex. B, § 17).

Section 12.5 of the Franchise Agreements provides Mainstream with certain purported audit rights, but only <u>during the term</u> of the Franchise Agreements as follows:

> **<u>MAINSTREAM'S AUDIT RIGHTS</u>**.  FRANCHISEE and its accountants will make all of their books, ledgers, work papers, accounts, bank statements, tax returns, sales tax returns, sales receipts and financial records pertaining to FRANCHISEE'S Business ('books and financial records') available to MAINSTREAM.  FRANCHISEE will allow MAINSTREAM or its authorized representatives to access FRANCHISEE'S Retail Location and Business office, without prior notice, during regular business hours or at all times to inspect, audit, photocopy, and videotape FRANCHISEE'S business operations and records, and to interview the Business' employees and current and prospective clients . . . FRANCHISEE'S failure or refusal to produre the books and financial records for audit by MAINSTREAM in accordance with this Article 12.5 will constitute a material breach of this Agreement and will be grounds for the immediate termination of this Agreement by MAINSTREAM.

(*See* Cmplt. Ex. A, § 12.5; Ex. B, § 12.5).

Accordingly, based on the plain language of Section 12.5 of the Franchise Agreements, Mainstream is only entitled to audit rights *<u>during the term</u>* of the Franchise Agreements.

The provisions noted above only come into play if there has not been a prior material breach by Mainstream. *See, e.g.*, *Ball v. Maynard*, 645 S.E.2d 890, 897 (N.C. Ct. App. 2007) ("It is well settled that where one party breaches a contract the other party is relieved from the obligation to perform.") (internal citations omitted). *See also Carotek, Inc. v. Textron Fastening Sys., Inc.*, No. CIV. 3:05395, 2008 WL 4567308, at *4

(W.D.N.C. Oct. 9, 2008) ("The general rule governing bilateral contracts requires that if either party to the contract commits a material breach of the contract, the other party should be excused from the obligation to perform further.") (internal citations omitted).

**—The Mitchell Defendants' Rights under the Franchise Agreements**

Section 16.2 of the Franchise Agreements provides:

> **16.1    DEFAULTS.**    MAINSTREAM will be in default under this Agreement if MAINSTREAM violates any material provision, term or condition of this Agreement.

(Cmplt. Ex. A, § 16.1; Ex. B, § 16.1).

The Mitchell Defendants had the right to terminate the Franchise Agreements upon Mainstream's default and failure to cure:

> **16.2   NOTICE OF BREACH.**   FRANCHISEE will not have the right to terminate this Agreement unless and until written notice setting forth the alleged breach has been given to MAINSTREAM by FRANCHISEE and MAINSTREAM fails to commence the actions necessary to correct the alleged breach within 30 days after having been given such written notice. If MAINSTREAM fails to commence the actions necessary to correct the alleged breach as provided herein within 30 days after having been given such written notice, then this Agreement may be terminated by FRANCHISEE as provided for in this Agreement.

(Cmplt. Ex. A, § 16.2; Ex. B, § 16.2).

**—Facts Leading up to the Dispute**

On September 19, 2019, Mainstream sent the Mitchell Defendants two letters (one for each franchise) directing them to migrate to the new POS System. (Cmplt. Ex. C). If they failed to install and operate Mainstream's mandated Springboard POS System by October 19, 2019, Mainstream stated that it would issue formal defaults under the terms of its Franchise Agreements. (*Id.*).

On September 27, 2019, the Mitchell Defendants emailed an eight-page response to Mainstream's September 19, 2019 letters. (Cmplt. Ex. D). The Mitchell Defendants set forth therein multiple reasons as to why Mainstream was not acting in good faith, or in a fair and nondiscriminatory fashion, in unreasonably exercising its discretion to demand that they replace their proven, capably performing POS System, under threat of termination, if they did not do so within 30 days. (*Id.*) In particular, the Mitchell Defendants explained that the new Springboard POS System is fraught with issues. (*Id.*) Namely, they would incur significant and unnecessary hardware and software costs; the new Springboard POS System was incompatible and incapable of syncing with their current leading accounting software; the new Springboard POS System would require additional staff to address the numerous additional steps needed to receive a product; and other Mainstream store owners had already cited poor service and response from Springboard. (*Id.*)

While Mainstream said the Mitchell Defendants would have until October 19, 2019 to "install and operate the new POS System" prior to putting the Mitchell Defendants in formal default under the terms of the Franchise Agreements (Cmplt. Ex. C), Mainstream jumped the gun when, on October 2, 2019, prior to the October 19, 2019 deadline given to the Mitchell Defendants, Mainstream prematurely issued two formal Notices of Default and Termination to the Mitchell Defendants with respect to their Winston Salem and Mooresville locations. (Cmplt. Ex. E). Mainstream contended that the Mitchell Defendants defaulted under the terms of the Franchise Agreements because they had not yet purchased and installed the mandated Springboard POS System. (*Id.*)

Mainstream relied on Section 15.2 of the Franchise Agreements and stated that the Mitchell Defendants had just 30 days to cure (*i.e.*, to November 1, 2019), at which point the Franchise Agreements would be deemed terminated. (*Id.*)

On October 3, 2019, the Mitchell Defendants responded to Mainstream's October 2, 2019 Notices of Default and Termination. (Cmplt. Ex. F). The Mitchell Defendants disputed Mainstream's purported right to terminate the Franchise Agreements and invoked their right under Section 16.2 of the Franchise Agreements to therein notify Mainstream of Mainstream's breaches of the Franchise Agreements and their right to terminate the Franchise Agreements unless Mainstream cured its breaches, including by withdrawing its notice of termination. (*Id.*)

On October 16, 2019, Mainstream's counsel sent the Mitchell Defendants a letter claiming that they had failed to specify how Mainstream breached the Franchise Agreements or how Mainstream might cure the alleged breaches. (Cmplt. Ex. G).

On November 1, 2019, the Mitchell Defendants notified Mainstream that Mainstream had no legal right to terminate the Franchise Agreements, and therein notified Mainstream that Mainstream's uncured breaches gave them the right to terminate the Franchise Agreements on or about the same November 1, 2019 date, which the Mitchell Defendants stated "we are now doing." (Cmplt. Ex. H).

On November 5, 2019, Mainstream sent counsel for the Mitchell Defendants a letter advising Defendants that the Franchise Agreements, effective immediately, had been terminated because they failed to cure the POS System default and had subsequently abandoned the franchises. (Cmplt. Ex. I).

*After* termination, on November 6, 2019, Mainstream sent the Mitchell Defendants two audit letters expressing a baseless concern that they "underreported their sales to Mainstream while operating their" franchised business in Winston Salem and Mooresville. (Cmplt. Ex. J). It is apparent that Mainstream attempted to use this baseless "concern" to force the Mitchell Defendants to surrender the books and records of their Winston Salem and Mooresville locations over to Mainstream for an audit—after the Franchise Agreements had already been lawfully terminated, which it had no right to do.

It is against this backdrop, that Defendants now move to dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### III.    Argument

A Rule 12(b)(6) motion to dismiss for failure to state a claim should be granted:

> If the complaint does not allege 'enough facts to state a claim to relief that is plausible on its face.' *Twombly*, 550 U.S. at 570. In other words, the factual allegations must 'be enough to raise a right to relief above the speculative level.' *Id.* at 555. 'Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.' *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (quoting *Twombly*, 550 U.S. at 570). As explained by the United States Supreme Court:

> A claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable interference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.E.2d 868 (2009) Internal quotations and citations omitted).

A Rule 12(b)(6) motion tests the sufficiency of a complaint and 'does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.' *Republican Party of N.C. v. Martin*, 980 F.2d 943, 951 (4th Cir. 1992). Accordingly, a court should 'assume the truth of all facts alleged in the complaint and the existence of any fact that can be proven, consistent with the complaint's allegations.' *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 176, 180 (4th Cir. 2000). Although the truth of the facts alleged is assumed, courts are not bound by the 'legal conclusions drawn from the facts' and 'need not accept as true unwarranted interferences, unreasonable conclusions, or arguments.' *Id.*

*Hall-El v. United States*, No. 1:11CV1037, 2013 WL 1346621, at *3 (M.D.N.C. Apr. 3, 2013), *report and recommendation adopted sub nom*, *El v. Pate*, No. 1:11CV1037, 2013 WL 5213428 (M.D.N.C. Sept. 16, 2013).

**A.    Count I should be dismissed because: (1) Mainstream committed prior material breaches of the Franchise Agreements and the implied covenant of good faith and fair dealing; (2) Mainstream violated the Minnesota Franchise Act; and (3) Mainstream's post-termination non-compete provisions in the Franchise Agreements are overbroad and are, therefore, unenforceable on their face as a matter of law.**

> **1.    <u>Mainstream committed prior material breaches of the Franchise Agreements and the implied covenant of good faith and fair dealing.</u>**

Mainstream's claim for breach of the Franchise Agreements and Guaranty, and failure to comply with the non-compete covenants, rests entirely on the <u>false premise</u> that Mainstream did not commit prior material breaches of the Franchise Agreements (which Mainstream did), that the Mitchell Defendants are bound by the post-termination covenants not to compete (which they are not), and that the post-termination covenants not to compete are enforceable (which they are not). *See Ball*, 645 S.E.2d at 897 ("It is well settled that where one party breaches a contract the other party is relieved from the obligation to perform.") (internal citations omitted). *See also Carotek, Inc.*, 2008 WL

12

4567308, at *4 ("The general rule governing bilateral contracts requires that if either party to the contract commits a material breach of the contract, the other party should be excused from the obligation to perform further.") (internal citations omitted).

Under North Carolina law,[5] in every contract there is an implied covenant of good faith and fair dealing. *See, e.g.*, *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 781 S.E.2d 889, 894 (N.C. Ct. App. 2016). The implied covenant of good faith and fair dealing is especially meaningful in long-term contracts, like franchise agreements, which grant the franchisor discretion to take vague and unspecified actions, including, but not limited to, changing a franchisee's obligations under a constantly evolving operations manual. Indeed, "[u]nder North Carolina law, where one party has sole discretion under a contract, it may use that discretion so long as it does not violate its implied duty of good faith and fair dealing." *Jiangmen Kinwai Furniture Decoration Co. Ltd. v. IHFC Props.*, LLC, 780 F. App'x 1 (4th Cir. 2019). *See also Cole v. Wells Fargo Bank, N.A.*, 2016 WL 737943, at *7 (W.D.N.C. Feb. 23, 2016) ("Courts have equated the covenant of good faith and fair dealing with an obligation to exercise . . . discretion reasonably and with proper motive . . . not . . . arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties."). Stated differently, "[w]here a contract confers on one party a discretionary power affecting the rights of the other, this discretion must be exercised in a reasonable manner based upon good faith and fair play." *Midulla v.*

---

[5] The Franchise Agreements are governed by North Carolina law because the franchises were located in North Carolina, and the Franchise Agreements provide that the parties' relationship will be governed by the state in which the franchises are located. (*See* Cmplt. Ex. A, § 20.10; Ex. B., § 20.10).

*Howard A. Cain Co.*, 515 S.E.2d 244, 246 (N.C. Ct. App. 1999) (internal quotations and citations omitted).

Mainstream breached the Franchise Agreements and the implied covenant of good faith and fair dealing in three primary ways.

First, Mainstream breached the Franchise Agreements by sending the Mitchell Defendants the October 2, 2019 Notice that they were to be terminated for failure to install an unwanted, and expensive, new POS System. (*See* Cmplt. Ex. E). Mandating the new POS System, under threat of termination, was unreasonable, and not a good faith or fair and non-discriminatory exercise of Mainstream's discretion under these circumstances, as, again, the Mitchell Defendants already had a capably performing POS System, and the new POS System was fraught with flaws (which the Mitchell Defendants relayed to Mainstream in their September 27, 2019 letter (Cmplt. Ex. D)). The Mitchell Defendants' refusal to purchase and install the new POS System did not provide Mainstream with the right to terminate the Franchise Agreements.

Second, Mainstream breached the Franchise Agreements by failing to withdraw its notice of wrongful termination, as specified by the Mitchell Defendants in their October 3, 2019 Notice pursuant to Article 16.2 of the two Franchise Agreements. (*See* Cmplt. Ex. F).

Third, Mainstream violated the terms of the Minnesota Addenda, which were incorporated by reference into the two Franchise Agreements, because it did not have the requisite good cause to terminate the Mitchell Defendants, nor did Mainstream provide the requisite notice and opportunity to cure under the Franchise Agreements as amended

by Mainstream's Minnesota Addenda, Exhibits F and G to the FDD (as required under the Minnesota Franchise Act).

To expand, as noted in more detail above, certain required provisions of the Minnesota Franchise Act, Minn. Stat. § 80C.01, *et seq.*, pertaining to sales made in the state of Minnesota were incorporated by reference into the Franchise Agreements in Exhibit F and Exhibit G to the FDDs, which were prepared by Mainstream's counsel, Gray Plant, and which were sent to the Mitchell Defendants prior to them entering into the Franchise Agreements (as required by the Minnesota Franchise Act and by the Federal Trade Commission).[6]

Mainstream breached the Franchise Agreements' required "cure period" (as amended by Exhibits F and G), which was 60 days, not 30 days, as Mainstream purported to claim in its October 2, 2019 Notice. Stated differently, the October 2, 2019 Notice of Default and Termination (Cmplt. Ex. E) was a violation of the Minnesota Franchise Act's applicable provisions, which Gray Plant attorneys had incorporated by reference into the two Franchise Agreements, with Addenda to the two FDDs, including the statutory requirements that Mainstream have the requisite good cause for these terminations, and provide the requisite 90 days' notice and 60 days' opportunity to cure. (Mainstream's express statutory breaches are explained more fully in Part A.2 below).

---

[6] *See* Minn. Stat. § 80C.19 ("The provisions of sections 80C.01 to 80C.22 concerning sales and offers to sell shall apply when a sale or offer to sell is made in this state; when an offer to purchase is made and accepted in this state; or when the franchise is to be located in this state."). While the choice of law provisions of the Franchise Agreements designated North Carolina law, the two Minnesota Addenda made clear that these provisions of the Minnesota Franchise Act would apply. Moreover, Mainstream, as a Minnesota based franchisor, created an offer to sell under the Minnesota Franchise Act under the broadly defined definition of "offer." *See* Minn. Stat. § 80C.01, Subd. 16 ("every attempt to offer to dispose of, and every solicitation of an offer to buy, a franchise or interest in a franchise for value.").

Moreover, as the Mitchell Defendants notified Mainstream by letter on October 3, 2019, Mainstream also failed to meet its contract-in-fact and contract-in-law obligations by, among other things: (1) failing to provide them with commercially reasonable training, as Mainstream is obligated to do by Article 8 of both the Franchise Agreements; (2) failing to have in place, and appropriately and timely upgrade, commercially reasonable assistance to timely meet the Mitchell Defendants' inventory needs, as required by Article 6; (3) failing to provide the Mitchell Defendants with commercially reasonable advertising and marketing programs that would generate a reasonable return on their mandatory advertising expenditures, as required by Article 5; (4) mandating that the Mitchell Defendants deal with suppliers specified by Mainstream, including its mandate, under threat of termination, that they abandon their existing POS System in favor of Mainstream's mandated Springboard POS System, in violation of Mainstream's obligations to them under Article 6; and (5) failing to provide the Mitchell Defendants with a comprehensive up-to-date manual and related direction sufficient to meet the changing demands and preferences of their current and prospective customers, including failing to adequately and affirmatively respond to the Mitchell Defendants' requests for how best to address their customers' evolving preference for shopping via e-commerce sites, like those maintained by its competitors, rather than in their stores, in violation of Article 6 of the Franchise Agreements.  (*See* Cmplt. Ex. F).

Accordingly, Mainstream's prior material breaches relieved the Mitchell Defendants from their obligation to perform under the Franchise Agreements.

"It is well settled that where one party breaches a contract the other party is relieved from the obligation to perform." *Ball*, 645 S.E.2d at 897 (internal citations omitted). *See also Carotek, Inc.*, 2008 WL 4567308, at \*4 ("The general rule governing bilateral contracts requires that if either party to the contract commits a material breach of the contract, the other party should be excused from the obligation to perform further.") (internal citations omitted).

As established above, Mainstream breached the Franchise Agreements and the implied covenant of good faith and fair dealing thereunder. Therefore, under well-established North Carolina contract law principles, the Mitchell Defendants were relieved of their duty to perform. Stated differently, given Mainstream's uncured prior material breaches of its two Franchise Agreements with the Mitchell Defendants, the Mitchell Defendants are no longer obligated to themselves abide by the terms of the previously terminated Franchise Agreements, including the post-termination non-competes.

For these reasons, Mainstream is unable to allege enough facts to state a claim to relief that is plausible on its face as a matter of law.

### 2. **Mainstream violated the Minnesota Franchise Act.**

The Minnesota Franchise Act, Minn. Stat. § 80C.01, *et seq.*, applies because the Mitchell Defendants' franchises were "sold in the State of Minnesota." (*See* **Exhibit A**). *See also* Minn. Stat. § 80C.19, Subd. 1 ("The provisions of sections 80C.01 to 80C.22 concerning sales and offers to sell shall apply when a sale or offer to sell is made in this state; when an offer to purchase is made and accepted in this state; or when the franchise is to be located in this state.").

Under the Minnesota Franchise Act, a "person"[7] is prohibited from terminating a franchise except for "good cause," which means "failure by the franchisee to substantially comply with the material and reasonable requirements imposed by the franchisor . . . ." Minn. Stat. § 80C.14, Subd. 3(b). Likewise, under Minnesota Rule 2860.4400, Subd. G, a franchisor commits an unfair and inequitable practice if the franchisor seeks to "impose on a franchisee any contract or rule, whether written or oral, any standard of conduct that is unreasonable." The imposition of an inadequate, unnecessary, and prohibitively expensive POS System can hardly be considered a material or *reasonable* requirement by a franchisor within the Minnesota Franchise Act and Minnesota Rule 2860.4400. **Therefore, Mainstream lacked the requisite good cause under the Minnesota Franchise Act to terminate the Mitchell Defendants' Franchise Agreements and accordingly violated the Minnesota Rule**.

Moreover, under Minn. Stat. § 80C.14, Subd. 3:

No person may terminate or cancel a franchise unless: (i) that person has given written notice setting forth all the reasons for the termination or cancellation at least 90 days in advance of termination or cancellation, and (ii) the receipt of the notice fails to correct the reasons stated for termination or cancellation in the notice within 60 days of receipt of the notice[.]

Stated differently, because the Mitchell Defendants' franchises were "sold in the State of Minnesota" (Minn. Stat. § 80C.19; Exhibit A) the Minnesota Franchise Act applies, and Article 15.2 of the Mitchell Defendants' Franchise Agreements was amended to comply with the Minnesota Franchise Act and required that Mainstream

---

[7] The Minnesota Franchise Act defines a "person" as "a natural person, corporation, partnership, trust, or other legal entity." Minn. Stat. § 80C.01, Subd. 12.

provide them with written notice that they breached the Agreement "at least 90 days prior to the date this Agreement is terminated" with 60 days to cure the alleged breach.

The Mitchell Defendants were not provided with notice "at least 90 days prior to the date" their Franchise Agreements were purportedly terminated by Mainstream, nor were they provided with the requisite 60 days to cure. Instead, Mainstream's two October 2, 2019 Notices of Default and Termination (Cmplt. Ex. E) failed to accurately cite or apply Article 15.2, as amended pursuant to Exhibits F and G to Mainstream's FDDs. Rather, the Mitchell Defendants were given only a "30 day" opportunity to cure such alleged defaults.

Because of Mainstream's violations, it is the Mitchell Defendants who are entitled to damages.

Accordingly, Mainstream did not have the requisite good cause to terminate the Mitchell Defendants, nor did Mainstream provide the requisite notice and opportunity to cure under the Minnesota Franchise Act and the Franchise Agreements as amended by Mainstream's Minnesota Addenda, Exhibits F and G to the FDD. As such, Mainstream's statutory and contractual violations negate any obligation by the Mitchell Defendants to comply with any post-termination obligations and entitles the Mitchell Defendants to a remedy under the Minnesota Franchise Act, including attorneys' fees and costs, and the recovery of all damages caused to them by Mainstream's violations of the Minnesota Franchise Act.

**3. Mainstream's post-termination non-compete provisions in the Franchise Agreements are overbroad because they extend far beyond the protection of Mainstream's legitimate interests and are, therefore, unenforceable on their face as a matter of law.**

Post-termination non-competes are overly broad and unenforceable on their face under North Carolina law.

Post-termination covenants not to compete are disfavored in the law, and will not be enforced if the "restriction is overbroad . . . or otherwise not reasonably necessary to protect the established interests of the plaintiff."[8]

A covenant not to compete in a franchise agreement is valid and enforceable under North Carolina law if the covenant is: "(1) reasonable as to the duration and geographic scope of the restriction and (2) the restriction is otherwise necessary to protect the legitimate interests of the franchisor." *Meineke Car Care Centers, LLC v. ASAR Inc.*, No. 3:14-CV-129-RJC, 2014 WL 3952491, at *5 (W.D.N.C. Aug. 13, 2014) (finding the non-compete reasonable as it only prohibited franchisee from being engaged in a competitive

---

[8] *See, e.g., Pirtek USA, LLC v. Wilcox*, No. 606CV566ORL31KRS, 2006 WL 1722346, at *1 (M.D. Fla. June 21, 2006), in which the request of Plaintiff's counsel for a post-termination preliminary injunction after the Pirtek franchisor acted to terminate the applicable franchise agreement was <u>denied</u>, for several reasons, including these two: (1) this franchisor's claim to own the customer list was rejected by the Court, since "the customers were those of the franchisee, not [the franchisor] [the franchisor's] customers are the franchisees themselves. If any substantial customer relationships were developed, they were developed by the franchisee;" (2) in applying the traditional four-part test for preliminary injunctive relief—*i.e.*, (i) a substantial likelihood of success on the merits; (ii) a substantial threat of irreparable injury if the injunction is not granted; (iii) the threat of injury to the plaintiff outweighs the harm an injunction may cause the defendant; and (iv) granting the injunction would [serve] the public interest—and in considering these four prerequisites, "courts should be mindful that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." The Court in that case found that there was not a substantial likelihood that the franchisor would prevail on the merits of the case, and that the alleged irreparable injury through a loss of goodwill to its existing franchise relationships was "at best, speculative," and noting that if indeed there was any harm in the former franchisee operating a competing business, "the harm would not be irreparable but compensable through money damages." Given the franchisor's findings in favor of the franchisee with respect to the first two prongs of the four-prong test for granting injunctive relief, the Court determined that it did not need to also address the remaining two factors, and concluded that the franchisor was not entitled to preliminary injunctive relief.

business, and nothing more).  "The reasonableness of a non-competition covenant is a matter of law for the court to decide."  *Id.*  (internal quotations and citations omitted).

The Mitchell Defendants do not dispute the time and territory restrictions of the non-compete provisions.  However, the non-competes are overbroad and unenforceable because they extend far beyond the protection of Mainstream's legitimate interests.  *See, e.g.*, *Window Gang Ventures, Corp. v. Salinas*, No. 18 CVS 107, 2019 WL 1471073, at *1 (N.C. Super. Apr. 2, 2019) (refusing to enforce a franchisor's non-compete because it precluded employment by "any business which is the same, similar to or competitive with [the franchisor].").

In an April 2, 2019 decision by the Superior Court of North Carolina, in *Window Gang Ventures, Corp. v. Salinas*, No. 18 CVS 107, 2019 WL 1471073, at *1 (N.C. Super. Apr. 2, 2019), applying North Carolina law, the court dismissed, with prejudice, the franchisor's effort to enforce a post-termination covenant not to compete after the franchise agreement in that case had expired.  Particularly applicable to this case, the North Carolina court noted that "[c]ovenants not to compete are 'disfavored' under North Carolina law."  *Id.* at *4.  The court went on to state that the franchisor, "as the party seeking to enforce the covenant, has the burden to prove the covenant's restrictions are reasonable," adding that "[t]he reasonableness of a non-competition agreement is a matter of law for the court."  *Id.*  The North Carolina court's granting of the motion to dismiss the claim as to the enforceability of a post-termination covenant not to compete addressed a clause that is extremely similar to the post-termination covenant not to compete in this

case. The language in question provided that, for a period of two years after the termination or expiration of the agreement, the franchisee did not then:

> Have any interest as an owner . . . partner, director, officer, employee, consultant, representative or agent, or in any other capacity, in any other business conducting residential or commercial cleaning services . . . or <u>any business which is the same, similar to or competitive with [the franchisor's business]</u> . . . within a radius of 50 miles of [their] Operating Territory.

*Id.* at *5 (emphasis added).

The North Carolina court in this case cited a North Carolina appellate case for its explanation that the North Carolina appellate courts have determined that non-competes in franchise agreements present hybrid situations in which courts should combine the elements used to evaluate non-competes for the sale of a business and those used to analyze non-competes in employment contracts, quoting the North Carolina appellate court's explanation as follows:

> <u>the ultimate issue which we must decide</u> in resolving such disputes among franchisors and franchisees <u>is the extent to which the non-competition provision contained in the franchise agreement is no more restrictive than is necessary to protect the legitimate interests of the franchisor</u>, with the relevant factors to be considered in the making of this determination to include . . . the extent to which the restriction is otherwise necessary to protect the legitimate interests of the franchisor.

*Id.* (internal citations omitted; emphasis added).

The North Carolina court considered this final factor to be considered as to whether this very similar post-term covenant not to compete should be enforced, concluding that "at this level of the analysis . . . [franchisor's] claim for breach of the Non-compete fails as a matter of law." *Id.* at *7. In support of this conclusion that the post-termination covenant not to compete needed to be dismissed, as a matter of law, the

court cited the *Outdoor Lighting* appellate case decided under North Carolina law, in relevant part as follows:

> we believe that the extent to which a particular contractual provision unreasonably impairs a former franchisee's ability to work in a related field or particular industry is relevant to the reasonableness of a non-competition restriction arising from the termination of a franchise agreement.

*Id.* (emphasis added).

Just as is the case here, the North Carolina court observed that the non-compete language in that case precluded the franchisees from working in any capacity for the following:

> any other business . . . which is the same, similar to or competitive with [the franchisor's business] and the [franchisor's franchise system] within a radius of 50 miles of [the] Operating Territory.

*Id.*

The North Carolina court concluded that, by the non-compete's own terms, the provision extends to businesses that are [the same] or "similar to" the franchisor's business and the franchisor's system, "not simply to those that are 'competitive' with [the franchisor's business]. <u>This feature alone makes the Non-compete overbroad and unenforceable</u>." *Id.* at *8 (emphasis added).

This same feature in Mainstream's post-term covenant not to compete language, prohibiting the Mitchell Defendants from being in "any business that is in any way competitive with (including, but not limited to, over the Internet) or similar to the Mainstream Boutique business" is most appropriately also deemed to be overbroad and unenforceable.

Finally, as the North Carolina court noted, no franchisor having sought to impose this type of overly broad restriction on its franchisees may ask any North Carolina court to "blue pencil" the non-compete to render it enforceable, as, under North Carolina law, the blue pencil rule "'severely limits what the court may do to alter the covenant.'" *Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920. As a general rule, '[t]he courts will not rewrite a contract if it is too broad but will simply not enforce it.' *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 529, 379 S.E.2d 824, 828 (1989); *see, e.g.*, *Beverage Sys.*, 368 N.C. at 699, 784 S.E.2d at 461 ('[W]hen an agreement not to compete is found to be unreasonable, we have held that the court is powerless unilaterally to amend the terms of the contract.')." *Id.* at *8. The same result, for these reasons, is most appropriate here.

Similarly, in *Outdoor Lighting Perspectives Franchising, Inc.*, the court rendered a post-termination covenant not to compete in an Outdoor Lighting Perspectives franchise agreement unenforceable that prohibited the franchisee from engaging in any business in competition with or any business similar to the franchised business.

Here, the non-compete provisions prohibit the Mitchell Defendants from, among other things, being "engaged in any business that is **in any way competitive with** (including, but not limited to, over the Internet) **or similar to** the Mainstream Boutique businesses conducted by MAINSTREAM or MAINSTREAM'S franchisees[.]" (*See* Cmplt. Ex. A, § 18.2; Ex. B, § 18.2) (emphasis added). As seen, the non-compete provision extends to businesses that are "similar to" the Mainstream Boutique businesses, not simply those that are merely "competitive with" the Mainstream Boutique businesses.

The Superior Court of North Carolina has already held that this feature alone makes the non-compete provisions overbroad and unenforceable. *See, e.g.*, *Window Gang Ventures, Corp.*, 2019 WL 1471073, at *8 ("Thus, by the Non-compete's own terms, the prohibition extends to businesses that are 'the same' or 'similar to' Window Gang and its system, not simply to those that are 'competitive' with Window Gang. **This feature alone makes the Non-compete overbroad and unenforceable**.") (emphasis added).

In light of all the foregoing, the non-compete provisions in the Franchise Agreements, under North Carolina law, are overbroad and unenforceable. Moreover, given the above breaches of Mainstream's legal duties noted in Part A.1, the Mitchell Defendants' purported post-termination non-compete obligations were no longer enforceable.

Mainstream's position here is unpersuasive and fundamentally flawed, it cannot be cured by any amendment, and the Court should therefore dismiss Mainstream's claims for breach of the Franchise Agreements and Guaranty and failure to comply with the non-compete with prejudice.

**B.      Count II should be dismissed because Mainstream's prior material breaches of the Franchise Agreements and violations of the Minnesota Franchise Act rendered the Mitchell Defendants' other post-termination obligations unenforceable.**

As noted in Part A.1 above, Mainstream committed prior material breaches of the Franchise Agreements and violated the Minnesota Franchise Act. Because of Mainstream's prior material breaches, the Mitchell Defendants were no longer obligated

to abide by the other post-termination obligations set forth in Sections 6 and 17 of the Franchise Agreements.

Moreover, Mainstream fails to cite to any specific purported post-termination obligation in the 24 subdivisions of Section 6 of the Franchise Agreements. The only mention of Section 6 of the Franchise Agreements in Mainstream's Complaint relates only to **<u>in-term obligations</u>**. *See, e.g.*, Cmplt. ¶ 37 (referring to the obligation in Section 6.6 to comply with standards and specifications during the term); Cmplt. ¶ 38 (referring to Section 6.22 of the Winston Salem Franchise Agreement and Section 6.21 of the Mooresville Franchise Agreement and the Mitchell Defendants' ability to obtain computer hardware and software, among other things, during the operations of the Mitchell Defendants' business); Cmplt. ¶ 39 (referring to the obligation in Section 6.7 to complete modernizations or replacements of equipment and other materials during the term); Cmplt. ¶ 40 (referring to the operation manual in Section 6.10 to be used during the term); Cmplt. ¶ 41 (referring to Section 6.24 and the Mitchell Defendants' obligations to control and manage the business during the term) (importantly, Mainstream misstates the obligations of Section 6.24 in its Complaint); Cmplt. ¶ 48 (vaguely referencing Sections 6 and 17 of the Franchise Agreements, but failing to distinguish any purported post-termination obligations pursuant to Sections 6 or 17 of the Franchise Agreements).

Accordingly, for the reasons stated in Part A.1 above, the Court should dismiss Mainstream's claims of breach of the Franchise Agreements and Guaranty and failure to comply with other post-termination obligations with prejudice.

**C.   Count III should be dismissed because Mainstream was no longer entitled to purchase any of the Mitchell Defendants' Business Assets after it committed prior material breaches of the Franchise Agreements and violated the Minnesota Franchise Act.**

As noted in Part A.1 above, because Mainstream committed prior material breaches of the Franchise Agreements and violated its duties under the Minnesota Franchise Act, Mainstream was no longer entitled to purchase any of the Mitchell Defendants' usable supplies, inventory, fixtures and equipment.

Moreover, Mainstream's Complaint conveniently overlooks the fact that, in the Mitchell Defendants' two November 1, 2019 letters of termination for its Winston Salem and Mooresville locations (attached to Plaintiff's Complaint as Exhibit H), the Mitchell Defendants advised Mainstream that, despite the disputed legal right of Mainstream to effect termination, if Mainstream wanted to purchase any of the Mitchell Defendants' Business Assets, including their current usable supplies, inventory, fixtures, equipment, or any other assets required by Mainstream to operate their Mainstream Boutique Business, Mainstream should let them know what they wanted to buy on or before the close of business on November 6, 2019.   In the event of such notice, the Mitchell Defendants offered to promptly then give to Mainstream what they believed to be the current fair market value price of any such Business Assets.   Mainstream never provided the Mitchell Defendants with any such notice of the particular Business Assets that Mainstream might have an interest in buying on or before November 6, 2019.

Accordingly, Mainstream cannot plausibly claim, as it has, that it has been damaged by the Mitchell Defendants' purported breach of their obligations to sell to

Mainstream all its usable Business Assets when the Mitchell Defendants did in fact do so. Mainstream's past decision to not purchase any of the Mitchell Defendants' Business Assets cannot now be asserted against the Mitchell Defendants under the thinly veiled disguise of Mainstream being "damaged."

For these reasons, the Court should dismiss Count III.

**D.     Count IV should be dismissed because Mainstream is not entitled to marketing fees due to its prior material breaches, and Mainstream's claim for damages is subject to arbitration.**

As noted in Part A.1 above, Mainstream committed prior material breaches of the Franchise Agreements and violated its duties under the Minnesota Franchise Act.  In relevant part to Count IV, Mainstream failed to provide the Defendants All These Things, LLC, Charlotte Parris, and Anitra Mitchell with commercially reasonable advertising and marketing programs that would generate a reasonable return on their mandatory advertising expenditures.  Accordingly, because Mainstream materially breached its obligations as it pertains to Marketing Fees, Mainstream is not entitled to any such Marketing Fees from Defendants All These Things, LLC, Charlotte Parris, and Anitra Mitchell.

Moreover, Count IV should be dismissed because such claims are subject to arbitration.  Section 19.1 of the Franchise Agreements provides:

> Except as expressly provided to the contrary in this Agreement, all disputes and controversies between MAINSTREAM and FRANCHISEE and their officers, directors and owners or partners and the Personal Guarantors, including allegations of fraud, misrepresentation or violation of any state or federal laws or regulations, arising under, as a result of, or in connection with this Agreement or FRANCHISEE'S Mainstream Boutique Business will be submitted to binding arbitration (the 'Arbitration') under the

> authority of the Federal Arbitration Act and will be arbitrated in accordance with the then-current Commercial Rules and Regulations of the American Arbitration Association (the 'Commercial Rules').

(*See* Cmplt. Ex. A, § 19.1; Ex. B, § 19.1). Because Count IV is a claim for damages and not subject to any "carve out" from the arbitration clause, it is subject to arbitration.

For these reasons, Count IV should be dismissed.

**E.     Count V should be dismissed because Mainstream is not entitled to future lost fees due to its prior material breaches of the Franchise Agreements and its damages claim is subject to arbitration.**

As noted in Part A.1 above, Mainstream's material breaches of the Franchise Agreements and violations of the Minnesota Franchise Act relieved the Mitchell Defendants from the obligation to perform. As such, Mainstream is not entitled to future lost royalty fees due to its own prior material breach.

Moreover, Mainstream incorrectly asserts that "Defendants caused the premature termination of the Franchise Agreements by, among other things, failing to install the required POS System and by abandoning their Mainstream Boutique Franchised Business." (Cmplt. ¶ 114). When, contrary to what Mainstream purports, it was Mainstream who committed prior material breaches of the Franchise Agreements by mandating that the Mitchell Defendants purchase and install a different type of POS System that was inadequate, unnecessary, and prohibitively expensive. (*See* Cmplt. Ex. D).

Additionally, Mainstream fails to provide any basis for its purported right to claim lost future fees, and, as such, fails to allege enough facts to state a claim to relief that is plausible on its face.

Mainstream's claims for damages in the amount of the remaining term of the Franchise Agreements is likewise too speculative to calculate. *See, e.g.*, *Days Inns Worldwide, Inc. v. Inv. Props. of Brooklyn Ctr.*, LLC, No. CIV. 10-609 MJD/JJK, 2011 WL 4538076, at *5 (D. Minn. Aug. 26, 2011), *report and recommendation adopted*, No. CIV. 10-609 MJD/JJK, 2011 WL 4537934 (D. Minn. Sept. 29, 2011) (refusing to award any amount of future damages to franchisor because there was no evidence that the franchisor could "estimate, with any reasonable degree of certainty," its lost future profit damages). Moreover, Mainstream's claims for damages is properly subject to arbitration.

For these reasons, the Court should dismiss Count V. (*See* Cmplt. Ex. A, § 19.1; Ex. B, § 19.1).

**F.     Count VI should be dismissed because Mainstream had no right to an audit pursuant to Section 12.5 of the Franchise Agreements after the Franchise Agreements had already been terminated.**

Aside from the primary breaches of the Franchise Agreements described in Part A.1 above, Mainstream's request to audit the books and records of the two Franchise Businesses was nothing more than retaliatory harassment for the Mitchell Defendants' bona fide business decision to end their relationships with Mainstream. Mainstream's requests for 13 categories of documents to be sent to Mainstream and its counsel (within one week) were overly broad, not commercially reasonable, and were not good faith discretionary audit requests. (*See* Cmplt. Ex. J). Upon information and belief, Mainstream has never made any similar requests to any current or former Mainstream Boutique franchisee. These actions violated the applicable contract-in-law principle of

good faith, fair and non-discriminatory dealing, even if the claimed audit rights in the two Franchise Agreements were still in effect, and enforceable, which they were not.

Because of Mainstream's prior material breaches of the Franchise Agreements noted in Part A.1 above and in the immediately preceding paragraph, Mainstream had no right to an audit pursuant to Section 12.5 of the Franchise Agreements after the Franchise Agreements had been terminated.

Additionally, based on the plain language of Section 12.5 of the Franchise Agreements, such audit rights are only available to Mainstream during the term of the Franchise Agreement. Even if it were true that Mainstream "terminated the Franchise Agreements on **November 5, 2019**" (Cmplt. ¶ 1; emphasis added), as Mainstream purports, that would render Mainstream's **November 6, 2019** demand for an audit null and void. (Cmplt. ¶ 68).

For these reasons, the Court should dismiss Count VI.

**G.    Count VII should be dismissed because Mainstream's civil conspiracy claim fails under North Carolina law.**

In Count VII, Mainstream purports to allege a civil conspiracy claim. Under North Carolina law, the elements of a civil conspiracy are: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Piraino Bros., LLC v. Atl. Fin. Grp., Inc.*, 712 S.E.2d 328, 333 (N.C. Ct. App. 2011) (internal quotations and citations omitted). It is well established under North Carolina law that "there is not a separate civil action for

civil conspiracy in North Carolina." *Dove v. Harvey*, 608 S.E.2d 798, 800 (N.C. Ct. App. 2005). Rather, "recovery must be on the basis of sufficiently alleged wrongful overt acts." *Id.* North Carolina courts have found that where a plaintiff's underlying tort claim fails, a plaintiff's claim for civil conspiracy must also fail. *See, e.g.*, *Strickland v. Hedrick*, 669 S.E.2d 61, 73 (N.C. Ct. App. 2008) ("It is well established that there is not a separate civil action for civil conspiracy in North Carolina . . . Plaintiff argues that civil conspiracy should attach to . . . plaintiff's claims for . . . [malicious prosecution.] As we have held that summary judgment for defendant on these claims was proper, plaintiff's claim for civil conspiracy must also fail.") (internal quotations and citation omitted).

First, Mainstream grossly mischaracterizes the facts. The Mitchell Defendants did not create a "pla[n], and implemented their conspiracy in secret to deprive Mainstream of financial benefits, deprive Mainstream of benefits of the Franchise Agreements, and deprive Mainstream of the opportunity to retain the customer goodwill developed under the Marks and Business System." (Cmplt. ¶ 129). There was no such "plan" or "conspiracy" to deprive Mainstream of anything. Instead, in an effort to mitigate the damages caused by Mainstream's wrongful termination, through a separately formed entity by Brad Mitchell and Anitra Mitchell, Grace and Love, LLC began operating a different type of upscale clothing boutique, with an emphasis on women's fashion and apparel, at the leased Winston Salem, North Carolina location. Likewise, through a separately formed legal entity by Charlotte Parris, CCP, LLC began to operate an upscale clothing boutique in Mooresville, North Carolina, at the leased location. The Mitchell Defendants had the right to do so, in order to mitigate the damage caused by

Mainstream's wrongful termination, and because the post-termination non-compete is unenforceable.

Second, Mainstream's Complaint states that the Mitchell Defendants "developed a plan and scheme to create Grace and Love, and CCP, for the specific purpose and intent of soliciting and diverting Mainstream's customers to 'Love + Well Boutique' and 'Bliss by the Lake' and evade the non-compete provisions in the Franchise Agreements." (Cmplt. ¶ 126). "A threshold requirement in any cause of action for damages caused by acts committed pursuant to a conspiracy must be a showing that a conspiracy in fact existed. The existence of a conspiracy requires proof of an agreement between two or more persons. Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement must be sufficient to create more than a suspicion or conjecture in order to justify submission to a jury." *Dove*, 608 S.E.2d at 801.

Mainstream's Complaint does not sufficiently allege the necessary evidence of an agreement. Instead, Mainstream merely alleges that the Mitchell Defendants "developed a plan and scheme" (Cmplt. ¶ 126) and "created, planned, and implemented their conspiracy." (Cmplt. ¶ 129). Moreover, if we construe this claim as alleging conspiracy to evade the non-compete provisions in the Franchise Agreements, it is still subject to dismissal because the Mitchell Defendants were no longer bound by the post-termination non-compete provisions in the Franchise Agreements based on Mainstream's prior material breach of the Franchise Agreements. Therefore, because Mainstream's claim for failure to abide by the non-compete fails, Mainstream's claim for civil conspiracy for

failure to abide by the non-compete also fails. *See, e.g.*, *Strickland v. Hedrick*, 669 S.E.2d 61, 73 (N.C. Ct. App. 2008) ("It is well established that there is not a separate civil action for civil conspiracy in North Carolina . . . Plaintiff argues that civil conspiracy should attach to . . . plaintiff's claims for . . . [malicious prosecution.] As we have held that summary judgment for defendant on these claims was proper, plaintiff's claim for civil conspiracy must also fall.") (internal quotations and citation omitted).

For these reasons, the Court should dismiss Count VII.

**H.   Count VIII should be dismissed because Mainstream's purported right to attorneys' fees fails as a matter of law.**

Sections 20.1 and 20.11 of the Franchise Agreements are unconscionable one-way fee shifting provisions, which only require the Mitchell Defendants to reimburse Mainstream for its attorneys' fees and costs if Mainstream prevails. Section 20.1 of the Franchise Agreements states in relevant part:

> In any action brought under this provision where MAINSTREAM prevails against FRANCHISEE, FRANCHISEE will indemnify MAINSTREAM for all costs that it incurs in any such proceedings including, without limitation, attorneys' fees actually incurred, expert witness fees, costs of investigation, court costs, travel and living expenses, and all other costs incurred by MAINSTREAM.

(Cmplt. Ex. A, p. 27, § 20.1; Ex. B, p. 27, § 20.1).

Section 20.11 of the Franchise Agreements states:

> FRANCHISEE will pay all costs and expenses, including attorneys' fees, deposition costs, expert witness fees, investigation costs, accounting fees, filing fees and travel expenses actually incurred by MAINSTREAM in enforcing any term, condition or provision of this Agreement or in seeking to enjoin any violation of this Agreement by FRANCHISEE.

(Cmplt. Ex. A, p. 28, § 20.11; Ex. B, p. 28, § 20.11).

As noted in Part A.1 above, Mainstream committed prior material breaches of the Franchise Agreements. As such, Mainstream is not now able to take advantage of the terms of its terminated Franchise Agreements that it materially breached.

Because Mainstream is not entitled to prevail on its claims, and because Mainstream is seeking to enforce an unenforceable non-compete obligation, this Court should dismiss Count VIII of Mainstream's Complaint.

### IV. Conclusion

For all the foregoing reasons, Plaintiff's Complaint should be dismissed.

**DADY & GARDNER, P.A.**

Dated: December 6, 2019  */s/ J. Michael Dady*
J. Michael Dady (MN #2062X)
Kristy L. Miamen (MN #0387135)
Rachel D. Zaiger (MN#0400594)
5100 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
PH: (612) 359-9000
jmdady@dadygardner.com
kmiamen@dadygardner.com
rzaiger@dadygardner.com

**ATTORNEYS FOR DEFENDANTS**