1    UNITED STATES DISTRICT COURT
     DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                        )
     Mainstream Fashions            )    File No. 19-cv-2953
4    Franchising, Inc.,             )              (SRN/TNL)
                                    )
5            Plaintiff,             )
                                    )    Saint Paul, Minnesota
6    vs.                            )    January 17, 2020
                                    )    1:30 p.m.
7    All These Things, LLC, et al,  )
                                    )
8                                   )
             Defendants.
9    ------------------------------------------------------------

10          BEFORE THE HONORABLE SUSAN RICHARD NELSON
               UNITED STATES DISTRICT COURT JUDGE
11                    **(MOTIONS HEARING)**

12   APPEARANCES
      For the Plaintiff:        LATHROP GPM, LLP
13                              CRAIG P. MILLER, ESQ.
                                80 South Eighth Street
14                              Suite 500
                                Minneapolis, Minnesota 55402
15
      For the Defendants:       DADY & GARDNER
16                              J. MICHAEL DADY, ESQ.
                                KRISTY LYNN MIAMEN, ESQ.
17                              RACHEL D. ZAIGER, ESQ.
                                80 South Eighth Street
18                              Suite 5100
                                Minneapolis, Minnesota 55402
19
      Court Reporter:           CARLA R. BEBAULT, RMR, CRR, FCRR
20                              316 North Robert Street
                                Suite 146 U.S. Courthouse
21                              Saint Paul, Minnesota 55101

22

23

24        Proceedings recorded by mechanical stenography;
     transcript produced by computer.

25

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  We are here today in the matter of Mainstream Fashions Franchising, Inc. versus All These Things, LLC, et al.  This is civil file number 19-2953.

Let's begin by having counsel note your appearances, please.

MR. MILLER:  Your Honor, Craig Miller on behalf of the plaintiff, Mainstream Fashions Franchising.  I have with me at counsel's table the CEO of Mainstream, Corey DeNicola.

THE COURT:  Very good.  Good afternoon.

MR. DADY:  Good afternoon, Your Honor.  My name is Michael Dady.  I have with me my partner Kristy Miamen and our colleague Rachel Zaiger.  And also appearing with us today are our two clients, Anitra and Brad Mitchell.

THE COURT:  Very good.  Welcome to everybody.

We are here to consider two motions, plaintiff's motion for preliminary injunction and defendants' motion to dismiss.  I always take motions in the order in which they are filed and so we'll begin with the plaintiff's motion for the preliminary injunction.  Mr. Miller.

MR. MILLER:  Thank you, Your Honor.

May I proceed, Your Honor?

THE COURT:  You may.

1           MR. MILLER:  Your Honor, this case is about two

2      former franchisees who operated Mainstream boutique

3      franchise businesses in Mooresville and Winston-Salem, North

4      Carolina for approximately eight years before they decided

5      they wanted to go out on their own and operate two competing

6      women's clothing and accessory businesses without -- to

7      avoid having to pay royalties to Mainstream.

8           After using Mainstream's trademarks, business

9      system, goodwill, confidential and proprietary materials,

10      and customers for eight years, they made the conscious

11      decision to abandon their franchises and now want to

12      misappropriate the goodwill associated with the Mainstream

13      trademarks, use Mainstream's confidential and proprietary

14      information, and use Mainstream's customers to operate those

15      competing businesses at the exact same location as their

16      former franchise businesses.

17           But, Your Honor, they simply cannot do that under

18      the terms of the noncompete and non-solicitation provisions

19      in the Franchise Agreement, as well as the other post-term

20      obligations.  I'm not going to reiterate for the Court

21      specific to what all those post-term obligations that are

22      specifically set out in the briefing.

23           THE COURT:  And you can assume I've read

24      everything.

25           MR. MILLER:  Understood, Your Honor.  I appreciate

1     that.  But I do want -- in the interest of time, I want to

2     try to focus on what I think are the salient points.

3          If we look at the *Dataphase* factors and we focus

4     on the most important one, which is the likelihood of

5     success on the merits, it's clear, Your Honor, that in this

6     instance we've met our burden of demonstrating that there's

7     a likelihood of success on the merits that the defendants

8     have breached the noncompete, the non-solicitation

9     provisions, as well as the other post-termination

10     obligations in the Franchise Agreement.

11          We have demonstrated through the briefing and the

12     declaration that we properly terminated the Franchise

13     Agreements because defendants abandoned their franchises and

14     they refused and failed to install the POS system that they

15     were required to install under the terms of the Franchise

16     Agreement.  So based upon that, we had the right to

17     terminate the Franchise Agreements and, in fact, did do

18     that.

19          Following the termination, as you know, Judge, the

20     defendants have an obligation to comply with the noncompete,

21     which in Article 18.2 says for a period of two years they

22     will not divert, or attempt to divert, any business or

23     customers of their business to a competing business.

24          And secondly, they agreed that for that same

25     two-year period they will not own, operate, lease, be

1   engaged in, or have any interest in any business that is in

2   any way competitive with or similar to the Mainstream

3   franchises that they owned and operated.

4            Here, the record reflects and demonstrates,

5   there's no dispute, that they in fact are operating women's

6   clothing and accessory businesses in their former

7   Mooresville location, as well as in the Winston-Salem

8   location.

9            THE COURT:  Talk to me a little bit about the

10   enforceability of that noncompete.  Help me with some North

11   Carolina case law that enforces such an expansive

12   noncompete.

13            MR. MILLER:  Your Honor, I don't think that it is

14   expansive.  I think that it's enforceable, first of all,

15   because we have some legitimate interests to protect, right?

16   And so we've listed and identified what those legitimate

17   interests are.

18            THE COURT:  That's always true.  The question is

19   whether it's overly expansive.

20            MR. MILLER:  I don't think it is, Your Honor.  I

21   think that we've cited several cases in our brief where the

22   courts have specifically looked at language that is similar

23   to the language in this situation which talks about similar

24   to and competitive with, and those courts enforced the

25   covenants that had the exact same language.  For example,

1       the *Baskin-Robbins* case, as well as the outdoor living --

2       excuse me, outdoor living case -- excuse me, *Outdoor*

3       *Lighting* case that we've cited in our briefs.

4               In both of those instances the Court found that

5       language that stated that any interest in any business which

6       is the same or similar to the store was and is enforceable.

7       So under the existing case law, we believe that the

8       noncompete is not overbroad.  If you look at the cases that

9       they cite in support of this, they are not applicable, Your

10      Honor.

11              Specifically if you look at the *Pirtek* case, you

12      know, that's a case that deals with Florida noncompete law.

13      It has no precedential value here.  The *Window Gang* case

14      that they cite, and that they rely heavily on, is a state

15      trial court opinion.  And in that instance the court

16      determined that the language in there was overly broad

17      because it prohibited the franchisees from working in any

18      business which "conducts residential or commercial cleaning

19      services."

20              That was too broad in that instance, Your Honor,

21      because the franchisee was only seeking to operate a

22      competing window cleaning business, which wasn't directly

23      necessarily directly competitive with the overbroad language

24      that was in that noncompete.

25              That's not the situation that we have here, Your

1    Honor.  We've got a situation where we are seeking to

2    prevent the defendants from operating a women's clothing and

3    accessories business, the exact same business that they

4    operated when they were franchisees of Mainstream.  It might

5    be overbroad if we were seeking to enforce -- stop them or

6    prevent them from operating a clothing store or just an

7    accessory store, but that's not the case in this instance.

8    We're seeking to prevent them from operating the exact same

9    business that they operated when they were Mainstream

10   franchisees.

11            THE COURT:  Well, they say it's not the exact same

12   business and you say, Well, it's women's clothing and

13   accessories; that's enough.  And, of course, women's

14   clothing and accessories, like any other business, is

15   targeted at various different populations, and it may be

16   competitive and it may not be.  Women's clothing and

17   accessories is a big umbrella, wouldn't you agree?

18            MR. MILLER:  I don't disagree with that, Your

19   Honor, but the evidence that we submitted in support of our

20   motion demonstrates that it's the same layout.  They are

21   using -- they are selling the exact same products that they

22   sold when they were Mainstream franchisees.  As a matter of

23   fact, the evidence demonstrates that they are selling the

24   Mac and Me brand, which is an exclusive brand to Mainstream.

25            THE COURT:  They deny that, right?  They deny

1    that.

2            MR. MILLER:  No, they don't deny that.  What they

3    say is, Well, that was a mistake.  We -- you're correct --

4            THE COURT:  One time thing on the shelf.  They

5    took it off when they saw it.

6            MR. MILLER:  That's what they say, Your Honor,

7    correct.  And, you know, that could be true, it might not be

8    true.  But the fact of the matter is that demonstrates that

9    they are selling the exact same type of clothing and

10   accessories that they sold when they were Mainstream

11   franchisees.  They don't dispute that.  I think what they

12   say is that if you look at the inside of the store, there's

13   a different feel and vibe to it.  But they don't dispute

14   that they sell the same type of products and the same type

15   of accessories that they sold when they were Mainstream

16   franchises.

17           I would also note, Your Honor, that even if the

18   Court believes that -- or is uncomfortable with the language

19   of competitive with or similar to, whatever makes the Court

20   uncomfortable, it's clear under North Carolina law that this

21   Court has the right to blue pencil.  So I think, for

22   example, in the *Window Gang* case, a case that they rely

23   heavily on, if the franchisor in that instance had requested

24   that the court blue pencil the similar to language, that

25   case would have had a completely different outcome.

1          But if you read the case, it states that the

2     only -- that they were focusing on other language.  They

3     weren't focusing on the similar to language.

4          So in this instance, to the extent that the Court

5     feels it might be overbroad, it has the ability to simply

6     strike the similar to language and just use the competitive

7     with language; and that language specifically would prevent

8     the franchise -- the former franchisees from operating their

9     women's clothing and accessories business.

10          Does the Court have any questions at all about the

11     legitimate business interests that the -- that have been set

12     forth in the -- our moving papers?

13          THE COURT:  No, hum-um.

14          MR. MILLER:  Okay.  And I think, Your Honor, just

15     moving to the other -- so we think that we've satisfied the

16     three elements of an enforceable noncompete.  Establishing

17     legitimate business interests, demonstrating that it doesn't

18     violate the public interest, and also demonstrating that

19     it's not -- it's not unreasonable as to scope and

20     geographic -- geographic and time location.

21          But if we look at the other post-term obligations,

22     we've also demonstrated a likelihood of success with respect

23     to those.  I mean, it's clear that they have not provided us

24     with the customer list, which is an obligation under the

25     terms of the Franchise Agreement.

1          They say because we had momentary access to the

2     Constant Contact account that we had access to their

3     customer information.  That's only true for -- in a small

4     part and parcel, Your Honor, because that -- that Constant

5     Contact account doesn't include all of the customers that

6     they have.  And in any event, even if we had momentary

7     access to it, the reality of this is that they were supposed

8     to physically give us a customer list with all the contact

9     information and they failed to do that.

10         They also admit that they have not assigned over

11    the telephone numbers, the directory listings, and the

12    e-mail accounts.  They say that they are no longer using the

13    telephone numbers and that should be enough, but the fact of

14    the matter is they've got an obligation to assign those.

15    And absent them being involved in the assignment process, we

16    can't get access to that; and so they are basically holding

17    those telephone numbers hostage from us.

18         Similarly, with respect to the business assets,

19    they have an obligation to identify for us what business

20    assets they have that they used in their former franchise

21    business.  They have failed to give that to us.  They say

22    that they've satisfied that obligation because they've said,

23    Well, hey, if you want anything, let us know what you want.

24    Well, we don't know what we want unless they tell us what

25    they have.  They haven't done that, and presumably they

haven't done that, Your Honor, because they are using those

fixtures and equipment and inventory and accessories in

their competing business, which again would demonstrate that

this women's clothing and accessory business is the same

type of business that they operated as former franchisees.

Your Honor, I think we've set forth all of the

information necessary for the Court to determine whether or

not we've satisfied the *Dataphase* factors.  I do, instead of

focusing on those other *Dataphase* factors, unless the Court

wants me to, I just want to focus on two broad-reaching

arguments that the defendant makes in responding to our

motion.

THE COURT:  Well, you should also focus on

irreparable harm.

MR. MILLER:  Okay.  If we look at the irreparable

harm, Your Honor, there's numerous harm that's being

sustained as a result of the operation of their competing

business.  Number one, first and foremost, is the harm to

the goodwill.  If the injunction is not granted, the

goodwill is harmed because defendants are allowed to compete

unfairly with Mainstream and divert customers to that

competing business which obviously causes incalculable and

continuing loss of customers and goodwill, which is an

immediate harm to Mainstream.

Denying the injunctive relief would also harm

1    Mainstream because it's going to make it virtually

2    impossible for Mainstream to re-franchise that territory or

3    put another franchisee in there.  A franchisee is going to

4    be reluctant to open up a business there, a Mainstream

5    business, knowing that right across the street or right

6    around the corner is a former Mainstream franchisee who has

7    inside knowledge of Mainstream's business methods and is

8    going to use that to compete against the Mainstream

9    franchisee that's taking over that territory, not to mention

10    that they are taking advantage of the customers who have

11    been built up in that area using the Mainstream marks and

12    trademarks.

13          Mainstream is also going to suffer irreparable

14    harm if the noncompete is not enforced because if the

15    Mitchells, the defendants in this case, are allowed to avoid

16    their noncompete, I guarantee you there's going to be other

17    franchisees getting in line saying, Hey, why don't we do the

18    same thing.  Let's abandon our franchise.  Let's open up a

19    competing business so we don't have to pay Mainstream any

20    royalties.  If that happens, then the system as we know it

21    is going to unravel and is no longer going to be in

22    business, which again under established case law is

23    irreparable harm.

24          There's also irreparable harm to the sense that

25    there's customer confusion caused by the former franchisee

1    operating that same type of business.  A customer walks in,

2    they see the Mac and Me brand, which is known only for the

3    Mainstream business, they are going to wonder, Well, is this

4    business the same as the Mainstream business that used to be

5    here?  That creates customer confusion.

6           We've already also seen the customer confusion

7    because customers who have store credits with their old

8    franchise stores are calling Mainstream and calling

9    neighboring franchisees wondering how that customer credit

10   is going to be dealt with.  That creates a problem for

11   Mainstream for its name and for the franchisees in its area.

12   It doesn't look good for goodwill.

13          It also, you know, it harms our relationships with

14   our franchisees because if we're -- if we don't take action

15   on this and enforce the noncompete, then the franchisees in

16   that neighboring area, which in this case would be

17   Kernersville and Charlotte, which are only I think 15 and 30

18   miles respectively away from the former businesses, they are

19   forced to compete with that franchisee, which impacts their

20   business relationship, which ultimately impacts our

21   relationships with our franchisees.

22          So all of these harms are irreparable.  Under

23   existing case law, each of this harm is a basis or reason

24   for enforcing the noncompetes, and the existing case law

25   also demonstrates that each of the harms that I just

1  outlined are incalculable and there's no way that they can

2  be satisfied through monetary damages.

3  I would note that the one case that they kind of

4  cite inapposite to our harm argument is the *In Re: Shelly's*

5  case, but that case didn't involve a franchisee that was

6  actually operating a competing business.  That case involved

7  a situation where a franchisee was thinking about going on

8  its own and thinking about operating a franchise -- or

9  excuse me -- a competing business against its former

10  franchise, but never exactly took the step to do that.  And

11  so in that instance, that probably led the court to

12  determine that there was no potential harm to the

13  franchisor's goodwill and they could be compensated with

14  monetary damages.  But that's not the case we have here,

15  Your Honor.

16  And I think the harm that I've just outlined

17  outweighs the harm to the defendants.  I mean, the case law

18  is clear, Your Honor, and they have stated it time and time

19  again in the context of a motion for preliminary injunction,

20  if the harm to the defendants or the franchisees is

21  self-inflicted, then that harm is outweighed by the harm

22  that's sustained by the franchisor.  Here, the defendants

23  made the conscious decision to walk away and abandon their

24  former franchises.  They made the decision to go out on

25  their own knowing that there was a noncompete in place and

1       knowing that there was post-termination obligations to

2       prevent them from what they are trying to do now.

3               In a situation like that, Your Honor, the courts

4       have made it clear that that's self-inflicted harm and

5       that's not gonna outweigh the harm to the franchisor, in

6       this instance Mainstream.

7               I also want to talk again about just the two

8       overreaching arguments that the defendants have made.  One

9       is that because Mainstream allegedly breached the Franchise

10      Agreement before it was terminated, that somehow invalidates

11      or releases the post-term obligations that they have.  That

12      is not the law, Your Honor.

13              In this instance it's clear under the case law

14      that if we have an independent basis to terminate the

15      franchise relationship, which we did, and we've demonstrated

16      that we had the basis to terminate for failure to install

17      the POS system and their abandonment of the franchise, in

18      that situation when we have the basis to terminate, they've

19      got an obligation to comply with the post-termination

20      obligations.

21              It makes no difference if before that termination

22      took place there are breaches that are being alleged against

23      Mainstream.  Their remedy in that situation is to simply

24      sue, in a counterclaim fashion, Mainstream for monetary

25      damages.  They do not have the right to avoid or ignore,

1    invalidate their post-termination obligations, which is the

2    argument that they are trying to make in this situation.

3           They rely on -- and I think it's also important to

4    point out that the language of the post-term obligations, as

5    well as the noncompete, specifically states that the

6    post-termination obligations must be complied with no matter

7    how or why the Franchise Agreement is terminated.  And so

8    even if they -- even if they are going to contest or argue

9    that we didn't have a basis to terminate, the fact of the

10   matter is they state in their briefs and in the letters that

11   they sent on November 1st that they were terminating the

12   Franchise Agreement.

13          So regardless of who terminated, the fact of the

14   matter is that they are terminated; and because they are

15   terminated, they have an obligation to comply with their

16   post-termination obligations.  They have not cited any case

17   law that suggests that a breach of a Franchise Agreement or

18   breach of the implied covenant of good faith and fair

19   dealing allows them or releases them from their obligations

20   under the post-termination obligations in a situation like

21   this where the Franchise Agreement was actually terminated.

22          The other and final point that I wanted to focus

23   on is their MFA argument, Your Honor.  I have been doing

24   this for 23 years and I don't think I have ever seen an

25   argument where more of a stretch was made.  They are trying

1     to suggest that the MFA applies here and that that somehow

2     would bar enforcement of the noncompete.

3           Your Honor, the MFA doesn't apply for several

4     reasons.  First of all, the addenda that they refer to,

5     which was simply a form addenda that was included in the

6     FDD, was never incorporated or intended to be an

7     incorporated into the Franchise Agreement.  It's merely a

8     form document, just like the other form documents from the

9     other 12 or 13 registration states that have form addendas

10    tied to the FDD.  That simply because they are including it

11    in the FDD doesn't mean that they're automatically

12    incorporated into the Franchise Agreement.  That addenda

13    would only be incorporated to it if it was initialed by the

14    parties and physically incorporated into the Franchise

15    Agreement, which it wasn't.

16          It wasn't because, as we state in the declaration

17    from Mr. DeNicola, the parties never intended for it to be

18    included.  And tellingly, there's no statement from the

19    defendants themselves stating that that was intended to be

20    included in there.  And it wasn't intended to be included in

21    there, Your Honor, because there's a waiver provision in the

22    Franchise Agreements that specifically say that the parties

23    waive application of the MFA.

24          THE COURT:  But isn't it true that if there were

25    not a waiver provision, or the waiver provision was not

knowingly and voluntarily made, that the Minnesota Franchise

Act benefits would accrue to these folks?  In other words,

it doesn't need to be incorporated in the Franchise

Agreement.  The law says that it applies to Minnesota

franchisors unless there is a knowing and voluntary waiver.

Some law suggests that there can't be a knowing and

voluntary waiver.  That's another issue.

But you're suggesting that a Minnesota franchisor

can actually issue a franchise from Minnesota where the

Minnesota Franchise Act doesn't apply?

MR. MILLER:  Correct, Your Honor.

THE COURT:  And tell me how you -- why you --

MR. MILLER:  For two reasons.  One, the waiver

argument, right?

THE COURT:  Take the waiver off the table.  The

question is whether it has to be incorporated into the

document itself.  I don't believe it does.  It's the

application of the law to the Franchise Agreement.

MR. MILLER:  Well, I know you want me to ignore

the waiver provision so I will.

THE COURT:  Yes.

MR. MILLER:  But that's out there.  The other

issue is under existing case law, it's clear that the MFA

does not apply to franchisees that are located outside the

State of Minnesota.  If the franchisee operates his business

1    and is located in another state, like in this instance North

2    Carolina --

3                    THE COURT:  Even if the franchise is issued in

4    Minnesota by a Minnesota franchisor?

5                    MR. MILLER:  Correct.

6                    THE COURT:  That's not how I read the law.

7                    MR. MILLER:  Well, Your Honor, we've cited the

8    case law in our brief that supports that.

9                    THE COURT:  Well, the case law you've cited

10   suggests that the waiver in a couple of cases may be

11   effective for an out-of-state franchise.

12                   MR. MILLER:  Correct, that's the *Hockey*

13   *Enterprises* case, Your Honor.  But I also point the Court to

14   the *Johnson Brothers Liquor Company* case, as well as the

15   *Wave Forms Systems* case, both instances where the Court

16   said:  "Where a franchisor to a Franchise Agreement is a

17   Minnesota corporation, the agreement is not within the

18   purview of the MFA if the franchisee is not located in and

19   does not operate in Minnesota."

20                   THE COURT:  And your position is the Minnesota

21   Franchise Act only applies where you have a Minnesota

22   franchisor and Minnesota franchisee, period.  Never applies

23   outside the state boundaries?

24                   MR. MILLER:  Correct, Your Honor.

25                   THE COURT:  Okay.

1            MR. MILLER:  That's what the case law holds.  And

2       I encourage the Court to take a look at those two cases that

3       I just cited.

4            But, Your Honor, even assuming -- let's assume

5       that the MFA does apply.  That doesn't change anything.

6       Because the fact of the matter is under the MFA, a

7       franchisor has the right to immediately terminate a

8       Franchise Agreement if the franchisee abandons that

9       franchise store.

10           THE COURT:  But of course here there's a fact

11      question about whether this was abandonment or not.  They

12      take a different position.

13           MR. MILLER:  They do, Your Honor.

14           THE COURT:  Yeah.

15           MR. MILLER:  But I think if the Court is going to

16      weigh the facts of this case -- and I'm not surprised that

17      they are going to take that position -- but if the Court is

18      going to weigh the facts, I think it can clearly determine

19      that there's a substantial likelihood of success that they

20      did properly terminate for abandonment.

21           If you look at the letters that are in play here,

22      on October 2nd we sent out our notice of default for failure

23      to install the POS system.  The next day they send a letter

24      to us and say, Wait a minute, you can't force us to install

25      that.  That's unreasonable.  And, Oh, by the way, you're in

1    breach and, you know, we've got the right to terminate the

2    Franchise Agreement.

3         Then on November 1st they send another letter

4    stating that we are terminating the Franchise Agreement

5    effective immediately, and we're ceasing operations.  We're

6    removing our signs.  We're sending the manuals back, et

7    cetera, et cetera.  I don't know how anybody could look at

8    that set of facts and not determine that they had ceased

9    operating and therefore abandoned their franchise.

10        So as a result of that, four days later on

11   November 5th, we sent a notice of termination stating, Hey,

12   we're terminating your franchise rights because, one, you

13   failed to install the POS system that you were required to

14   install; and you didn't cure the default within 30 days.

15   And also, based upon your November 1st letter, you have

16   clearly abandoned your franchise so we're terminating those

17   Franchise Agreements.

18        Under that factual scenario, Your Honor, I would

19   have a hard time understanding how somebody could determine

20   that abandonment hasn't taken place.

21        The last thing, Your Honor, that I wanted to

22   address, unless the Court has additional questions for me,

23   is just the bond issue.  You know, the defendants claim that

24   if we're successful on our motion, that we should be

25   obligated to post a bond in the amount of $350,000 which

1      they claim is the damages that they would sustain if they

2      were forced to shut down their competing businesses.

3              I should note that this Court has broad discretion

4      in determining whether or not a bond should be issued and

5      what the bond amount can be.  The Court also has discretion

6      to say that we're not going to enforce the bonding

7      requirements at all under Rule 65(c).

8              In this instance I think no bond is warranted for

9      a couple of reasons:

10             Number one, there's a bond waiver provision in the

11     Franchise Agreements.  Under Article 20.1 the parties agreed

12     that Mainstream is entitled to injunctive relief without the

13     posting of a bond.  So that weighs in favor of not requiring

14     the posting of such a bond.

15             In addition, Mainstream's been around for 30

16     years.  This company is not going anywhere, Your Honor.

17     It's a strong, vibrant company.  And so to the extent that

18     there's a concern that there's not going to be any money if

19     it's somehow later determined that the injunction was

20     granted improperly, that's not a concern because it's a

21     solvent and financially strong argument or strong company.

22             And lastly, Your Honor, I think when determining

23     whether or not bond needs to be posted, the Court can look

24     at the facts of the case and determine, Hey, not only is

25     there strong likelihood of success on the merits for this

1    preliminary injunction, but looking down the line, the facts

2    as we know them, it's pretty clear that Mainstream's going

3    to be entitled to a permanent injunction.  And so in that

4    instance there's not likely to be any damages for the

5    defendants which is going to warrant the posting of a bond.

6          So with that being said, Your Honor, we ask that

7    the Court enter an order consistent with the proposed order

8    that was submitted on file with this Court.

9          THE COURT:  Thank you, Mr. Miller.

10          Mr. Dady.

11          MR. DADY:  Thank you, Your Honor.  We have a

12    PowerPoint to share.  We've got handouts for the counsel and

13    the Court.

14          We're not going to use all those slides, Judge,

15    but we have them for backup in case you have questions.  We

16    just want to zero in on a few.

17          THE COURT:  All right.  Thank you.

18          MR. DADY:  But given kind of the last topic

19    addressed, I'd like to address that first and that is the

20    applicability of the Minnesota Franchise Act, and Mr. Miller

21    wants to talk about being around a long time.  I have been

22    around about as long as the Minnesota Franchise Act

23    practicing franchise law, Judge, and he's just plain wrong.

24    We don't need to look at an oddball case or two to decide

25    whether this Minnesota Franchise Act applies to out-of-state

1    franchisees or not because the statute is crystal clear.

2          Minnesota Statute 80C.19 subdivision (1) says that

3    applicable sales and offers to sell or purchase, is it

4    limited to Minnesota residents?  No.  The provisions of

5    Section 80C.01 to 80C.22 concerning sales and offers to sell

6    shall apply when a sale or offer to sell is made in the

7    state.  It's undisputed that's what happened here.  When an

8    offer to purchase is made and accepted in this state, or

9    when the franchisee is to be located in the state.  It

10   doesn't have to be, but if it is, it applies.

11         Similarly, subdivision (2) says the same thing and

12   it clearly applies outside the state for the purposes of

13   Section 80C.01 to 22.  An offer to sell or to purchase is

14   made in the state whether or not party is then present in

15   this state, when the offer originates from the state, as it

16   did, or is directed by the offer to this state and received

17   by the offeree in the state.  So the statute clearly applies

18   by the plain language of the statute.

19         There's been some revisionist history going on

20   here in the statement of facts by Mainstream counsel and so

21   the first thing we did, anticipating that, is to prepare a

22   timeline, and that's our first PowerPoint, Judge, and I do

23   want to breeze through that, but to make it clear what the

24   facts are and aren't.  And every one of these PowerPoint

25   presentations in the handout has got a cite to the record

1    that shows the statement.

2           And for starters, Anitra Mitchell has significant

3    experience in the clothing business before she ever

4    considered and became a Mainstream franchisee.

5           On June 2 of 2011, the Winston-Salem Franchise

6    Agreement was signed by an entity owned by Anitra Mitchell

7    and her mother Charlotte Parris, and the business was

8    operated out of the basement of Anitra's home.  It wasn't

9    until August 1 of 2012, on page 3, that the Winston-Salem

10   bricks and mortar location was opened by the mother-daughter

11   entity.

12          There was one visit, and one visit only, about two

13   years later by executives from Mainstream.  That first and

14   only visit was by Marie DeNicola, Corey DeNicola's mother

15   and the founder of the company, in 2014, her one and only

16   visit, and she never did visit the other location.

17          October of '14 there was some scurrilous

18   suggestion that there was some transfer made to try and

19   hoodwink Mainstream in some way that's poppycock.  The

20   conveyance occurred in September of '14.  Charlotte Parris

21   conveyed her 50 percent interest in the entity to her

22   son-in-law for two reasons.  She couldn't keep up because of

23   her own illness and she was dealing with the ultimate death

24   of her husband.  And secondly, in those circumstances she

25   wanted to make sure the business didn't fail, so she

1    transferred her interest to her son-in-law.

2        January 16 of 2015, the Mooresville Franchise

3    Agreement was signed by Brad and Anitra Mitchell.  June 1 of

4    15, the bricks and mortar location was opened there, and the

5    leases at those two locations continue so it's not

6    surprising their clients, in an effort to mitigate their

7    damages, are operating their independent stores at the same

8    lease locations.  The leases continue.

9        THE COURT:  I know everyone feels a little

10    pressure with time and the snow is challenging all of us,

11    but for the sake of the court reporter, Mr. Dady, just a

12    little bit slower, okay?  Thank you.

13        MR. DADY:  Not the first time I have been told

14    that by a court reporter.  In fact, one of them said I have

15    the record for the most pages in two hours, and when she was

16    very young she was kind of proud of that.  She's not so

17    proud of it now as she's gotten more experience.  I'll slow

18    down.  Thanks for the reminder.

19        So June 1 of '15 the bricks and mortar location in

20    Mooresville opens.  There was one corporate visit to that

21    store July 27 of '17.  The son, Corey DeNicola, did a visit.

22    One visit, one visit only, to Winston-Salem.  Never did

23    visit the Mooresville location.

24        This is an important slide here, Judge.

25    Pre-termination by Mainstream.

1          This new POS system was under a lot of discussion,

2     getting a lot of pushback from franchisees.  Anitra is one

3     of the most highly-regarded franchisees right now and was

4     consulted in a telephone call by the son Corey DeNicola just

5     before Labor Day.  Corey DeNicola calls Anitra and says,

6     What do you think I should do with respect to our proposed

7     Springboard POS system?  And Anitra replied, Mainstream

8     should either terminate that contract, let people use the

9     good systems that they have that are working like ours; or,

10    if they are going to leave it in place, they should allow

11    any franchisee who desires to sign up for this new POS

12    system to go ahead and do it, but they shouldn't make it

13    mandatory under threat of termination.

14          Corey responded, I'll think about it over Labor

15    Day.  He did.  A few days after Labor Day he called and said

16    to Anitra, We're going to move forward as planned mandating

17    the new system and termination if you don't.

18          Indeed, a few days later, September 19 of 2019,

19    Mainstream directed the Mitchell defendants to migrate to

20    the new POS system and said, If you don't, we're going to

21    default and terminate you.

22          And indeed, September 27 of '19, concerned about

23    that, the Mitchells responded with a very lengthy e-mail.

24    It's Exhibit D to the complaint setting forth the reasons

25    why they had a good system.  This new system hasn't been

1   properly tested.  There's been no demonstration that there

2   will be any positive return on investment from the big

3   investment that's required, and so you really shouldn't be

4   mandating it under threat of termination.  That's Exhibit D

5   to their complaint.

6           October 2, Mainstream issued two formal notices

7   not just of default but also of termination.  If you don't

8   purchase and have this new system up and running within 30

9   days, you are -- we're hereby notifying you that you will be

10  terminated as a franchisee effective November 1 of 2019.

11  That's what occurred.  That's the termination by Mainstream.

12  There was no abandonment.  They terminated our client

13  effective November 1.

14          We contend they didn't have the lawful right to do

15  that.  So we immediately -- our clients wrote back and

16  disputed that right to terminate saying it's not

17  commercially reasonable for the reasons we've explained.

18  You aren't giving us other alternatives.  And if you

19  don't -- we're calling on you now to invoke our rights under

20  Section 16.2.  It's one of the only franchisee-friendly

21  paragraphs in the Franchise Agreement.  There's a couple of

22  them, but that one says if we're not doing the job as your

23  franchisor, you can give us 30 days' notice; and if we don't

24  start to cure that deficiency, you have the right to end the

25  relationship in 30 days.  So that notice was sent and it's

1    Exhibit F to the complaint.

2            The requested cure did not happen.  It wasn't

3    started.  In fact, they said, No, we're going to go forward

4    and terminate, as we said, on November 1.

5            On to November 1.  That's the date that they had

6    been advised by the franchisor they were terminated, and we

7    contend that termination was wrongful but we said in a

8    letter back to them, Because we have the right to terminate

9    this relationship if you materially breach and don't seek to

10   cure, and that is the situation, we are now exercising our

11   right, and we are now exercising our lawful right to also

12   end this relationship on November 1.

13           And in that letter, by the way, they did also say,

14   If you want to buy back any of our assets, tell us what you

15   want to buy and we'll give you a week to do that and we'll

16   give you a fair market price.  No response was received.

17           November 1 then, given the fact that the

18   franchisor had said that you're terminated as of that date,

19   and they said you don't have the right to do it but we're

20   also terminating as of that date, they completely shut down

21   their two businesses and ceased operating as Mainstream at

22   both locations and proceeded to go dark for about ten days

23   while they worked on re-doing their two spaces to start

24   independent businesses.

25           In that ten-day period Mainstream didn't sit idly.

1    They called our clients' two landlords and said, You know,

2    these folks no longer have the legal right to operate a

3    clothing store in your space.  That, of course, caused some

4    serious stress and for our clients' efforts to try and

5    mitigate their damages by starting a new business which was

6    now underway in this ten-day period.

7            And during that ten-day period Marie DeNicola,

8    Corey's mother, approached Constant Contact, which our

9    clients were paying to store 9,777 customers e-mails, and

10   she convinced Constant Contact they should transfer those

11   e-mails that were stored at the expense of my clients to

12   her; and she sent out 9,777 notices saying these folks are

13   out of business but you should use this coupon I'm giving

14   you and go see the competing Mainstream down the road 10 or

15   15 miles; and indeed that Mainstream franchisee business had

16   a significant uptick because of her capturing our clients'

17   customers.

18           What the *Pirtek* case says, when it's your hard

19   work that generates the customers, it doesn't matter what

20   the franchisor says in the contract.  It doesn't matter what

21   the writing says.  Those customers are the customers of the

22   folks who worked to earn them and keep them and nurture

23   them, but they were taken from her by Marie DeNicola and

24   transferred to another franchisee.

25           In a clever effort to recreate the history,

1    Mainstream's counsel on November 5th wrote a letter claiming

2    that his clients had terminated effective November 1, and

3    that we had unlawfully -- and we had lawfully terminated

4    November 1 -- that you abandoned the franchisees.  No,

5    that's not abandonment of franchise.  When you have an

6    ongoing relationship with ongoing obligations and you leave,

7    that's abandonment.

8        And the reason they want to claim abandonment is

9    because they blew the statutory notice requirements.  They

10   were supposed to give our clients 90 days' notice of the

11   termination, not 30; 60 days to cure, with termination only

12   to follow at the end of that 90-day period.  There's an

13   exception if you abandon your franchise, and that's why they

14   are trying to claim after-the-fact of termination on

15   November 1 there was a November 5 abandonment, and that's

16   legal poppycock.

17       November 4, November 7, the landlords are calling

18   asking for indemnification because the franchisor is making

19   noises like we don't have the lawful right to keep you in

20   our spaces.  That's interfering with clients' contractual

21   opportunities which they needed to pursue to mitigate the

22   damages caused by this wrongful termination.

23       November 11, after being dark for ten days, Brad

24   and Anitra Mitchell open the independent store in the

25   Winston-Salem lease location, and Anitra's mother opens an

1    independent store at the Mooresville location.

2         November 15, given all these noises against our

3    clients' landlords and against them, we commenced an

4    arbitration action seeking a declaration that what they did

5    was unlawful and seeking monetary damages.  A few days later

6    then they commenced this action for injunctive relief.

7         THE COURT:  Talk to me for a second about the

8    nature of the women's clothing boutique that they have open

9    now.  Mainstream argues that it's the very same types of

10   clothes and accessories.  Your client says that's not true.

11   I think Mainstream believes you concede that point.  If you

12   would address that, please.

13        MR. DADY:  We don't concede that we're selling the

14   same lines of clothing.  And there was one mistake, as you

15   correctly noted, where an employee put one Mac and Me point

16   out.  They claim a proprietary interest in Mac and Me and in

17   one other line that's got two initials as being proprietary

18   to Mainstream.  Our clients are selling neither one of

19   those.

20        They are selling women's clothing, though, which

21   some folks' definition of competitive, it might be -- you

22   know, it's a women's clothing business and there's lot of

23   them out there competing with each other.  Our clothing is

24   actually significantly lower priced in the two independent

25   locations, I'm advised, but they aren't purchasing or

1    reselling any proprietary products of Mainstream, and they

2    aren't using the Mainstream marks and there's no proprietary

3    information that's --

4         THE COURT:  And it's at a lower price point than

5    the Mainstream product?

6         MR. DADY:  It is.  And the revenues are lower,

7    too.  They are operating as an independent after, through

8    their efforts, not Mainstream's.  The Mainstream name had a

9    good reputation in the two markets where they were operating

10   and they had to end that because of the termination.  But

11   they have done it and they've got new lowered price lines of

12   clothing, but they are in a similar business selling women's

13   clothing.

14        So the -- on to the preliminary injunction and

15   some of those factors, I want to speak to some of those.

16        And we appreciate the training that Rachel Zaiger

17   got on the PowerPoint.  Here's the second one we handed to

18   you, Judge.  The opposition to preliminary injunction, and

19   we like to think and speak macro to micro whenever we can.

20   And the first point on the second slide would be the macro

21   point.  Mainstream's motion should be denied because it

22   cannot meet its burden of establishing the four factors.

23   Interesting that Mr. Miller would talk about three.  There

24   are four actually necessary to obtain injunctive relief.

25        And on to the next slide.  I think we've got the

1    procedural law in Minnesota.  We've got the substantive law

2    in North Carolina, and seeking injunction is actually kind

3    of a combination of two, I would say.

4         But Judge Tunheim does a good job of laying out

5    the *Dataphase* factors, and there are four of them, and the

6    phrase Judge Tunheim uses is a good one.  That is the party

7    seeking injunctive relief, in Judge Tunheim's words, bears

8    the burden of establishing the four *Dataphase* factors.

9         Number one, probability that Mainstream will

10   succeed on the merits.  Judge, in the interest of time I

11   would like to save my points as to that for the second

12   motion because as you noted correctly in your note back to

13   us that the motions are interrelated.

14        But I want to go to number two.  As the judge

15   correctly points out, to demonstrate irreparable harm, the

16   moving party has got to demonstrate that what they are

17   seeking is not compensable with money damages.  That's a

18   quote from the judge in this particular case, the *Great*

19   *America Leasing* case.

20        In this case Mainstream has made eight counts in

21   their complaint against our clients.  One of them is for the

22   injunctive relief that they claim they should be entitled to

23   because they just can't get money damages.  In the other

24   seven counts, what they are seeking by way of relief is

25   money damages.  This is not a case where there's

demonstrable irreparable harm.  This is a case where they are seeking money damages.  This case, as they say in their complaint, in seven of the eight counts is about money damages and for that reason alone it should not be granted.

But more significantly, topic three hits close to home for my family and me and my law practice.  It says what you need to do if you're seeking injunctive relief is take a look at -- the decision maker -- compare the hardship to the Mitchell defendants.  If the injunction is granted, they would be out of business.  Their opportunity to mitigate would be lost.  All they know for many, many years, both of them -- they are a team, husband and wife team.  Husband financial and computer issues, Anitra is a very capable salesperson.  They would be out of business.  They would be unable to mitigate.  They would have tremendous hardship.

On the other hand, the hardship to Mainstream if the inunction is not granted, business would go on as usual. They have figured out how to capture our clients' customers. They are marketing to them on the behalf of the other stores where their sales are going on.

This reminds me of the first case I had for my father, 1975, where Judge Lord had to decide if he goes one way, my dad and other beer distributors like him are out of business.  If he goes the other way, they stay in business. What Judge Lord said, affirmed by the Eighth Circuit, is the

1    imbalance is so disparate here that the damage to Mr. Dady

2    and his colleagues in this Hamm's beer business, that you

3    can't weigh them on the same scale.  He went right to that

4    factor and said injunctions, um, that these folks are going

5    to be allowed to stay in business, and his decision was

6    affirmed by the Eighth Circuit Court of Appeals.

7            We do the same balancing here and for the same

8    reason.  This injunction should be denied so that our

9    clients, the Mitchells, can stay in business.

10           And on to topic four, the public interest.

11   Covenants not to compete are disfavored in North Carolina

12   and elsewhere.  It's also the case that we've got a

13   Minnesota Franchise Act that says what we need to do for

14   folks that buy franchises from Minnesota franchisors.  We

15   need to level the playing field for them because the

16   writings are always so one-sided to favor the franchisor,

17   we're adding the protection of the Minnesota Franchise Act

18   to level the playing field.  That's public policy in

19   Minnesota and it's also public policy in North Carolina.

20           Furthermore, the public interest in North Carolina

21   is spoken with respect to the *Window Gang Ventures* case.

22   It's a 2019 case and it cites a Superior Court of North

23   Carolina case in 2013.  It says the public policy in North

24   Carolina is you do not enforce overly-broad noncompete

25   language.  And what they say is to the extent you are saying

1   that the noncompete includes similar businesses, both of

2   those cases, the *Window Gang* case and the case that was

3   cited -- that cleaning company case, say the fact that you

4   say that you can't even compete if you're a similar business

5   all by itself renders that particular noncompete covenant

6   overly broad and it's unenforceable as a matter of law.  No

7   fact issue there.

8           And in this case the noncompete case is even

9   broader.  Not only does it say the noncompete keeps you out

10  of any similar business, it also says that it keeps you out

11  of any business that is in any way competitive.  So if

12  you're selling lady's clothing, I could see where in some

13  way that would be competitive.  This is overly broad and for

14  that reason should not be enforced.

15          On to slide 23.  Just to back up what I was

16  talking about earlier with reference to Judge Lord, we've

17  also given you a more recent case.  It says under balance of

18  harms, a franchisee can show irreparable harm by plausibly

19  showing that they will go out of business pending a trial.

20  And that's, of course, what would occur here.

21          And the thrust of Mainstream's argument is, as I

22  said, seven out of eight counts, yes, we want money damages

23  for those violations.  That's not the type of irreparable

24  harm that this Court should be granting injunctive relief.

25          And on to slide 24.  Just a summation of some of

1    the factors that we referenced before, including the fact

2    that to the extent an injunction would cause people to have

3    ongoing lease obligations is another form of irreparable

4    harm.  Mainstream can be compensated by money damages and

5    they have already figured out we don't think it's ethical or

6    appropriate to be taking our clients' customer lists and

7    selling to those folks and thereby depriving us of our

8    efforts to mitigate damages, but they are doing it.  They

9    have figured out how to take advantage of what they did to

10   our clients rather than be suffering.

11           And finally with respect to the public interest at

12   slide 25, it is in the public interest to allow folks who

13   have been damaged by the type of conduct that amounted to a

14   prior material breach by this franchisor to be able to

15   mitigate their damages by operating a similar business, but

16   it's not the same, using the same name, the same proprietary

17   products, they are selling lower cost women's clothing and

18   they are operating in the lease that's got some term to run

19   to it; and that's appropriate and consistent with the public

20   interest, not inconsistent.

21           So with that, unless the Court has questions, that

22   concludes my comments.

23           THE COURT:  Thank you very much, Mr. Dady.

24           All right.  Brief response if you have one.  I

25   think if we hear you out completely on this, I think the

1    motion to dismiss should go more quickly.

2          Mr. Miller.

3          MR. MILLER:  Just a couple of points, Your Honor.

4    On the argument that this is not the same type of business,

5    I mean, it clearly is.  They admit that this is an upscale

6    women's boutique business -- he just put it up on his

7    slide -- that sells women's clothing and accessories.

8    That's the exact same thing that Mainstream is.  It's an

9    upscale women's boutique that sells --

10          THE COURT:  It's such a general description it's

11   hard for me -- it's just, you know, men's clothing,

12   children's children, you can have very different stores that

13   fall under those categories.

14          MR. MILLER:  Your Honor, but it's a boutique,

15   right?  You know, it's not some large department store.

16   It's a boutique that focuses on selling clothing to women on

17   an upscale basis.  And I'm having a hard time understanding

18   how somebody could look at that and not see that those --

19          THE COURT:  For instance, you could describe

20   Talbots and Evereve as both being upscale women's boutique

21   stores and they have completely different audiences.  So it

22   depends.  I don't really have a handle on exactly what they

23   are selling.  I just hear these general --

24          MR. MILLER:  Well, again, they announce themselves

25   as an upscale women's boutique business selling women's

1    clothing and accessories.  That's the exact same thing that

2    Mainstream is.

3              THE COURT:  But you heard what I just said.  I can

4    name two stores that --

5              MR. MILLER:  I understand, Your Honor.  But

6    listen, we can part and parcel all day long, but the fact of

7    the matter is that it's a competing business.  And so that

8    obviously is a concern and we fit -- we feel like it fits

9    within the definition or the language of the noncompete.

10             On the monetary damages, we've again, we've

11   established or highlighted case law that demonstrates that

12   in the instances where we're suffering irreparable harm, the

13   courts have said as a matter of law you cannot be

14   compensated for those losses through monetary damages.  And

15   I'm not sure what Mr. Dady is pointing to in the complaint,

16   but we've made it specifically clear in the instances where

17   we're seeking an injunctive relief that that can't be

18   adequately compensated through monetary damages.

19             The two instances where we're seeking monetary

20   damages are the marketing fees and lost future fees; and

21   yes, in those instances we would be, and expected to be,

22   compensated through monetary damages.

23             With respect to the training aspect, Your Honor,

24   we've set forth in our declaration from Mr. DeNicola the

25   specific training that the franchise received.  They may

1    object to it and say that it wasn't good enough, but the

2    fact of the matter is is that they were trained on our

3    business methods and our business systems, and they received

4    our confidential and proprietary manuals.  There's no

5    dispute that that occurred.  They may try to argue and say,

6    Well, it wasn't good enough.  That's fine.  But the fact of

7    the matter is that they received training on how Mainstream

8    franchisees operate their business, and they cannot use that

9    inside knowledge to now compete directly against

10    Mainstream's franchisees.

11          And again, lastly, Your Honor, again, to the

12    extent that the Court is not comfortable with the similar to

13    language, we've highlighted several cases in our brief that

14    demonstrate that it's an easy fix.  The Court can simply

15    blue pencil that and effect the noncompete written without

16    that language.

17          Thank you.

18          THE COURT:  Thank you very much.

19          Okay.  Let's move ahead to the motion to dismiss.

20          MR. DADY:  And I might just say on that blue

21    pencil issue, North Carolina law says if it's too broad, you

22    don't blue pencil; and even those older cases where there

23    was some blue penciling, it's limited to one thing, crossing

24    out some language.  And here you couldn't cross out enough

25    language to narrow that competitive business or that similar

1    business language enough to make it not unreasonably broad.

2         With respect to the Motion to Dismiss, Your Honor,

3    we've given you several slides there, but I'm just going to

4    limit my comments to the second slide, and I've got six

5    documents that I want to reference that are in the record in

6    those subsequent pages, but the focus is going to be with

7    respect to that second slide.

8         North Carolina law is clear that to the extent

9    there's a prior material breach of the Franchise Agreement

10   as augmented by the covenant of good faith and fair dealing,

11   while recognized under North Carolina law, that eliminates

12   any post-term obligation for any noncompete even if it

13   weren't unreasonably broad.

14        And with respect to the documents that I want to

15   direct the Court's attention to in the record, because there

16   are plenty of them, the first one is Exhibit D to the

17   complaint.  And that was the September 27, 2019 e-mail that

18   Anitra and Brad Mitchell spent a lot of time putting

19   together together, because Brad is the computer person,

20   Anitra is the salesperson, to lay out in substantial detail

21   why it is, as Corey had asked, that the current POS system

22   is working as well, if not likely better, than the other one

23   with no additional expense to them or others who were

24   operating.  And she went to great length to lay this out and

25   received unfortunately no response other than put in the

1    Springboard system or we're going to terminate you effective

2    November 1, which is what they did.

3            On to Exhibit F.  They sent them the termination

4    effective November 1, and we recognize in that October 3

5    letter, which is Exhibit F, we acknowledge receipt that you

6    told us our Franchise Agreements are terminated on November

7    1 of 2019, and we're telling you that you didn't have the

8    legal right to do that, but we do have the legal right to

9    terminate you on November 1 because 30 days ago we asked you

10   to withdraw this wrongful termination notice and you haven't

11   done it, so now we have the right under Section 16.2 of the

12   Franchise Agreement to end this relationship and we're now

13   doing it.

14           So it's effected on November 1.  There is no

15   abandonment on November 5.  They terminated us on November 1

16   unlawfully.  We terminated them lawfully on November 1, and

17   the abandonment is revisionist history that did not occur.

18           On to Exhibit H.  On November 1 then our clients

19   write to Mr. DeNicola to confirm the termination, disputing

20   his right to terminate on that date, but saying we have the

21   right to terminate as of that same November 1 date and we're

22   doing it.  And if you want to purchase any of our assets,

23   tell us what you want to buy and we'll give you a fair

24   market price, but please do it in a week.  No response.

25           Exhibit A was the Franchise Agreements.  And

there's three particularly significant paragraphs for this

particular proceeding.  One of them is paragraph 15.2 under

Notice of Breach.  And that 15.2 says:  Except as provided

for in Article 15.4 and 15.5, that relates to abandonment.

That's why Mr. Miller keeps trying to say there's an

abandonment here, but the fact is our clients remained

active until the relationship was ended by them unlawfully,

and by our clients lawfully.  There's no abandonment, so the

rest of the paragraph is what applies.

Mainstream will not have the right to terminate

this agreement unless and until written notice setting forth

the alleged breach has been given to franchisee by

Mainstream, and franchisee fails to correct the alleged

breach, how long do they have?  The rest of the sentence.

Within the period of time specified by applicable law.

Well, the applicable law, as the addendum points

out, is the Minnesota Franchise Act.  They were supposed to

have been given 90 days' notice, 60 days cure, with

termination to be effective on the 90th day only if any

reasonable cure was effected.  Instead they were given only

30 days' notice.

On to paragraph 16.2.  That gives franchisee the

right to terminate the agreement, provided it gives written

notice setting forth the alleged breach to Mainstream, and

Mainstream fails to commence the actions necessary to

1  correct the alleged breach within 30 days after having been

2  given such written notice.  That notice had been given 50

3  days earlier listing several failures in the relationship

4  but also saying it's wrongful to be saying you're going to

5  terminate us in 30 days.  Please withdraw it.  They didn't.

6  We therefore had that right to terminate at the end of that

7  30-day period, which they did.

8          And then finally, on to 20.7, apropos Mr. Miller's

9  surprising claim that the Minnesota Franchise Act and the

10  addendum in the FDD doesn't apply, the writing that his law

11  firm put together for Mainstream says the opposite.

12  Paragraph 20.7.  In both Franchise Agreements under the

13  integration clause, entire agreement, paragraph 20.7.  The

14  last sentence.  "Nothing in this agreement is intended to

15  disclaim the representations Mainstream made in the

16  franchise disclosure document Mainstream provided to

17  franchisee."

18          That franchise disclosure document, both of them,

19  contained in that franchisor disclosure document the

20  Minnesota addendum that says if you want to terminate,

21  unless they have abandoned, you got to give them 90 days'

22  notice, 60 days to cure.  You better have cause, and then

23  you can terminate at the end of the 90 days.  And that's in

24  the Mainstream Franchise Agreement at the Minnesota

25  addendum, which is actually quoting the language from the

1    Minnesota Franchise Act.

2            It says if you're selling to -- from the State of

3    Minnesota, this is what you got to put in the Franchise

4    Agreement.  Gray Plant drafted the documents.  Their code is

5    down in the bottom.  Gray Plant.  My clients were not

6    represented by counsel.  There was no knowing waiver of

7    anything.  In the writing that the Gray Plant law firm put

8    together they said we're not disclaiming anything in our

9    Franchise Agreement that's set forth in the FDD.  In the FDD

10   is the Minnesota addendum that expressly references the

11   applicability of the Minnesota Franchise Act, and the same

12   provisions set forth in that addendum are in the Minnesota

13   Franchise Act at 80C.14 subdivision (3).

14           So they committed prior material breaches,

15   including they didn't follow the notice provisions.  They

16   didn't have commercially reasonable good cause to terminate

17   for failure to install a POS system that wasn't needed; and

18   secondly, they violated the applicable Minnesota Franchise

19   Act when they didn't give the 90 days' notice and the 60

20   days to cure.

21           And thirdly, these claims should be dismissed in

22   their entirety because, as the North Carolina court has held

23   as a matter of law, these post-termination competes when

24   they say you can't compete in any business that is in any

25   way competitive with, or similar to, Mainstream's business,

1    is on its face and under North Carolina cases -- we cited

2    two of them -- overly broad and you don't blue pencil them

3    in any way.  You found them overly broad and as a matter of

4    law these claims should all be dismissed with prejudice.

5            THE COURT:  Thank you very much, Mr. Dady.

6            Mr. Miller.

7            MR. MILLER:  Your Honor, the defendants seek

8    dismissal by primarily disputing the facts in the complaint

9    and trying to introduce new facts in support of their

10    arguments instead of contending that Mainstream has

11    sufficiently -- or has failed to sufficiently set forth

12    facts that establish a plausible claim.

13            Indeed, if you look at their brief they

14    specifically state, quote, Mainstream's claims are based on

15    an erroneous misunderstanding of the facts and

16    misinterpretation of the contract.

17            So in their own brief they admit that there are

18    factual disputes here, Your Honor, that can't be decided on

19    a motion to dismiss and for that basis alone the Court

20    should dismiss or not grant their motion to dismiss.

21            Here we only have to demonstrate that we've pled

22    the facts sufficient to establish a plausible claim, which

23    we've done.  We've demonstrated that under North Carolina

24    law there's two elements to a breach of contract claim.

25    One, that there's a valid contract exists; and two, that

1    they breached that contract.

2          We've set forth facts that support each of our six

3    or seven counts that demonstrate that there was that valid

4    contract and that a breach occurred in that situation.  So

5    based upon that, Your Honor, you know, it's pretty clear

6    that there is no basis for granting their motion to dismiss.

7          They basically -- throughout Mr. Dady's arguments

8    and in their briefs they basically contest a couple of

9    different things.  One, that we engaged in some prior

10   material breaches that somehow release them of their post-

11   termination obligations.  For the reasons already set forth,

12   that's just not true.

13         But from a motion to dismiss perspective, there's

14   a dispute over whether or not we breached our obligations,

15   right?  And so from that standpoint, this Court can't decide

16   those facts as part of a motion to dismiss; and its claims,

17   any claims that they are relying upon to say that the claims

18   are barred as a matter of law because of our prior material

19   breaches, that's not going to be enough to carry the day on

20   a motion to dismiss.  And so again, for that reason it needs

21   to be -- their motion needs to be denied.

22         Similarly, with respect to their implied covenant

23   claim, they are trying to argue or suggest that as a matter

24   of law we have breached the implied covenant of good faith

25   and fair dealing, and so as a result of that, none of our

1   claims can move forward.  But again, that requires a factual

2   analysis.  There's a fact there that can't be decided on a

3   motion to dismiss.

4           Similarly, with respect to the MFA claim, again,

5   we've argued this before.  I've set forth why it is that the

6   MFA doesn't apply.  But even if it did apply, Your Honor,

7   the Court has to go through a factual analysis of does it

8   actually apply and, if so, was there an actual violation of

9   the MFA.

10          In this situation in a motion to dismiss, the

11  Court can't make that decision.  It requires a factual

12  analysis and a factual determination which isn't appropriate

13  for a motion to dismiss.

14          With respect to the noncompete claim, again, we've

15  set forth facts to demonstrate that there's a valid

16  noncompete in place; that they have breached the terms of

17  that noncompete; and as a result, we're entitled to

18  injunctive relief.  And so we've sufficiently pled the facts

19  supporting that claim.  That's enough.  That's all we have

20  to do.  We don't have to go any further.

21          And again, we've demonstrated already with respect

22  to the motion for preliminary injunction why the noncompete

23  is enforceable, that it's not overly broad, and that it

24  should be enforced.

25          Similarly, with respect to the post-termination

1    obligations, we've set forth, again, that there are post-

2    termination obligations in the Franchise Agreement

3    specifically that they must comply with.  We've demonstrated

4    facts to show that they have not complied with that.  And so

5    we've appropriately pled facts sufficient to support a

6    plausible claim there.

7        They attack those by not stating, again, that we

8    have not pled the sufficient facts.  They simply dispute the

9    facts.  Again, not appropriate for a motion to dismiss.

10        With respect to the monetary claims in Counts IV

11   and V, they argue that not only should they be dismissed

12   because of our prior material breaches, but they should be

13   dismissed because they are subject to arbitration.

14        Your Honor, the monetary claims, which are IV and

15   V, seek marketing fees and lost future fees.  In this

16   instance they are directly tied back to the carve out

17   provision in the Franchise Agreement which says specifically

18   that you can seek relief, injunctive relief, in this court

19   for any post-term obligations, right?  And one of those

20   post-term obligations in Article 17 is payment of all fees

21   there due and owing.  In this instance there are past due

22   marketing fees and there are lost future fees.  And so as a

23   result, those fees -- those claims are appropriate in this

24   court because it satisfies the carve out provision.

25        In addition, it's exempt from arbitration because

1     these fees that we're seeking are directly related to the

2     immediate termination of the Franchise Agreement as a result

3     of the defendants' abandonment of their franchise stores.

4     Under the express provisions of the Franchise Agreement,

5     again, if there is a claim related to the immediate

6     termination, then those claims are not subject to

7     arbitration and can move forward appropriately in this

8     court.

9            And to the extent that they claim that our claim

10    for lost future fees is speculative, again, Your Honor,

11    that's a fact dispute that can't be decided on a motion to

12    dismiss, and so their motion with respect to that claim

13    needs to be denied.

14           And then lastly, on the civil conspiracy claim,

15    again, we've alleged plausible facts demonstrating that the

16    defendants conspire to invade -- to evade their noncompete

17    provisions and avert customers that have caused injury to

18    Mainstream, and so we have satisfied the pleading

19    requirements for a civil conspiracy claim.

20           And with respect to the claims against all

21    defendants, Your Honor, it's pretty clear from the case law

22    that we've cited that if defendants are -- even if they are

23    non-signatories to the Franchise Agreement, if they are all

24    acting in concert with one another, and they have conspired

25    or schemed together to avoid a contractual obligation, then

1    all of those participating parties can be held responsible

2    for that.

3              I want to focus, too, just again, Your Honor, on

4    this termination issue.  We never terminated effective

5    November 1st.  We couldn't have terminated effective

6    November 1st.  We sent the notice of default letter on

7    October 2nd.  We gave them 30 days to cure.  Under the

8    express terms of the Franchise Agreement, both 15.3 and

9    15.4, a termination by us doesn't become effective until we

10   provide them with written notice of that termination.  We

11   never provided them with written notice until November 5th.

12   So that's when the termination became effective.

13             They, on their own, decided before that time that

14   they wanted to voluntarily abandon their franchise and cease

15   operations.  That's on them.  They chose to do that.  And so

16   because they ceased operations prematurely, we went ahead

17   and terminated based upon abandonment.  And I think the

18   facts establish that.

19             Finally, Your Honor, the addenda that is in the

20   franchise disclosure document that defense counsel talks

21   about isn't a representation in the FDD.  It's simply a form

22   agreement.  It was not incorporated into the Franchise

23   Agreement in no way, shape or form.

24             Similarly, Your Honor, with respect to the audit

25   and accounting claim, that -- in that instance, that claim

1   is not -- that claim can move forward.  It's not -- it

2   doesn't apply only in a situation where the Franchise

3   Agreement is in place.  If you look at Article 17.1C of the

4   Franchise Agreement, it specifically says that if an

5   agreement expires or is terminated for any reason,

6   franchisee will comply with all other applicable provisions

7   of this agreement.  That would include the audit provision

8   which we are seeking an accounting under pursuant to Article

9   6.  And so, again, this -- the claim, the audit and

10   accounting claim can proceed and is not subject to a motion

11   to dismiss.

12        Your Honor, unless the Court has any questions,

13   that concludes my arguments on the motion to dismiss.

14        THE COURT:  Thank you.

15        Briefly, Mr. Dady.

16        MR. DADY:  Very briefly, Judge, unless you have

17   any questions.

18        We did get notice on -- dated October 2, not just

19   of default but of termination.  It wasn't just a notice of

20   default.  It says you are going to be terminated.  It will

21   be effective November 1 unless you have by that time

22   purchased and installed the POS system.  And as we

23   acknowledged on our October 3 response, that termination by

24   them was wrongful, but we're now exercising our 30-day right

25   to exercise our contractual right to terminate.

1           And the fact that they breached the agreement and

2     then try to enforce post-term noncompetes is crystal clear

3     under North Carolina law, prior breach excuses any

4     obligation to perform.  Otherwise, you could do nothing, as

5     they essentially were doing for our clients, and then try to

6     keep folks out of business for another two years, even

7     though they didn't deliver on their commitments under the

8     agreement.  And that's just not the public policy or

9     appropriate law, and it's not the law in North Carolina or

10    Minnesota which does say the Minnesota Franchise Act applies

11    if the sale takes place from Minnesota even to out-of-state

12    franchisees.

13           THE COURT:  Thank you.

14           All right.  The Court will take these motions

15    under advisement and they do require more study on my part.

16    But as I sit here today, I'm inclined to deny both motions.

17    With respect to the motion to dismiss, because of the

18    procedural posture of the motion the Court must accept the

19    facts as pled as true, and so I'm of the view that fact

20    issues preclude dismissal at this stage of the game.

21           With respect to the motion for a preliminary

22    injunction, the Court has a lot of concerns about, as you

23    point out very clearly, Mr. Miller, you live in different

24    factual worlds here.  And so whether the Court, based on all

25    these factual disputes, can determine who is going to

1    prevail here or who has the greatest likelihood of

2    prevailing, I don't know that the Court can do that at this

3    point.

4         I also am concerned that comparing the harms

5    doesn't necessarily favor your client.  I'm not even

6    convinced necessarily that there's irreparable harm.  But as

7    I said, this is just my instinct now.  I am going to study

8    this further.

9         But in the meantime it does seem to me, based on

10   my ten years as a Magistrate Judge, that there is a path to

11   resolution here.  What I think both sides are looking at is

12   years of costly litigation, and I'm sure nobody wants that.

13   I think both sides want a divorce, and I think there are

14   ways to make the divorce palatable to both sides so that

15   Mainstream's interests are well preserved and the

16   defendants' interests are well preserved.  I really think

17   there's a pathway here.

18        The women's clothing and accessory business is

19   very broad and there's lots of ways in which you can be an

20   upscale women's clothing boutique and accessories and

21   actually not even compete at all.  I think that has to do

22   with the market.  Are you targeting older women?  Are you

23   targeting teenagers?  What kind -- are you looking more at

24   beachwear?  Are you looking at formal wear?  I mean, it's an

25   enormously broad umbrella of clothing.  And I think there's

1    a way to navigate this and negotiate a resolution that is

2    fair on both sides.  And I think that just seems so much

3    more sensible to me than years of litigation on this issue

4    for both sides, to be honest.

5             I notice that this was originally assigned I

6    believe to Judge Bowbeer but then it went to Judge Leung.

7    Am I correct about that?

8             MR. MILLER:  That's correct, Your Honor.

9             THE COURT:  Okay.  I spoke with Judge Leung about

10   this and asked if he would be willing promptly to meet with

11   the parties, and at least spend a full day and evening

12   trying to negotiate some resolution to this, and he's

13   agreeable to it.  He's agreeable to doing it very soon.  I

14   asked him if he could do it in the next 30 days, and he was

15   agreeable to that.  So he's expecting a call from the

16   parties.  He may have left now because of the snow, but

17   certainly in the next week if you can call him no later

18   than, I'd say, next Wednesday or Thursday and schedule a

19   time.

20            In the meantime, these motions will remain under

21   advisement.  I will continue to do my study.  I may change

22   my mind.  I don't know.  I'm just telling you what my

23   initial thoughts are if that's helpful at all in trying to

24   reach a sensible resolution of this case.

25            Any thoughts or questions about my remarks?

1          MR. DADY:  Thank you, Judge.  You kind of remind

2    me of earlier days in your tenure as a judge here, and we

3    would -- and we have resolved lots of cases over the years

4    with the Gray Plant firm and we'll give it another try here.

5          THE COURT:  And I think Mainstream's interests can

6    be well enforced here with a reasonable resolution.

7          Court is adjourned.

8          (Court adjourned at 2:49 p.m.)

9                        *     *     *

10

11

12          I, Carla R. Bebault, certify that the foregoing is

13    a correct transcript from the record of proceedings in the

14    above-entitled matter.

15

16

17          Certified by:   s/Carla R. Bebault
                            Carla Bebault, RMR, CRR, FCRR
18

19

20

21

22

23

24

25