# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mainstream Fashions Franchising, Inc., | Case No. 19-cv-02953 (SRN/TNL) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| All These Things, LLC; a North Carolina limited liability company; Grace & Love, LLC, a North Carolina limited liability company; CCP, LLC, a North Carolina limited liability company; Charlotte Cooper Parris, a North Carolina resident; Anitra Mitchell, a North Carolina resident; and Bradley Mitchell, a North Carolina resident, | |
| Defendants. | |

Craig P. Miller, Lathrop GPM LLP, 80 South 8th Street, Suite 500 IDS Center, Minneapolis, MN 55402, and Maisa Jean Frank, Lathrop GPM LLP, 600 New Hampshire Avenue, N.W., The Watergate Suite 700, Washington D.C. 20037, for Plaintiff.

J. Michael Dady, Kristy Lynn Miamen, and Rachel Zaiger, Dady & Gardner, PA, 80 South 8th Street Suite 5100, Minneapolis, MN 55402, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter comes before the Court on Plaintiff Mainstream Fashions Franchising, Inc.'s ("Mainstream") Motion for a Preliminary Injunction (Doc. No. 5), and Defendants All These Things, LLC; Grace & Love LLC; CCP, LLC; Charlotte Cooper Parris, Anitra Mitchell, and Bradley Mitchell's (collectively, "Defendants") Motion to Dismiss (Doc. No. 21) pursuant to Fed. R. Civ. P. 12(b)(6). For the foregoing reasons, the Court **GRANTS**

**IN PART** and **DENIES IN PART** Mainstream's Motion for a Preliminary Injunction and **DENIES** Defendants' Motion to Dismiss.

## I.     BACKGROUND

This case arises out of a dispute between a women's clothing franchisor and several former franchisees.  The issues largely surround the terms of the parties' Franchise Agreements (*See* Compl. Exs. A & B [Doc. No. 1-1]) governing two former franchise locations in North Carolina, and the subsequent breakdown in the parties' business relationship.  While the parties agree on some facts, they strenuously dispute liability, the meaning of certain contractual provisions in the Franchise Agreements, as well as the application of Minnesota franchise law to the case.

The Court notes that its consideration of the record necessarily differs for each motion at issue.  With respect to Defendants' motion to dismiss, the Court "assumes as true all factual allegations in the pleadings, interpreting them most favorably to [Mainstream], the nonmoving party."  *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1128 (8th Cir. 2019).  However, with respect to Plaintiff's motion for a preliminary injunction under Fed. R. Civ. P. 65, the Court makes preliminary factual findings and conclusions of law based on the limited record before it.  *See CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 798 (D. Minn. 2018).  The Court stresses, however, "that the facts recited herein are not final determinations of disputed matters binding in later stages of litigation[,]" as it is a " 'general rule' " that findings of fact and conclusions of law made by a court at the preliminary injunction stage are not binding at trial on the merits.  *Id.* (citation omitted); *see also Cambria Co. LLC v. Schumann*, No. 19-cv-3145 (NEB/TNL), 2020 WL 373599,

at *3 (D. Minn. Jan. 23, 2020) (noting that the court "is cognizant that discovery and the development of the record could change the likelihood of success" on the merits).

## A. Parties

Plaintiff Mainstream is a Minnesota corporation with a principal place of business located in Minneapolis, Minnesota. (Compl. [Doc. No. 1] ¶ 5.) Mainstream is the franchisor of the Mainstream Boutique franchise system, which consists of a business "concept and system" for operating women's retail clothing and accessories businesses with a unique "style and character." (*Id.* ¶¶ 6, 17.) Mainstream utilizes several trademarks, trade names, and trade dress in the operation of its franchise, and sells products under the Mac and Me marks (collectively, "Marks"), which is exclusive to Mainstream. (*Id.* ¶¶ 18–19.) Franchisees of Mainstream are licensed to use Mainstream's Marks, exclusive products, and business system while operating their Mainstream franchised businesses. (*Id.* ¶ 20.) Currently, there are over eighty Mainstream Boutique retail locations in operation across the United States. (Aff. of Corey DeNicola [Doc. No. 8] at ¶ 8.)

Defendants Anitra and Bradley Mitchell ("A. Mitchell," "B. Mitchell," or, , "the Mitchells") are residents of Winston-Salem, North Carolina. (*Id.* ¶ 8.)

Defendant Charlotte Cooper Parris ("Parris") is also a resident of North Carolina; she lives in Davidson, North Carolina. (*Id.* ¶ 12.)

Defendant All These Things, LLC ("All These Things") is a North Carolina limited liability company with its principal place of business located in Winston-Salem, North Carolina. (*Id.* ¶ 7.) At the beginning of the parties' relationship, Defendants Parris and A. Mitchell were equal co-owners of All These Things. (*See* Defs.' Mem. in Opp'n of Mot.

for Prelim. Inj. (Defs.' PI Opp'n Mem.) [Doc. No. 31] at 4.)  However, in 2014, Parris assigned her membership interest in All These Things to B. Mitchell.  (*Id.*)  As such, All These Things is currently owned 50-50 by the Mitchells.  (*Id.*; *see also* Compl. ¶ 8.)

Defendant Grace and Love LLC ("G&L")[1] is a North Carolina limited liability company with its principal place of business located in Winston-Salem, North Carolina. (Compl. ¶ 9.)  The Mitchells are 50-50 members of G&L.  (*Id.* ¶ 10.)

Defendant CCP, LLC ("CCP") is a North Carolina limited liability company with its principal place of business located in Davidson, North Carolina.  (*Id.* ¶ 11.)  Parris is the sole member of CCP.  (*Id.* ¶ 12.)

### B.      Factual Background

#### 1.      Creation of the North Carolina Franchises

As noted above, this case centers on two Mainstream Boutique franchises operated by Defendants in North Carolina.  (Compl. ¶ 22.)  The first franchise was created on June 14, 2011, when Mainstream and All These Things (then owned by A. Mitchell and Parris) entered in a Franchise Agreement granting All These Things the right to operate a Mainstream Boutique in the Winston-Salem, North Carolina area.  (*Id.* ¶ 23; *see also* Compl. Ex. A.)  This contract, which the Court will refer to as the Winston-Salem Franchise Agreement, had an initial term of ten years.  (Compl. Ex. A, Art. 2.1.) Defendants A. Mitchell and Parris also executed a Personal Guaranty in which they

---

[1]      The parties occasionally refer to Grace and Love as "Love and Grace."  Pursuant to the copy of the LLC's Articles of Organization provided by Plaintiff, the Court refers to the entity as "Grace and Love."  (*See* Decl. of Corey DeNicola in Supp. of Prelim. Inj., Ex. H [Doc. No. 8-1].)

guaranteed to Mainstream that they would be personally liable for the Agreement's obligations. (*Id.* at 31.) Moreover, B. Mitchell—A. Mitchell's spouse, not yet involved as a business party—also agreed to be bound by the Agreement's confidentiality and non-compete provisions. (Compl. ¶ 24; *see also* Compl. Ex. A at 31.) The Winston-Salem Mainstream Boutique operated at 110 Oakwood Drive, Suite D, Winston-Salem, North Carolina 27104. (Compl. ¶ 25.) In 2014, Parris assigned her membership interest in All These Things to B. Mitchell. (Defs.' PI Opp'n Mem. at 4.) The parties dispute whether Mainstream was aware of this assignment. (*See id.* at 4; Pl.'s Reply in Supp. of Mot. for Prelim. Inj. (Pl.'s PI Reply) [Doc. No. 37] at 15–16.)

The second franchise was created on January 16, 2015, when Mainstream and the Mitchells entered into a Franchise Agreement granting the Mitchells the right to operate a Mainstream Boutique in the Mooresville, North Carolina area. (Compl. ¶ 26; *see also* Compl. Ex. B.) Much like the Winston-Salem location, this contract—which the Court will refer to as the Mooresville Franchise Agreement—had an initial term of ten years. (*See* Compl. Ex. B., Art. 2.1.) The Mooresville Mainstream Boutique operated at 126 Mooresville Commons Way, Mooresville, North Carolina 28117. (Compl. ¶ 27.)

### 2. Terms of the Franchise Agreements

Aside from a few differences in fee percentages and initial payments due to Mainstream, the two Franchise Agreements are materially the same.[2] The Court sets forth the relevant provisions in detail.

---

[2] Because the Agreements are, for the most part, materially identical, the Court refers only to the Winston-Salem Franchise Agreement (Compl. Ex. A) unless otherwise noted.

### a. Operations Manual, Fees, and Transfers of Interest

Under the terms of both Agreements, Mainstream was obligated to provide its franchisees with an updated copy of its confidential Operations Manual, and the franchisees were obligated to conduct their business in accordance with the manual's terms, which could be revised by Mainstream at any time. (Compl. Ex. A, Art. 6.10.) In return, among other things, both Agreements required All These Things and the Mitchells to pay a certain percentage of their weekly net revenue to Mainstream, and both require payments—in some form—for Mainstream's marketing costs. (*Id.*, Arts. 4.2, 4.3, 4.7, 5.2.) Franchisees are restricted by a host of conditions, under the terms of the Agreements, in assigning or transferring their interest in the franchised business, including a requirement that Mainstream be notified of any assignment or transfer in writing. (*Id.* Art. 14.1–14.5.) The Agreements also provide that Mainstream is entitled to a "transfer fee" should such a transfer or assignment occur, equal to the lesser of the expenses incurred by Mainstream in facilitating or otherwise accepting the transfer, or $5,000. (*Id.*, Art. 14.6.)

### b. Uniform Standards and Equipment

Both Agreements contain several provisions regarding quality control, uniformity, and other standards required by Mainstream of its franchisees in order to ensure that "all Mainstream Boutique businesses will be uniform in nature and will sell and dispense quality goods and services." (*Id.* Ex. A, Art. 6.) For example, each Agreement requires the franchisee to "construct and equip the Retail Location in accordance with MAINSTREAM's current approved specifications and standards pertaining to equipment, inventory, signage, fixtures, accessory features and design and layout of the Business."

(*Id.*, Art. 6.3.; *Id.*, Art. 6.6 (requiring compliance with Mainstream's standards "established by MAINSTREAM *from time to time*" (emphasis added); *Id.*, Art. 6.11 (requiring franchisee to purchase "equipment" to be used in conducting their business from suppliers approved by Mainstream).)  The Agreements also permit Mainstream to require its franchisees to modernize their equipment to "reasonably conform to the standards then prescribed by MAINSTREAM for similarly situated new Mainstream Boutique Business[es] no less than every five years."  (*Id.*, Art. 6.7; *see also id.*, Art. 6.12 (requiring franchisee, at its own expense, to maintain equipment "in accordance with requirements that MAINSTREAM periodically may establish, by notice or otherwise").)

### c.      Confidentiality and Customer Lists

Both Agreements contain provisions related to confidentiality, as well as "customer lists" generated through the operation of the Mainstream Boutique franchises.  (*See* Compl. Ex. A, Art. 6.24; *Id.*, Art. 6.23.)  For example, under the terms of the contracts, franchisees were obligated to maintain the secrecy and confidentiality of the Mainstream Operations Manual, as well as any "confidential and proprietary information concerning [Mainstream's] Business System and the procedures, technology, operations and data used" in the system.  (*Id.*, Art. 7.1–7.3.)  Moreover, the Agreements state that all customer lists are the property of Mainstream, licensed to franchisees to use, and franchisees were obligated to provide Mainstream with an up-to-date customer and account list at least once each month.  (*Id.*, Art. 6.24.)  Upon "termination or expiration of" either Agreement, franchisees were obligated to "promptly deliver to MAINSTREAM a complete list of

current and former customers and all information . . . respecting any accounts" related to those customers. (*Id.*)

### d.    Training and Franchisor Meetings

Training was also addressed in both Agreements. (*See* Compl. Ex. A, Art. 8; *Id.*, Ex. B, Art. 8.) Mainstream was obligated to provide a "training program" to franchisees "at Mainstream's headquarters." (*See id.*, Art. 8.1.) The program was to include classroom instruction and on-the-job training for not less than three days in order to orient franchisees to Mainstream's Business System, as well as daily operating procedures. (*Id.*) Franchisees were obligated to complete the training program, "to MAINSTREAM's satisfaction," prior to commencing business operations. (*Id.*) Mainstream reserved the right to provide additional optional training to franchisees, as well as the right to hold or sponsor franchise conventions and meetings that it could designate, at its sole discretion, as either optional or mandatory. (*Id.*, Art. 8.7.)

### e.    Financial Statements, Reporting, and Audit Rights

The Agreements also addressed financial statements, reporting, and accounting requirements. (*See id.*, Art. 12.) Franchisees were required to maintain an accurate record of daily net revenues, and remit a statement of the weekly net revenues from the business to Mainstream. (*Id.*, Art. 12.1.) Franchisees were also required to provide Mainstream with monthly and annual financial statements. (*Id.*) Both Agreements also stated that Mainstream possessed the right, "without prior notice, during regular business hours or at all times to inspect, audit, photocopy, and videotape FRANCHISEE'S business operations and records, and to interview the Business' employees and current and prospective clients."

(*Id.*, Art. 12.5.)  Franchisees were obligated to make all books, financial records, work papers, accounts, etc. available to Mainstream for such an audit.  (*Id.*)  The plain language of the audit rights provisions of the Agreements does not state whether Mainstream's audit rights exist only during the term of the parties' Agreement, or if they survive termination.  (*Id.*)  The parties dispute whether Mainstream's audit rights in fact survive the termination of the Agreements.  (*Compare* Defs.' Mem. in Supp. of Motion to Dismiss (Defs.' MTD Mem.) [Doc. No. 23] at 7, *with* Pl.'s Mem. in Opp'n to Motion to Dismiss (Pl.'s MTD Opp'n Mem.) [Doc. No. 36] at 13 n.4.)

### f.      Mainstream's Right of First Refusal

Both Agreements provide Mainstream with the right of first refusal regarding the sale or disposal of franchisee's business, Franchise Agreement, or any other ownership interest in a franchisee.  (Compl. Ex. A, Art. 13.1.)  Specifically, franchisees must first offer any such items or interest to Mainstream through written notice containing "all material terms and conditions of the proposed sale or transfer, including price and payment terms."  (*Id.*)  The Agreements note that Mainstream's nonacceptance of a franchisee's written offer to purchase a franchisee's business or assets does not alter or change a franchisee's other obligations under the Agreement.  (*Id.*, Art. 13.2.)

### g.      Mainstream's Termination Rights

Central to the parties' dispute are Mainstream's termination rights under the Agreements.  (*See id.*, Art. 15.)  The Agreements set forth two paths Mainstream can take for termination, depending on the circumstances.  First, if a franchisee violates any material provision, term, or condition of the Agreement, including but not limited to failing to pay

any fees or conform to Mainstream's Business System, Mainstream may terminate the Agreement only after it has provided written notice of the alleged breach to the franchisee, and the franchisee fails to cure the alleged breach within 30 days of receiving the written notice. (*Id.*, Art. 15.1–15.2.) If the franchisee fails to cure the alleged breach, and Mainstream desires to terminate the Agreement, it must send the franchisee written notice stating that the Agreement is terminated as of the date of the notice. (*Id.*, Art. 15.3.)

The second path Mainstream can take is immediate termination. (*Id.*, Art. 15.4.) Immediate termination rights vest with Mainstream if, among other things, the franchisee "voluntarily or otherwise abandons" the franchised business, or the franchisee is involved in "any act or conduct which materially impairs the goodwill" associated with Mainstream's Marks or business system, and fails to correct such a problem within 24 hours of being notified. (*Id.*) If either of those situations occurs, Mainstream may proceed with immediate termination under Article 15.4 provided its sends written notice to the franchisee, which is effective when such notice is given. (*Id.*, Art. 15.5.) The term "abandon" is defined in the Agreements as "the conduct of the FRANCHISEE, including acts of omission as well as commission, indicating the willingness, desire or intent of FRANCHISEE to discontinue operating the franchised Business in accordance with the quality standards, uniform requirements and the Business System" contained in the Agreements and Operations Manual, among other things. (*Id.*, Art. 23.1.)

### h. Franchisee's Termination Rights

The Agreements also provide the franchisee with limited termination rights. (*See* Compl. Ex. A, Art. 16.) Unlike Mainstream, franchisees have one termination path: if

Mainstream "violates any material provision, term or condition of [the] Agreement[,]" the franchisee may send Mainstream written notice setting forth the alleged breach, asserting Mainstream is in default, and giving Mainstream 30 days to cure the alleged breach. (*Id.*, Art. 16.1–16.2.) If Mainstream "fails to commence the actions necessary to correct the alleged breach" within 30 days, the franchisee may terminate the Agreement. (*Id.*, Art. 16.2.) The franchisee's termination rights are further limited by a waiver provision that bars the franchisee from asserting a breach if it fails to give Mainstream written notice within one year of the date that the franchisee "has knowledge of, determines, or is of the opinion that" there has been an alleged breach. (*Id.*, Art. 16.3.)

### i.      Franchisee's Obligations Upon Termination

Termination of the Agreements at issue, regardless of the reason, renders franchisees subject to several obligations. (*See* Compl. Ex. A, Art. 17.1.) Within five days of termination, for example, the franchisee must pay all fees owed to Mainstream, and return all copies of Mainstream's Operations Manual, advertising materials, customer lists and accompanying information, and all other printed Mainstream materials. (*Id.*) The franchisee's rights to use the Mainstream Marks end immediately upon termination, and the franchisee is required to assign to Mainstream any telephone numbers, email addresses, and directory listings for said numbers. (*Id.*, Art. 17.2–17.4.) Mainstream also has the right, though not the obligation, to purchase the "then-usable supplies, inventory, fixtures and equipment, and all other assets that are required by Mainstream for a standard Mainstream Boutique business" owned by the franchisee. (*Id.*, Art. 17.5.) In furtherance of this "right to purchase," the Agreements provide that upon termination, the franchisee

must provide Mainstream with written notice listing the cost of each one of the "Business Assets," and that if Mainstream and the franchisee cannot agree on a price, the price "will be the fair market value of such assets and either party will have the right to demand" that such value be determined through arbitration. (*Id.*)

### j.  Franchisee's Covenant Not To Compete

The Agreements also contain covenants not to compete that cover both in-term and post-termination periods. (Compl. Ex. A, Art. 18.) The post-termination noncompete provisions, relevant here, bar the franchisee—for a period of two years, within 25 miles of both the franchisee's former location and any other Mainstream Boutique location—from (1) seeking to employ or actually employing any employee or independent contractor employed by Mainstream, or induce such persons to leave Mainstream; (2) diverting or attempting to divert any business to any competing business; or (3) owning, operating, leasing, or otherwise conducting, directly or indirectly, any business that is "in *any way competitive with . . . or similar to* the Mainstream Boutique businesses[.]" (*Id.*, Art. 18.2 (emphasis added).) The Agreements state that the franchisee and any personal guarantors agree that the noncompete provisions are "necessary to protect the legitimate business interests of MAINSTREAM and MAINSTREAM'S franchisees[,]" and acknowledge "that damages alone cannot adequately compensate MAINSTREAM if there is a violation of [the noncompete provisions] by" the franchisee. (*Id.*, Art. 18.3.) The Agreements state that the franchisee acknowledges Mainstream's right to pursue injunctive relief. (*Id.*)

### k.     Arbitration

The Agreements also require, in certain circumstances, that any dispute between Mainstream and a franchisee be resolved through arbitration.  (*See id.*, Art. 19.)  The Agreements state that "[e]xcept as expressly provided to the contrary in this Agreement, all disputes and controversies . . . arising under, as a result of, or in connection with this Agreement or [franchisee's] Mainstream Boutique Business will be submitted to binding arbitration . . . ."  (*Id.*, Art. 19.1.)  The Article excludes, however, the following disputes:

- Claims by Mainstream for injunctive relief (Article 20.1), such as claims seeking to enforce Mainstream's Marks or Business System; post-termination obligations; transfer or assignment provisions; or a franchisee's violation of confidentiality/noncompete provisions;

- Disputes involving the Marks (under Article 3);

- Disputes about immediate termination (under Articles 15.4 & 15.5);

- Disputes over the confidentiality provisions (Article 7); and

- Disputes regarding the noncompete covenants in Article 18.

(*Id.*, Art. 19.5, 20.1.)

### l.     Choice of Law and Attorneys' Fees

The Agreements also contain a choice of law provision and an attorneys' fees provision.  The choice of law provision states that both the Agreements' terms, as well as the relationship between Mainstream and its franchisee, "will be governed by the laws (statutory or otherwise) of the state in which the Retail Location is located," namely North Carolina.  (*Id.*, Art. 20.10.)  The provision also states that the franchisee "waives the rights

and protections that may be provided through the franchise or business opportunity laws of any state other than the state in which the retail location is located." (*Id.*)

The attorneys' fees provision states that the franchisee will pay "all costs and expenses, including attorneys' fees, deposition costs, expert witness fees, investigation costs, accounting fees, filing fees and travel expenses actually incurred by MAINSTREAM in enforcing any term, condition or provision of this Agreement or in seeking to enjoin any violation of this Agreement[.]" (*Id.*, Art. 20.11.)

### 3.     Franchise Disclosure Documents

As required by federal law, Mainstream also provided a Franchise Disclosure Document ("FDD") to Defendants.  *See* 16 C.F.R. § 436.2 (2018) (requiring franchisors to furnish prospective franchisees with a "current disclosure document"); 16 C.F.R. §§ 436.3, 436.5 (2018) (listing the significant amount of information that must be disclosed to a prospective franchisee about the franchisor, its business, and investment in a franchised-business).  Defendants acknowledge receipt of the FDD in their Agreements, both through contractual provisions and an attached receipt.  (*See* Compl. Ex. A, Art. 22.4; *Id.* [Doc. No. 1-1] at Doc. Page No. 39; Compl. Ex. B, Art. 22.4; *Id.* [Doc. No. 1-1] at Doc. Page No. 83.)  As required by federal law, the FDD contains prominent, plain language warnings on its cover, informing prospective franchisees that the "disclosure document summarizes certain provisions of your franchise agreements and other information in plain English." (*See* Dady Aff. in Supp. of Mot. to Dismiss (Dady MTD Aff.), Ex. A [Doc. No. 24-1] at Doc. Page No. 1 (Mooresville Franchise Disclosure Document); *Id.*, Ex. B at Doc. Page

No. 4 (Winston-Salem Franchise Disclosure Document).)[3] It also states "[t]he terms of your contract will govern your franchise relationship[,]" and warns prospective franchisees to not rely on the disclosure document alone to understand any proposed franchise agreement. (*Id.*, Ex. A at Doc. Page No. 1.)

Contained at Exhibit F of the Mooresville FDD, and Exhibit G of the Winston-Salem FDD, is a "State Addenda" with the header "ADDENDUM TO MAINSTREAM BOUTIQUE FRANCHISE AGREEMENT <u>FOR THE STATE OF MINNESOTA</u>[.]" (Dady MTD Aff., Ex. A at Doc. Page No. 3; *Id.*, Ex. B. at Doc. Page No. 6.) It states that "[t]his Addendum will pertain to franchises sold in the State of Minnesota and will be for the purpose of complying with Minnesota statutes and regulations." (*Id.*, Ex. A at Doc. Page 3.) The addenda further state, in relevant part, that "[n]otwithstanding anything . . . in the . . . Franchise Agreement to the contrary, the Agreement will be amended" as follows:

> 2.      Article 15.2 will be amended to require that, except as set forth in Article 15.4 and 15.5, in the event MAINSTREAM gives FRANCHISEE written notice that FRANCHISEE has breached this Agreement, such written notice will be given to FRANCHISEE at least 90 days prior to the date this Agreement is terminated by MAINSTREAM, and FRANCHISEE will have 60 days after having been given such written notice within which to correct the breach specified in the written notice; and

> 3.      Notwithstanding any provisions of this Agreement to the contrary, a court of competent jurisdiction will determine whether MAINSTREAM will be required to post a bond or other security, and the amount of such bond or other security, in any injunctive proceeding commenced by MAINSTREAM against FRANCHISEE or FRANCHISEE's shareholders.

---

[3]      The "State Addenda" are identical for each franchise. Accordingly, the Court cites to only one of those documents moving forward unless otherwise noted.

(*Id.*, Ex. A at Doc. Page 3.)   These provisions align with portions of the Minnesota Franchise Act ("MFA"), and the requirements contained therein.  *See* Minn. Stat. § 80C.14, subds. 1, 3 (2018).   Below the modifications, each addenda contains two lines for Mainstream and the franchisee to initial.  (*Id.*)  For both franchises, however, those lines are unsigned.  (Dady MTD Aff., Ex. A at Doc. Page No. 3; *see also id.*, Ex. B at Doc. Page No. 6.)  The parties dispute the effect of these addenda on their relationship, as well as the application of the Minnesota Franchise Act to this case.  (*Compare* Defs.' PI Opp'n Mem. at 34 (arguing the MFA applies), *with* Pl.'s PI Reply at 11 (arguing the opposite).)

### 4.       Mainstream's Decision to Change its Point-of-Sale System

In January 2019, Mainstream informed its franchisees, including Defendants, that the Mainstream Boutique system was upgrading to a new point-of-sale ("POS") system, and that franchisees would need to migrate to the new system pursuant to the terms of their franchise agreements.  (Compl. ¶ 53.)  The new POS system is cloud-based, and provides access to real-time sales, inventory, and other data designed to increase sales, streamline operations, and potentially allow franchisees to take advantage of opportunities that require an internet.  (*Id.* ¶ 54.)  All of Mainstream's franchisees, other than Defendants, have either installed or agreed to install the new POS system.  (*Id.* ¶ 55.)

From January 2019 to September 2019, Mainstream repeatedly informed Defendants of their obligation to upgrade to the new POS system.  (*Id.* ¶ 56.)  They did not do so.  Beginning in September 2019, the parties began exchanging letters related to this issue.

On September 19, 2019, Mainstream sent a letter to Anitra Mitchell and Charlotte Parris (Winston-Salem Franchise), and a letter to the Mitchells (Mooresville Franchise) reminding them of their obligation to migrate to the new POS system and indicating that they had not yet done so. (*See* Compl. Ex. C [Doc. No. 1-1].) Mainstream also warned each franchisee that if they failed to (1) sign their contracts with the new POS provider by September 26, 2019, (2) secure a migration date to the new POS system by September 26, 2019, and (3) install and operate the new POS system by October 19, 2019, Mainstream would put the franchisees in formal default under the terms of their Franchise Agreements. (*Id.*)

On September 27, 2019, the Mitchells responded to Mainstream's letter. (*See* Compl. Ex. D [Doc. No. 1-1].) The Mitchells disputed Mainstream's right to default both the Winston-Salem and Mooresville franchise locations for not upgrading to the new POS system, and argued that the new POS system was unproven, could not meet the franchised businesses' needs, and should not be required in light of the franchises' current "well-functioning" POS system. (*Id.* at 1.) Specifically, the Mitchells noted that their "decision to not install [Mainstream's] mandated POS System is based on our considered judgment that [Mainstream's] mandate is not based on good faith, commercially reasonable business reasons." (*Id.*) The Mitchells noted they had previously expressed concerns with the new POS system, and that those concerns had not been adequately addressed. (*Id.* at 1–2.) They then highlighted nine specific categories of concern regarding the new POS system: (1) increased cost to franchisees for both hardware and software; (2) additional accounting costs related to the inability of the new POS system to sync with the old POS system; (3)

the lack of a plan to integrate the new POS system with e-commerce opportunities; (4) false claims of savings under the new POS system; (5) increased staffing costs; (6) the lack of any business or financial plan regarding the new POS system; (7) training and rollout concerns; (8) gift cards and current customer balance issues under the new system; and (9) poor service and response from the new POS provider. (*Id.* at 3–8.) The Mitchells then requested that Mainstream withdraw its notice of potential default. (*Id.* at 8.)

On October 2, 2019, Mainstream sent letters to both franchisees asserting that the franchisees had not met the September 26 deadline imposed in its prior letters by failing to sign contracts for, and migrate to, the new POS system. (*See* Compl. Ex. E.) In accordance with its prior letters, Mainstream then declared each franchisee in breach of their Franchise Agreements, and, pursuant to Section 15.2 of the Franchise Agreements, gave the franchisees 30 days to cure the failure to migrate to the new POS system. (*Id.*) If franchisees failed to cure, Mainstream noted, the Franchise Agreements would terminate within 30 days of the letter, i.e. November 2, 2019. (*Id.*)

The next day, on October 3, 2019, the Mitchells sent a letter to Mainstream acknowledging Mainstream's October 2 letter, and asserting that they, and not Mainstream, had the right to terminate their two franchise relationships. (*See* Compl. Ex. F at 1.) The Mitchells asserted that Mainstream had materially breached both the Winston-Salem and the Mooresville Franchise Agreements, "as augmented by what we are advised are your contract-in-law obligations to exercise your discretion in your franchise relationships with us in an honest, good faith, commercially reasonable, and non-discriminatory manner." (*Id.*) The Mitchells argued that Mainstream had breached this obligation in "multiple ways,

most recently by sending [] two . . . letters advising us that both of our Franchise Agreements will be terminated unless we abandon our well-functioning current POS System and install, and have operational by October 19, 2019, an unreasonably expensive and less effective . . . Point of Sale [] System . . . ." (*Id.*) They also raised five "material failures" on Mainstream's part: (1) Mainstream's failure to provide, under Article 8, commercially reasonable training; (2) Mainstream's failure to provide, under Article 6, commercially reasonable assistance to timely meet inventory needs; (3) Mainstream's failure to provide, under Article 5, commercially reasonable advertising and marketing programs; (4) Mainstream's "mandate, under threat of termination," that franchisees use an untested new POS system; and (5) Mainstream's failure to provide a comprehensive, up-to-date Operating Manual that enabled franchisees to better accommodate consumers' increasing interest in e-commerce shopping. (*Id.* at 1–2.) Because, the Mitchells noted, Mainstream had not responded to their September 27, 2019 letter, and instead had responded with notice-of-default letters, the Mitchells asserted their "contractual right to terminate [their] two Franchise Agreements effective November 3, 2019." (*Id.* at 1.)

On October 16, 2019, Mainstream sent another letter to the Mitchells, this time through counsel, denying that Mainstream had breached the Franchise Agreements and arguing that, in any event, the Mitchells had failed to comply with the terms of Article 16.2 by failing to describe with specificity how Mainstream breached and what it could do to cure. (Compl. Ex. G. at 1–4.) Mainstream's counsel also noted that the Mitchells had not provided notice of the alleged breaches to Mainstream at the time they allegedly occurred, as required by the Franchise Agreements. (*Id.* at 1.) Finally, Mainstream reminded the

Mitchells that they had 30 days from its prior letter (i.e. until November 2, 2019) to cure its breach by migrating to the new POS system. (*Id.* at 3–4.)

On November 1, 2019, Anitra Mitchell and Charlotte Parris (for the Winston-Salem Franchise), and the Mitchells (for the Mooresville Franchise) sent letters to Mainstream acknowledging Mainstream's October 2 letters and the "notice of the termination of [the] . . . franchise[s]" contained therein. (Compl. Ex. H.) However, the franchisees asserted that because of Mainstream's "uncured correction of [its] breaches, as set forth in our October 3, 2019 written notice . . . [the franchisees have] the right to effect this termination at or about this same date, which we are now doing." (*Id.*) The franchisees noted that they would pay all continuing fees, advertising fund contributions, and any other amounts due and owing through November 1, 2019, on or before November 6, 2019. (*Id.*) They also stated that they would return Mainstream's Operations Manual, destroy any printed Mainstream Boutique materials in their possession, and remove signage on the franchises' premises. (*Id.*) Finally, the franchisees stated:

> If you would like to purchase any of our store's Business Assets, including our current usable supplies, inventory, fixtures, equipment, or any other assets required by Mainstream to operate our Mainstream Boutique Business, please let us know promptly, i.e., on or before the close of business on November 6, 2019, which of these Business Assets you would like to buy, and we will promptly give you what we believe would be the current fair market value price for each such Business Asset.

(*Id.*)

On November 5, 2019, Mainstream's counsel sent letters to Defendants advising them that their Franchise Agreements had been terminated, effective immediately, as a result of their failure to cure the POS system default identified previously, and because

Defendants had evidenced an intent to abandon, or actually had abandoned, their franchised businesses. (Compl. Ex. I [Doc. No. 1-1] at Doc. Page No. 112, 116.) Mainstream noted that to its knowledge, Defendants had closed their franchised business and had shut down each location's Facebook group. (*Id.* at 112, 116.) It also demanded that Defendants comply with their post-termination obligations under Articles 6.23, 6.24, 7, 17, and 18.2, including all post-termination covenants against competition and any obligations related to fees, customer lists, and, among other things, returning certain items to Mainstream. (*Id.* at 113, 117.) Mainstream also informed Defendants it was interested in purchasing "some or all of the Franchised Business' assets" pursuant to Article 17.5, and accordingly requested a list of "all usable supplies, inventory, fixtures and equipment used in the former [franchise], along with an estimate of the fair market value for each . . . asset[.]" (*Id.* at 114, 118.) Further, on November 6, 2019, Mainstream's counsel sent letters to Defendants advising them that Mainstream was concerned that they had been underreporting their sales. (Compl. Ex. J.) Accordingly, Mainstream informed Defendants that it was exercising its audit rights under Article 12.5, and demanded that Defendants provide copies of numerous records for review. (*Id.*)

### 5. Defendants' Ongoing Businesses

Shortly after this exchange of letters, Mainstream learned that Defendants continued to operate a retail business in each of the former franchised business locations, which it alleges is in violation of Defendants' post-termination obligations. (Compl. ¶ 70.) The location of the Winston-Salem franchised business is now the site of "Love + Well Boutique," owned by G&L, which in turn is owned by the Mitchells. (*Id.* ¶¶ 71–72.) The

location of the Mooresville franchised business is now the site of "Bliss by the Lake," owned by CCP, which in turn is owned by Parris. (*Id.* ¶¶ 73–74.) Mainstream alleges that G&L and CCP were created to circumvent the post-termination non-compete provisions of the Franchise Agreements, and that each retail business is violating Defendants' post-termination obligations. (*Id.* ¶¶ 71–75.) It also alleges that Defendants Parris and A. Mitchell are working in their respective competing businesses, and that Defendants are selling Mac and Me branded-products (exclusive to Mainstream Boutique) in their stores. (*Id.* ¶¶ 75–77.) Moreover, Mainstream contends, Defendants are utilizing social media accounts from their former franchised businesses to advertise their new businesses. (*Id.* ¶ 78.)

Mainstream also contends that Defendants have failed to comply with numerous other post-termination obligations, including the payment of fees, the assignment to Mainstream of the former franchised businesses' telephone numbers and email addresses, and the offer to Mainstream of the right to purchase the former franchised businesses' assets. (*Id.* ¶ 79.)

Defendants deny each of these allegations.

### C.     Procedural History

On November 21, 2019, Mainstream filed a complaint—with fourteen attached exhibits—asserting seven counts. (*See generally* Compl. ¶¶ 87–133.) In Count One, against all Defendants, Mainstream alleges breach of the Franchise Agreements and personal guaranties at issue for Defendants' failure to comply with their non-compete obligations. (*Id.* ¶¶ 87–94.) Count Two, against Defendants All These Things, the

Mitchells, and Parris, asserts breach of contract for failure to comply with the Franchise Agreements' post-termination obligations. (*Id.* ¶¶ 95–100.) Count Three, against the same Defendants as Count Two, asserts breach of contract for failure to allow Mainstream to purchase the former franchised businesses' assets. (*Id.* ¶¶ 101–106.) Count Four, against Defendants All These Things, A. Mitchell, and Parris, asserts breach of contract for failure to pay marketing fees. (*Id.* ¶¶ 107–111.) Count Five, against Defendants All These Things, the Mitchells, and Parris, asserts breach of contract for failure to pay future lost fees. (*Id.* ¶¶ 112–117.) Count Six, against the same Defendants as Count Five, asserts breach of the Franchise Agreements' audit provisions, and seeks specific performance requiring the Defendants to comply with Mainstream's request to inspect, audit, and photocopy the books and financial records for the former franchised businesses. (*Id.* ¶¶ 118–123.) Count Seven, against all Defendants, asserts that Defendants engaged in a civil conspiracy in an effort to evade the terms of their Franchise Agreements and steal Mainstream's customers. (*Id.* ¶¶ 124–130.) Finally, Count Eight, which is against All These Things, the Mitchells, and Parris, seeks attorneys' fees for the costs of pursuing this action. (*Id.* ¶¶ 131–133.) Mainstream seeks at least $350,000 in damages. (*Id.* ¶¶ 133(C), (D).)

The day after filing its complaint, Mainstream filed this motion for a preliminary injunction prohibiting Defendants from, among other things, operating its current businesses. (*See* Pl.'s Mot. for Prelim. Inj. [Doc. No. 5] at 1–2.) On December 6, 2019, Defendants filed a motion to dismiss the Complaint for failure to state a claim. (*See* Defs.' Mot. to Dismiss [Doc. No. 21]. The parties have briefed both motions in full. (*See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. (Pl.'s PI Mem.) [Doc. No. 7]; Defs.' PI Opp'n Mem.;

Pl.'s PI Reply Mem.; Defs.' MTD Mem.; Pl.'s MTD Opp'n Mem.; Defs.' Reply Mem. in Supp. of Mot. to Dismiss (Defs.' MTD Reply) [Doc. No. 45].)  The Court heard oral argument on both motions on January 17, 2020.  (*See* Minute Entry [Doc. No. 50].)[4]

---

[4]      After oral argument, Mainstream requested permission to file supplemental briefing regarding the potential applicability of the Minnesota Franchise Act to this case.  (*See* Feb. 24, 2020 Mainstream Letter [Doc. No. 57].)  It also simultaneously filed an additional declaration containing sixteen additional exhibits related to its motion for a preliminary injunction.  (*See* 2d Decl. of Corey DeNicola in Supp. of Mot. for Prelim. Inj. [Doc. No. 58].)  Defendants opposed the request but sought permission to file additional briefing should Mainstream's request be granted.  (*See* Feb. 24, 2020 Defs.' Letter [Doc. No. 59].) On February 25, 2020, the Court granted Mainstream's request, and permitted both parties to file short supplemental briefs regarding the application of the Minnesota Franchise Act to this case.  (*See* Feb. 25, 2020 Order [Doc. No. 60] at 1–2.)

Shortly after the Court granted permission to both parties to file supplemental briefs, but before either party did so, Defendants objected to the Court's consideration of the Second Declaration of Corey DeNicola (Doc. No. 58), noting (1) the declaration (which was, in fact, the third declaration by Corey DeNicola) was filed long after the conclusion of original briefing and oral argument; and (2) the declaration contained numerous pieces of factual information that were available to Mainstream prior to the close of briefing and oral argument.  (*See* Feb. 26, 2020 Defs.' Letter [Doc. No. 61] at 1–2.)  Mainstream opposed Defendants' objection.  (*See* Feb. 27, 2020 Mainstream Letter [Doc. No. 62] at 1–2.)  On February 28, 2020, the Court sustained Defendants' objections to the declaration, noting that it was untimely and contained materials largely available to Mainstream prior to the close of briefing on its motion for a preliminary injunction.  (*See* Declaration Order [Doc. No. 66] at 4–6.)  The parties subsequently filed their supplemental briefing regarding the applicability of the Minnesota Franchise Act.  (Pl.'s Supp'l Br. in Supp. of Mot. for Prelim. Inj. (Pl.'s Supp'l PI Br.) [Doc. No. 64]; Defs.' Supp'l Br. in Opp'n to Mot. for Prelim. Inj. (Defs.' Supp'l PI Br.) [Doc. No. 67].)  However, the Court's order sustaining Defendants' objection to the DeNicola declaration was filed just after Mainstream filed its supplemental briefing.  Given the timeline, a small section of Mainstream's supplemental brief contains a discussion of the DeNicola declaration.  (*See* Pl.'s Supp'l PI Br. at 5.)  In accordance with its order, the Court will not consider that section in analyzing Plaintiff's preliminary injunction motion.

## II.    DISCUSSION

The parties agree that the substantive law of North Carolina applies to Mainstream's claims pursuant to a choice-of-law provision in the Franchise Agreements.[5] (*See* Compl. Ex. A, Art. 20.10; *see also* Pl.'s PI Mem. at 15, n.3; Defs.' PI Opp'n Mem. at 20 n.6.) They disagree, however, as to whether North Carolina law, applied here, is augmented by the provisions of the MFA, (*see* Pl.'s PI Reply at 11; Defs.' PI Opp'n Mem. at 34), and the effect that the Act has on the underlying merits of the case. As noted below, however, the Court concludes that it need not reach this issue at this time because its application would not change the Court's decision on each motion.

### A.    Defendants' Motion to Dismiss

Defendants move to dismiss the entire complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Federal Rule of Civil Procedure 8(a)(1)–(3) requires that a complaint set forth "a short and plain statement" of "the grounds for the court's jurisdiction," the "claim showing that the pleader is entitled to relief," and "a demand for the relief sought, which may include relief in the alternative or different types of relief." A party who believes that a pleader has failed to do so may file a motion to dismiss under Fed. R. Civ. P. 12(b)(6), which permits dismissal where the plaintiff has failed "to state a claim upon which relief can be granted." When evaluating a motion to dismiss under Fed.

---

[5]    Given the parties' agreement, the Court need not engage in any choice-of-law analysis with respect to the substantive law underlying the parties' dispute. *See Lamoureaux v. MPSC, Inc.*, No. 14-cv-1488 (JRT/BRT), 2015 WL 8082598, at *7 n.10 (D. Minn. Dec. 7, 2015) (acknowledging party agreement regarding which state's law applies), *affirmed*, 849 F.3d 737 (8th Cir. 2017).

R. Civ. P. 12(b)(6), the Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). In doing so, however, the Court is not required to defer to legal conclusions or "formulaic recitation[s] of the elements of a cause of action." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), and consequently permit a claim to advance into discovery, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Neubauer v. FedEx Corp.*, 849 F.3d 400, 404 (8th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). While the plausibility standard is "not akin to a probability requirement," it necessarily requires a complaint to present "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

When considering a motion to dismiss under Rule 12(b)(6), "the court generally must ignore materials outside the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). Courts may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (citation omitted) (internal quotation marks omitted).

### 1. Overarching Arguments Regarding Counts One through Five

Defendants assert that Counts One through Five of Mainstream's complaint, which allege breaches of the Franchise Agreements' noncompete provision, post-termination obligations, right to purchase provision, marketing fees provision, and future fees provision, all fail because (1) Mainstream committed prior material breaches of the Franchise Agreements and implied covenant of good faith and fair dealing, rendering it unable to enforce any other contractual provisions against Defendants; (2) Mainstream violated the MFA, also rendering it unable to enforce other contractual provisions against Defendants; and (3) Mainstream's post-termination non-compete provisions are overbroad and unenforceable on their face. (*See* Defs.' Mot. to Dismiss [Doc. No. 21] at 2–3 (; Defs.' MTD Mem. at 12, 20–25.) The Court addresses each issue in turn.

### a. Mainstream's Prior Material Breaches of Implied Covenant of Good Faith and Fair Dealing

Defendants first contend that Mainstream's entire complaint rests on the "false premise" that it had not committed prior material breaches of the Franchise Agreements. (Defs.' MTD Mem. at 12.) Defendants argue that under the implied covenant of good faith and fair dealing, inherent in any contract made under North Carolina law, Mainstream breached its obligations to Defendants in six ways: (1) by sending Defendants the October 2, 2019 Notice that they were to be terminated for failure to install the new POS system; (2) by failing to withdraw the wrongful notice of termination; (3) by violating the terms of the Minnesota Addenda contained in Mainstream's FDD that was provided to Defendants prior to the implementation of the Franchise Agreements at issue; (4) by failing to provide

them with commercially reasonable training, commercially reasonable assistance in managing inventory needs, and commercially reasonable advertising and marketing programs; (5) by mandating that they deal with suppliers specified by Mainstream; and (6) by failing to provide an up-to-date copy of Mainstream's Operations Manual sufficient to meet the evolving needs of their customers. (*Id.* at 14–16.) In response, Mainstream vigorously disputes these purported breaches and contends that such factual disputes preclude dismissal as a matter of law. (Pl.'s MTD Opp'n Mem. at 12–13); *see Pay Child Support Online Inc. v. ACS State & Local Sols., Inc.*, No. 2-cv-1321 (DWF/SRN), 2002 WL 31748612, at *2 (D. Minn. 2002) (noting that the party seeking dismissal for failure to state a claim "may not support a motion to dismiss with general assertions that 'it didn't happen that way.' "). The Court agrees.

For example, Defendants' first argument—that Mainstream breached the implied covenant of good faith and fair dealing by sending its October 2 notice of default—is a dispute about whether Mainstream in fact had the right to send its October 2 notice of default; it is not a claim that Mainstream failed to allege facts sufficient to show a breach of the Franchise Agreements. Defendants are correct—and indeed, Mainstream appears to acknowledge (*see* Pl.'s MTD Opp'n Mem. at 14, n.6)—that North Carolina law recognizes that every contract contains an implied covenant of good faith and fair dealing that neither party " 'will do anything which injures the right of the other to receive the benefits of the agreement.' " *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 781 S.E.2d 889, 894 (N.C. Ct. App. 2016) (quoting *Bicycle Transit Auth. v. Bell*, 333 S.E.2d 299, 305 (N.C. 1985) (internal quotation marks omitted)). Moreover, Defendants may even be able

to prove, on the merits, that Mainstream's decision to require its franchisees to migrate to a new POS system was a violation of the implied covenant. *See, e.g.*, *Burger King Corp. v. Cabrera*, No. 10-20480-Civ., 2010 WL 5834869, at *5–6 (S.D. Fla. Dec. 29, 2010) (concluding there was a "substantial factual question" over whether a new POS system required by franchisor was appropriate where old system may not have been "obsolete"). But Defendants mistake proving their defense *on the merits* with Mainstream's requirements *at the pleading stage*. Mainstream need only allege sufficient facts—which this Court must take as true, *see Hager*, 735 F.3d at 1013—establishing a plausible case that, under its version of events, Defendants breached the Franchise Agreement. It has done so by alleging that it had the right, under the Franchise Agreements, to require its franchisees to change the POS system used in Mainstream Boutique stores from time to time, and that Defendants refused to do so in violation of the terms of the Franchise Agreement. (*See* Compl. ¶¶ 39, 53–60.); *see also Anytime Fitness, Inc. v. Reserve Holdings, LLC*, No. 18-cv-4905 (MJD/JJK), 2008 WL 5191853, at *6 (D. Minn. Oct. 6, 2008) (noting that "the franchisee is not excused from following the franchise agreement" merely by "accus[ing] the franchisor of failing to perform under the franchise agreement" (citation omitted)).

Defendants' second argument—that Mainstream again breached the implied covenant of good faith and fair dealing by refusing to withdraw the wrongful October 2 notice—is tied to, and accordingly falls with, its first argument.

Defendant's third argument—that Mainstream violated the terms of the Minnesota Addenda contained in the FDD—also fails to provide a valid basis for dismissal. As an

initial matter, the parties dispute whether the Minnesota Addenda are even a part of the Franchise Agreements at issue. (*See* Defs.' PI Opp'n Mem. at 34; Pl.'s PI Reply at 11.) The Addenda are unsigned (*see* Dady MTD Aff., Ex. A at Doc. Page No. 3; *see also id.*, Ex. B at Doc. Page No. 6.), and such FDD disclosures are not typically treated as contracts. *See Klosek v. Am. Express Co.*, No. 08-cv-426 (JNE/JJG), 2008 WL 4057534, at *13 n.9 (D. Minn. Aug. 26, 2008) (noting that an FDD is "not [an] agreement[] or negotiation[], but [rather a] disclosure[], which [a franchisor] must provide to all its prospective franchisees").

Moreover, while the Franchise Agreements acknowledge the existence of the FDD (*see* Compl., Ex. A at Art. 20.7 (noting that "[n]othing in this Agreement is intended to disclaim the representations MAINSTREAM made in the [FDD.]"), the Agreements also disclaim, albeit generally, the presence of any other written agreement between the parties. (*See id.* at Art. 20.7 (noting "there are no other oral or written understandings or agreements" between the parties other than the Agreement); *Id.* at Art. 20.10 (noting the franchisee "waives the rights and protections that may be provided through the franchise or business opportunity laws of any state other than the state in which the Retail Location is located"). Put simply, Defendants' assertion that the Addenda apply, and the extent to which they apply, is another factual dispute on which there is little record evidence at this stage in the proceedings, precluding dismissal.

### b.       Mainstream's Alleged Violation of the MFA

Defendants' second overarching basis for dismissing Mainstream's complaint is Mainstream's alleged violation of the terms of the Minnesota Franchise Act, and the rules

promulgated thereunder by the Minnesota Commissioner of Commerce. (*See* Defs.' MTD Mem. at 14–19.) Defendants assert that the MFA applies because Mainstream sold Defendants their franchises "in the State of Minnesota." (*Id.* at 17 (quoting Minn. Stat. § 80C.19, subd. 1 ("The provisions of sections 80C.01 to 80C.22 concerning sales and offers to sell shall apply when a sale or offer to sell is made in this state; when an offer to purchase is made and accepted in this state; or when the franchise is to be located in this state.")). Mainstream disputes the application of the MFA to this case and argues that the Act does not apply by its own terms or through the Minnesota Addenda, and, even if it could apply, Defendants waived its application through Article 20.10 of the Franchise Agreements. (Pl.'s MTD Opp'n Mem. at 14–18.) Mainstream also asserts that there is a fact question about whether Mainstream's sale of a franchise to Defendants occurred in Minnesota. (*Id.* at 18.)

A brief discussion of the MFA, and the state of the law with respect to its extraterritorial application, is warranted. The MFA "was adopted in 1973 as remedial legislation designed to protect potential franchisees within Minnesota from unfair contracts and other prevalent and previously unregulated abuses in a growing national franchise industry." *Clapp v. Peterson*, 327 N.W.2d 585, 586 (Minn. 1982) (citing *Martin Inv'rs, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn. 1978)). As introduced, it was described as a " 'bill to give the commissioner of securities some control over the franchising business in the State of Minnesota.' " *In re Ne. Exp. Reg'l Airlines, Inc.*, 228 B.R. 53, 59 (Bankr. D. Me. 1998) (citation omitted). Its provisions contain, among other things, registration requirements for franchisors, disclosure and form requirements for franchise

offerings, rules surrounding advertisements for franchise sales, certain prohibited and unfair practices, and a broad waiver section declaring most contract provisions purporting to waive the MFA's protections to be void. *See* Minn. Stat. §§ 80C.02 (registration), 80C.06 (offerings), 80C.09 (advertisements), 80C.13–.14 (prohibited and unfair practices), 80C.21 (waivers void).

As an initial matter, the Minnesota Supreme Court's decisions in *Clapp* and *Martin* suggest that the MFA applies only to franchisees *within* Minnesota. *See Clapp*, 327 N.W.2d at 586. However, despite this language, the Minnesota Court of Appeals has recently noted that the application of the MFA to an out-of-state franchisee is "a question without controlling precedent" because the *Martin* and *Clapp* decisions did not explicitly address the extraterritorial scope of the MFA. *Cambria Co. LLC v. M&M Creative Laminants Inc.*, No. A18-1978, 2019 WL 3543602, at *2 (Minn. Ct. App. Aug. 5, 2019). Indeed, several courts have concluded that the MFA does *not* apply to out-of-state franchisees. *See Novus Franchising, Inc. v. Superior Entrance Systems, Inc.*, No. 12-cv-204-WMC, 2012 WL 3542451, at *2 (W.D. Wis. Aug. 16, 2012) ("Even without the choice of law provision, [the MFA] is inapplicable to defendants, who are not Minnesota residents and who operate a franchise territory located entirely outside of Minnesota." (citing *Martin*, 269 N.W.2d at 872)); *In re Ne. Exp. Reg'l Airlines, Inc.*, 228 B.R. at 59 (concluding that party could not claim the protections afforded under the MFA "because they are not franchisees *within* Minnesota" (citing *Martin*, 269 N.W.2d at 872) (emphasis added)). The Eighth Circuit has also noted, albeit in passing, the same thing. *See Modern Comput. Systems, Inc. v. Modern Banking Systems, Inc.*, 871 F.2d 734, 739 (8th Cir. 1989) ("The

Minnesota Franchise Act was adopted sixteen years ago. It protects franchisees in Minnesota from unreasonable or abusive treatment by powerful franchisors."), *superseded by statute on other grounds acknowledged by*, Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 938 F.2d 870, 874 (8th Cir. 1991).

The judges in this district are split on the issue. Judge Montgomery has concluded on a few occasions that the MFA does *not* apply to out-of-state franchisees. *See, e.g.*, *Wave Form Systems, Inc. v. AMS Sales Corp.*, 73 F. Supp. 3d 1052, 1060 (D. Minn. 2014) (Montgomery, J.) (analyzing case law, statutory language, and apparent legislative intent); *Johnson Bros. Liquor Co. v. Bacardi U.S.A., Inc.*, 830 F. Supp. 2d 697, 703 (D. Minn. 2011) (Montgomery, J.) (noting Minnesota cannot regulate franchise agreements formed and performed in other states, and that "even where a party to a 'franchise agreement' is a Minnesota corporation, the agreement is not within the purview of the MFA if the franchisee is not located in and does not operated in Minnesota"); *Healy v. Carlson Travel Network Associates, Inc.*, 227 F. Supp. 2d 1080, 1087 (D. Minn. 2002) (Montgomery, J.) (concluding it was the "policy of the MFA to guard against abuses of *franchisees in Minnesota*" (emphasis added)). Judge Frank has also acknowledged, in addressing the statute's waiver provisions, that "a fundamental policy of Minnesota (and the MFA) is to protect Minnesota franchisees[.]" *Hockey Enters., Inc. v. Total Hockey Worldwide, LLC*, 762 F. Supp. 2d 1138, 1146 (D. Minn. 2011) (citing *Modern Comput. Systems, Inc.*, 871 F.2d at 739). And Judge Doty has observed that the MFA was passed "with the remedial purpose of protecting *Minnesota franchises* from unfair contracts." *Twin Cities Galleries,*

*LLC v. Media Arts Grp., Inc.*, 415 F. Supp. 2d 967, 974 (D. Minn. 2006) (emphasis added), *rev'd on other grounds*, 476 F.3d 598 (8th Cir. 2007).

Still, other judges in this district have reached the opposite conclusion. For example, Judge Magnuson has concluded that the MFA's "offer to sell" language—which states that "[t]he provisions of sections 80C.01 to 80C.22 concerning sales and offers to sell shall apply when a sale or offer to sell is made in this state", *see* Minn. Stat. § 80C.19, subd. 1, and on which Defendants rely here—provides a jurisdictional hook for the MFA to apply where an offer to sell a franchise is made in Minnesota, even where the franchisee is located in a different state. *See Candleman Corp. v. Farrow*, No. 98-cv-2463 (PAM/RLE), 1999 WL 35768614 (D. Minn. Feb. 1, 1999). More recently, a magistrate judge in this district reached the same conclusion, finding that the MFA can apply to out-of-state franchisees pursuant to the "offer to sell" language in Minn. Stat. § 80C.19, subd. 1, a decision affirmed by Judge Michael Davis. *Rise Above Fitness, Inc. v. FranChoice, Inc.*, No. 19-cv-1435, 2019 WL 7598652, at *10 (D. Minn. Dec. 19, 2019) (Wright, Mag. J.) ("[N]othing in the language of the statute suggest[s] that the MFA cannot apply to a foreign franchisee when the offer, in this case a solicitation, 'originates' from Minnesota"), *adopted and affirmed as modified*, 2020 WL 264657 (D. Minn. Jan. 17, 2020) (noting the absence of any objections to the report and recommendation of Magistrate Judge Wright, but one word in the opinion).[6]

---

[6]     The *Rise Above Fitness* decision is one of six related decisions authored by Magistrate Judge Wright, released on the same day, which address the issue. *See Dolphin Kickboxing Co. v. FranChoice, Inc.*, No. 19-cv-1477 (MJD/ECW), 2019 WL 7598649, at *8–9 (D. Minn. Dec. 19, 2019) (Wright, Mag. J.), *adopted and affirmed*, 2020 WL 264138

The Court need not wade into this murky water just yet, however, because (1) even if the MFA could apply, the Act's application depends on factual disputes not suitable for resolution on a motion to dismiss; and (2) even assuming the Act applies, it does not require dismissal.

First, with respect to the application of the Act, Defendants' lead argument for the MFA's application—that Mainstream's offer of sale of a franchise to Defendants took place in Minnesota—is itself a factual dispute between the parties. (*Compare* Pl.'s MTD Opp'n Mem. at 18 (disputing Defendants' assertion on this issue), *with* Aff. of B. Mitchell in Opp'n to Pl.'s Mot. for Prelim. Inj. [Doc. No. 33] at 2 (asserting that both franchises were offered to Defendants "in Minnesota"). Second, as noted above, there are significant factual disputes as to whether the Minnesota Addenda contained within the FDDs (which purport to augment the Franchise Agreements with certain MFA provisions) are in fact part of the Franchise Agreements. *See supra* at § II(A)(1)(a). Third, even assuming the MFA initially applies as a matter of law, both the language of the Act itself and case law relied upon by Defendants permits an out-of-state franchisee to waive its protections. *See* Minn.

---

(D. Minn. Jan. 17, 2020); *Hamilton v. FranChoice, Inc.*, No. 19-cv-1426 (MJD/ECW), 2019 WL 7598651, at *9–10 (D. Minn. Dec. 19, 2019) (Wright, Mag. J.), *adopted and affirmed*, 2020 WL 264148 (D. Minn. Jan. 17, 2020); *Johnson v. FranChoice, Inc.*, No. 19-cv-1417 (MJD/ECW), 2019 WL 7598623, at *10–11 (D. Minn. Dec. 19, 2019) (Wright, Mag. J.), *adopted and affirmed*, 2020 WL 264268 (D. Minn. Jan. 17, 2020); *Li v. FranChoice, Inc.*, No. 19-cv-1267 (MJC/ECW), 2019 WL 7598656, at *10–12 (D. Minn. Dec. 19, 2019) (Wright, Mag. J.), *adopted and affirmed*, 2020 WL 264273 (D. Minn. Jan. 17, 2020); *Van Saders v. FranChoice, Inc.*, No. 19-cv-1414 (MJD/ECW), 2019 WL 7598665, at *10 (D. Minn. Dec. 19, 2019) (Wright, Mag. J.), *adopted and affirmed*, 2020 WL 264326 (D. Minn. Jan. 17, 2020). All six decisions contain substantially identical language on the issue, and all were adopted and affirmed.

Stat. § 80C.21 (declaring void any "condition, stipulation or provision, including any choice of law provision, purporting to bind any person who, at the time of acquiring a franchise" is either (1) "a resident of [Minnesota], or, in the case of a [business], organized or incorporated under the laws of [Minnesota]", or (2) acquiring "any franchise to be operated in [Minnesota]"); *Candleman Corp.*, 1999 WL 35768614 (noting that the anti-waiver provision of the MFA did not apply where the franchisee was "not a resident of Minnesota and did not plan to establish his franchise in Minnesota"). These factual disputes over the MFA's applicability preclude, on their own, dismissal of Mainstream's complaint.

Second, even assuming that the MFA applies to this case, the Court's ruling remains the same. If the MFA applies, Mainstream was obligated to comply with Minn. Stat. § 80C.14, subd. 1, which states that "[n]o person, whether by means of a term or condition of a franchise or otherwise, shall engage in any unfair or inequitable practice in contravention of such rules as the commissioner [of commerce] may adopt defining as to franchises the words 'unfair and inequitable.' " One such rule, Minn. R. 2860.4400, subd. G, prohibits franchisors from "impos[ing upon] a franchisee by contract or rule, whether written or oral, any standard of conduct that is unreasonable." Defendants argue that Mainstream's mandate that they migrate to a new, untested, and purportedly inferior POS system was unreasonable, in violation of this rule. (*See* Defs.' MTD Mem. at 18). However, the reasonableness of this mandate is itself in dispute.

Similarly, if the MFA applies, it imposes longer time requirements for providing notice of termination to a franchisee. Pursuant to Minn. Stat. § 80C.14, subd. 3(a), a person

terminating or cancelling a franchise must give written notice at least 90 days in advance of termination of cancellation—and provide 60 days upon receipt of the notice to cure the alleged violations giving rise to the termination notice—except where: (1) termination is grounded upon "voluntary abandonment of the franchise by the franchisee"; or (2) the failure to cure any alleged violation materially impairs the good will of the franchisor's trade name. Subdivision 3(b) of the same statute requires that the person terminating a franchise have "good cause" before termination may occur at all. *See id.*, subd. 3(b). Defendants assert that Mainstream did not follow the timelines in subdivision 3(a), and accordingly lacked the requisite "good cause" to terminate the Franchise Agreements. (*See* Defs.' MTD Mem. at 18). Mainstream contends, however, that even if the MFA applies, Defendants voluntarily abandoned their franchises, which itself constitutes "good cause" for immediate termination under the MFA. (*See* Compl. ¶¶ 1, 63–64, 114; Pl.'s MTD Opp'n Mem. at 18 (noting the MFA permits immediate termination where franchisee's voluntarily abandon their franchises).); *see also* Minn. Stat. § 80C.14, subd. 3(a)(1), (3). Moreover, under the timeline of letter exchanges set forth above, *see supra* § I(B)(4), Mainstream's earliest letter declaring Defendants in default was sent on October 2, 2019, and gave Defendants 30 days—until November 2, 2019—to migrate to a new POS system. (*See* Compl. Ex. E.) Yet on November 1, *before* the expiration of that period, Defendants informed Mainstream that they were terminating the Franchise Agreements effective on or about the date of their letter. (*See* Compl. Ex. H.) Accordingly, Defendants' own termination appears to have occurred inside the time limits set forth in the MFA, which at minimum gives rise to a factual dispute over whether Mainstream possessed good cause at

that point in time to terminate the Franchise Agreements immediately.  *See* Minn. Stat. § 80C.14, subd. 3(a)(1).  These additional factual disputes illustrate that even if the MFA applies, they preclude dismissal of the Complaint.

### c.      Post-termination Non-compete Provisions

Defendants' last overarching argument for dismissal is that Mainstream's post-termination non-compete provisions are overbroad and unenforceable on their face.  (*See* Defs.' MTD Mem. at 20–25; Defs.' Mot. to Dismiss at 2–3.)  The noncompete provision states:

> FRANCHISEE, FRANCHISEE'S owners and the Personal Guarantors will not, for a period of two years after the termination or expiration of this Agreement, on their own account or as an employee, independent contractor, agent, consultant, partner, officer, director or owner of any other person, firm, entity, partnership, limited liability company or corporation: . . . (C) own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in any business that is *in any way competitive with (including, but not limited to, over the Internet) or similar to* the Mainstream Boutique businesses conducted by MAINSTREAM or MAINSTREAM'S franchisees, which is located (i) within a 25-mile radius of FRANCHISEE's Retail location; (ii) within a 25-mile radius of any other Mainstream Boutique businesses operated by MAINSTREAM or any of MAINSTREAM's franchisees . . . or (iii) over the Internet.

(Compl. Ex. A, Art. 18.2 (emphasis added).)

Defendants contend that under North Carolina law, a covenant not to compete in a franchise agreement is valid and enforceable only if it is (1) reasonable as to the duration and geographic scope of the restriction; and (2) the restriction is "otherwise necessary to protect the legitimate interests of the franchisor."  (Defs.' MTD Mem. at 20 (quoting *Meineke Car Care Centers, LLC v. ASAR Inc.*, No. 3:14-cv-129-RJC, 2014 WL 3952491,

at *5 (W.D.N.C. Aug. 13, 2014)).)  Defendants *do not* dispute the reasonableness of the duration and geographic scope restrictions of the noncompete provisions in their Franchise Agreements.  (*Id.* at 21.)  Rather, they take issue with the second prong, arguing that the noncompete provisions extend "far beyond the protection of Mainstream's legitimate interests" because the language prohibits Defendants from engaging in conduct that is not only directly competitive with Mainstream, but also "similar to" Mainstream's business. (*Id.* at 23 (citations omitted).)

Defendants rely heavily on a North Carolina trial-court decision, *Window Gang Ventures v. Salinas*, No. 18 CVS 107, 2019 WL 1471073, at *7–8 (N.C. Super. Ct. Apr. 2, 2019), in which the court concluded—on a Rule 12(b)(6) motion to dismiss—that a franchise noncompete provision that prohibited franchisees from working for "any business which is *the same*, *similar to* or competitive with" the franchisor was overbroad and unenforceable on its face because the "same [or] similar to" language  encompassed activities outside of those that would put the franchisee in competition with franchisor. That same language—"similar to"—is present in the Franchise Agreements here and, according to Defendants, is therefore unenforceable on its face.  (*See* Defs.' MTD Mem. at 23; Compl. Ex. A, Art. 18.2.)  Defendants also contend that while North Carolina courts can "blue pencil," or modify, contracts where provisions violate applicable law, they would not do so in this context.  (Defs.' MTD Mem. at 24–25.)

In response, Mainstream argues that the *Window Gang* case holds limited precedential weight, is distinguishable, and that other federal decisions out of North Carolina have enforced covenants containing the language at issue in Mainstream's

Franchise Agreements. (Pl.'s MTD Opp'n Mem. at 19–20 (citing *Outdoor Lighting Perspectives Franchising Inc. v. Home Amenities, Inc.*, No. 3:11-cv-0567, 2012 WL 137808, at *1 (W.D.N.C. Jan. 18, 2012); *Baskin-Robbins Inc. v. Golde*, No. 5:99-cv-102-BR(3), 2000 WL 35536665, at *1–2 (E.D.N.C. May 26, 2000)).) Mainstream also notes that Defendants agreed, in the Franchise Agreements, that the noncompete provisions were necessary so that Mainstream could retain "the opportunity to resell and/or develop a new Mainstream Boutique business at or in the area surrounding the Designated Radius." (*Id.* at 21 (quoting Compl. Ex. A, Art. 18.2).) Finally, Mainstream contends that North Carolina courts "routinely" blue pencil noncompete provisions where it does not require them to go beyond striking distinct, severable offending language. (*Id.* at 22 n.8.)

When analyzing noncompete provisions in the franchisor-franchisee context, the North Carolina Court of Appeals has adopted a hybrid test that combines certain factors considered when evaluating noncompete clauses between employers and employees, as well as factors used to evaluate noncompete clauses executed in connection with the sale of a business. *Outdoor Lighting Perspectives Franchising v. Harders*, 747 S.E.2d 256, 264 (N.C. Ct. App. 2013). Specifically, the court has noted:

> [T]he ultimate issue [in such cases] is the extent to which the non-competition provision contained in the franchise agreement is no more restrictive than necessary to protect the legitimate interests of the franchisor, with the relevant factors to be considered in the making of this determination to include the reasonableness of the duration of the restriction, the reasonableness of the geographic scope of the restriction, and the extent to which the restriction is otherwise necessary to protect the legitimate interests of the franchisor.

*Id.* The party who seeks enforcement of the covenant not to compete has the burden of proving the covenant is reasonable. *Id.* Importantly, "[t]he reasonableness of a noncompetition covenant is a matter of law for the court to decide." *Id.* (citation omitted) (internal quotation marks omitted). Here, the reasonableness of the time and geographic scope restrictions in the noncompete are not at issue. The only dispute is whether the restriction is "otherwise necessary to protect the legitimate interests of the franchisor." *Id.* In reviewing whether a noncompete provision violates this principle, North Carolina courts focus on the plain language used by the provision to define the scope of the activities from which franchisees are prohibited from engaging. *Id.* at 266.

The Court concludes that it cannot hold, as a matter of law, that the post-termination noncompete provisions in the Franchise Agreements are facially overbroad and unenforceable *at this stage in the proceedings*. Three reasons support this conclusion.

First, the North Carolina Court of Appeals has held that "a ruling on the enforceability of [a noncompete provision] cannot be made at the pleadings stage in cases where evidence is needed to show the reasonableness of the restrictions contained therein." *Mkt. Am., Inc. v. Lee*, 809 S.E.2d 32, 41 (N.C. Ct. App. 2017). This admonishment is well-taken because although North Carolina disfavors noncompete provisions, they are enforceable if the provisions' terms are reasonable. *See Hertzberg v. Fur Specialists, Inc.*, 781 S.E.2d 533 (Table), 2016 WL 48030, at *5 (N.C. Ct. App. 2016). Here, the record before the Court is sparse, and is insufficient to determine whether the "similar to" language in the Agreements appropriately protects Mainstream's legitimate interests. A fully developed record, however, could resolve this issue.

Second, Defendants do not dispute that Mainstream has sufficiently *alleged* a breach of the noncompete provisions at issue here; they only take issue with whether those provisions are enforceable. Mainstream has alleged that Defendants expressly acknowledged that the language of the covenant was "necessary to permit MAINSTREAM the opportunity to resell and/or develop a new Mainstream Boutique business at or in the area surrounding the Designated Radius." (Compl. ¶ 49 (quoting Compl. Ex. A, Art. 18.2).) Accordingly, there is a dispute of fact—but not an absence of sufficient allegations—as to whether the provision is enforceable or overbroad in its reach.

Finally, Defendants' contention that North Carolina courts consider the "similar to" language contained in the Franchise Agreements to be overbroad and unenforceable on its face is not dispositive at this stage in the proceedings. Certainly, there are cases supporting Defendants' position. As noted above, in *Window Gang*, a North Carolina trial court concluded—in analyzing a Rule 12(b)(6) motion to dismiss—that a noncompete provision containing "the same" or "similar to" language was "overbroad and unenforceable" because it went well beyond the prohibition of activities that would put the franchisee in competition with the franchisor. 2019 WL 1471073, at *8. Similarly, in *Harders*, the North Carolina Court of Appeals held that language prohibiting involvement in "any business similar to" the franchised business was overbroad and unenforceable because it prohibited the former franchisee from engaging "in activities that have no tendency to adversely affect Plaintiff's legitimate business interests." *Harders*, 747 S.E.2d at 628–29.

However, there are other North Carolina cases *upholding* "similar to" language in noncompete provisions. *See, e.g.*, *Cut N Up Hair Salon of Carolina Beach, LLC v. Bennett*,

765 S.E.2d 556 (Table), 2014 WL 4557190, at *4–5 (N.C. Ct. App. 2014) (concluding that noncompete precluding Defendants from participating in "any business which is the same as, similar to, or competitive with the Business" was reasonable to protect legitimate business interests); *OLP-Pittsburgh, Inc.*, 2012 WL 1313251, at *1–2 (noting that the phrase "competitive business" as used in the noncompete provision was defined as "any business operating in competition with an outdoor lighting business or any business *similar to* the [franchised business]" and upholding the provision as "necessary to protect [Plaintiff's] legitimate business interest[s]" (emphasis added)); *Golde*, 2000 WL 35536665, at *2, *6 (noting that noncompete provision barred franchisee from participating in "any business which is the "same or similar to the Store" and concluding that the provision was a "limited covenant" that was "reasonably necessary for the protection of [the franchisor's] legitimate business interest[s]"). Accordingly, the Court cannot conclude that the phrase "similar to" is overbroad as a matter of law, at least not at this stage in the proceedings, because it appears that whether "similar to" is in fact overbroad requires consideration of the unique facts of each case.[7]

---

[7] It is important to note that North Carolina courts recognize the power of the Court to "blue pencil" noncompete provisions so long as the Court limits its alterations to not enforcing a distinctly separable part of the covenant in order to render the provisions reasonable. *Hartman v. W.H. Odell & Assocs., Inc.*, 450 S.E.2d 912, 920 (N.C. Ct. App. 1994) (noting that beyond deciding to not enforce separable portion of noncompete, court may "not otherwise revise or rewrite the covenant"); *see also Beverage Systems of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 784 S.E.2d 457, 461 (N.C. 2016) (noting agreement cannot be blue-penciled unless it can be interpreted so that it sets out "both reasonable and unreasonable" restrictions). At oral argument, Mainstream requested that the "similar to" language be blue-penciled if the Court concludes that the provisions is overbroad.

In summary, fact issues preclude dismissal of Counts One through Five as a matter of law.

### 2. Count-Specific Arguments

Defendants also raise several count-specific arguments in support of their motion to dismiss. For most counts, Defendants reiterate their argument that Mainstream's prior material breaches render the provisions of the Franchise Agreements unenforceable. For the reasons noted above, the Court finds those arguments unavailing. *See supra* § II(A)(1)(a). The Court addresses the remaining count-specific arguments in turn.

### a. Count Two – Breach of Post-Termination Obligations

In Count Two, Mainstream asserts that Defendants All These Things, the Mitchells, and Parris breached their Franchise Agreements by failing to comply with the Franchise Agreements post-termination obligations. (Compl. ¶¶ 95–100.) Defendants argue that Mainstream has failed to state a claim under Count Two because it "fail[ed] to cite to any specific purported post-termination obligation[s]," as opposed to in-term obligations, in the Franchise Agreements. (Defs.' MTD Mem. at 26.) Mainstream responds that it has adequately identified such allegations in paragraphs 48 and 79 of its complaint. (Pl.'s MTD Opp'n Mem. at 13, n.5.) The Court agrees. (*See* Compl. ¶ 48.) Those obligations are listed in paragraph 48 of the complaint and correspond (albeit without explicit citation) to provisions of the Franchise Agreements. (*See* Compl. Ex. A, Art. 17.1 (noting obligation to pay all amounts due and owing to Mainstream, and obligation to "comply with all other applicable provisions of [the] Agreement"), *Id.*, Arts. 17.1–.5 (addressing Franchisee's obligations "upon termination or expiration" of the Agreement "for any reason").)

Moreover, in paragraph 79, Mainstream explicitly alleges that Defendants have failed, pursuant to the Franchise Agreements' post-termination obligations, to (1) pay past-due marketing fees; (2) pay future fees contemplated for the remainder of the Franchise Agreements' terms; (3) provide customer lists and account information; (4) assign telephone numbers, email addresses, and directory listings; and (5) provide a list of all usable supplies, inventory, fixtures, and equipment available for purchase. (Compl. ¶ 79.)

### b. Count Three – Breach of Right to Purchase Assets

In Count Three, Mainstream asserts that Defendants All These Things, the Mitchells, and Parris breached their Franchise Agreements by failing to comply with the Franchise Agreements' requirement that they allow Mainstream to purchase the former franchised businesses' assets. (Compl. ¶¶ 101–106.) Defendants argue that Mainstream's count fails as a matter of law because they offered Mainstream the right to purchase their assets. (Defs.' MTD Mem. at 27; *see also* Compl. Ex. H (requesting that Mainstream "let [Defendants] know promptly" if it was interested in purchasing any business assets).)

The Court finds that Mainstream's allegations are sufficient at this stage in the proceedings. Defendants did request that Mainstream "let [them] know promptly" of any interest to purchase business assets in their November 1, 2019 Letter. (*See* Compl. Ex. H). However, there remains a fact dispute as to whether such an offer satisfies the plain language of Article 17.5, which required Defendants to give Mainstream "written notice listing *the cost of each one of the Business Assets*" available. (*See* Compl. Ex. A, Art. 17.5 (emphasis added).) As Mainstream notes, it disputes whether Defendants' offer satisfied Article 17.5 because it "could not know which business assets it wanted to purchase

45

without knowing what business assets Defendants had[.]" (*See* MTD Opp'n Mem. at 8 n.1.) Importantly, on a motion to dismiss, the Court must take that inference as true. *See Hager*, 735 F.3d at 1013.

### c. Counts Four and Five – Breach of Obligation to Pay Past-Due Marketing Fees and Future Lost Fees

In Count Four, Mainstream asserts that Defendants All These Things, A. Mitchell, and Parris, breached their Franchise Agreement by failing to pay past-due marketing fees to Mainstream. (Compl. ¶¶ 107–111.) In Count Five, Mainstream asserts that Defendants All These Things, the Mitchells, and Parris, breached their Franchise Agreements by failing to pay future lost fees to Mainstream. (*Id.*, ¶¶ 112–117.) Defendants argue that both Count Four and Count Five should be dismissed because the claims seek damages and are therefore "subject to arbitration" under Article 19.1 of the Franchise Agreements. (Defs.' MTD Mem. at 28–29.) Defendants also argue, with respect to Count Five, that any claim for damages for future lost fees is too speculative to calculate, and accordingly fails as a matter of law. (*Id.* at 30.)

Mainstream responds Article 19.5 of the Agreements exempts from arbitration "any dispute involving immediate termination of this Agreement pursuant to Articles 15.4." (Pl.'s MTD Opp'n Mem. at 22–23 (quoting Compl. Ex. A, Art. 19.5).) Because Counts Four and Five stem from allegations of an immediate termination, and indeed, require resolution of whether that termination was proper, Mainstream argues that both Counts are not subject to arbitration. (*Id.*) With respect to Defendants' assertion that Count Five is too speculative, Mainstream contends that future lost royalties are available to franchisors

who terminate franchise agreements for abandonment under North Carolina law. (*Id.* at 23–24 (citing *Meineke Car Care Ctrs., Inc. v. RLB Holdings, LLC*, 423 F. App'x 274, 289 (4th Cir. 2011).)

The Court finds that Defendants' arguments with respect to Count Four and Five fail to establish that dismissal is required as a matter of law. First, with respect to arbitration, the Court must determine initially whether the parties entered a valid arbitration agreement, and, if so, whether the parties' dispute falls within the scope of that agreement. *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 873 (8th Cir. 2018) (citation omitted). State contract law governs the threshold question of whether an enforceable arbitration agreement exists, and if it does, "federal substantive law of arbitrability governs whether the litigants' dispute falls within the scope of an arbitration agreement." *Id.* (citation omitted) (internal quotation marks omitted). The parties do not dispute that the Franchise Agreements are valid contracts, or that they contain an arbitration agreement, so the only question is whether Count Four or Five falls within the agreements' scope. *Id.*

The Eighth Circuit has recognized that "it is a 'fundamental principle that arbitration is a matter of contract.'" *Id.* (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks omitted)). Consequently, "'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Id.* (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

The Franchise Agreements at issue contain two provisions on arbitration. First, Article 19.1 sets forth what disputes are subject to arbitration:

**19.1 <u>DISPUTES SUBJECT TO ARBITRATION</u>.** Except as expressly provided to the contrary in this Agreement, all disputes and controversies between MAINSTREAM and FRANCHISEE and their officers, directors and owners or partners and the Personal Guarantors, including allegations of fraud, misrepresentation or violation of any state or federal laws or regulations, arising under, as a result of, or in connection with this Agreement or FRANCHISEE's Mainstream Boutique Business will be submitted to binding arbitration (the "Arbitration") under the authority of the Federal Arbitration Act . . . .

(Compl. Ex. A, Art. 19.1.) Next, Articles 19.5 and 20.1 contain carve-outs for certain disputes that are not subject to arbitration:

**19.5 <u>DISPUTES NOT SUBJECT TO ARBITRATION</u>.** The disputes and controversies between MAINSTREAM and FRANCHISEE which are set forth in Article 20.1 and the following disputes and controversies between MAINSTREAM and FRANCHISEE will not be subject to Arbitration: (A) any dispute involving the Marks or which arises under or as a result of Article 3 of this Agreement; (b) any dispute involving immediate termination of this Agreement pursuant to Articles 15.4 and 15.5 of this Agreement; (C) any dispute involving enforcement of the confidentiality provisions set forth in Article 7 of this Agreement; and (D) any dispute involving enforcement of the covenants not to compete set forth in Article 18 of this Agreement. . . .

**20.1 <u>INJUNCTIVE RELIEF</u>.** In addition to the provisions of Article 19.5, MAINSTREAM will have the right to petition a Court of competent jurisdiction for the entry of temporary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement relating to: (A) FRANCHISEE'S improper or unauthorized use of the Marks and the Business System; (B) the obligations of FRANCHISEE upon termination or expiration of this Agreement; . . . [and] (D) FRANCHISEE'S violation of the provisions of this Agreement relating to confidentiality and covenants not to compete[.]

(*Id.*, Arts. 19.5, 20.1.)

Among these carve outs are "any dispute involving immediate termination of this Agreement pursuant to Article 15.4 and 15.5" as well as disputes seeking temporary or permanent injunctions and orders for specific performance "enforcing the provisions of

this Agreement relating to . . . (B) the obligations of the FRANCHISEE upon termination or expiration of this Agreement." (*Id.*) Here, Counts Four and Five stem entirely from Mainstream's immediate termination of the Franchise Agreements—which Defendants dispute it had the right to do—under Article 15.4—as set forth in its November 5, 2019 letters to defendants. (*See* Compl. Ex. I.) In fact, it appears that Mainstream's right to payment under Counts Four and Five depends on whether it had the right to terminate the Franchise Agreements immediately. Accordingly, whether Mainstream is even entitled to the damages it seeks in Counts Four and Five requires resolution of a "dispute involving immediate termination of [the Franchise Agreements] pursuant to Articles 15.4 and 15.5[.]" As such, neither Count is subject to arbitration because both fall into the express carve-out provision contained in Article 19.5. *See Interplastic Corp. v. Hudson Solid Surfaces Int'l, L.L.C.*, No. 09-cv-587 (JNE/JSM), 2009 WL 4038674, at *4 n.1 (D. Minn. Nov. 17, 2009) (noting the parties' agreement that "[plaintiff's] claim for nonpayment cannot be compelled to be resolved in arbitration, as the carve-out provision of the Agreement permits [plaintiff] to pursue the claim in a court of law").

With respect to Count Five, Defendants' assertion that future lost fees are too speculative also fails as a matter of law, especially at this stage in the proceedings. As the United States District Court for the Western District of North Carolina has noted, applying North Carolina law, if a franchisor is entitled to damages under a franchise agreement, it is "entitled to be placed in the same position that it would have been had the obligations under the Franchise Agreement . . . been performed." *Maaco Franchisor SPV, LLC v. Cruce*, No. 3:18-cv-361, 2019 WL 5295702, at *5 (W.D.N.C. Oct. 18, 2019). This includes "the

value of amounts owed to [the franchisor] before [the franchisee's] premature closure of the [franchises], the lost royalties and advertising contributions that are the proximate result of [the franchisees'] breaches, and attorneys' fees and costs." *Id.* (citing *Meineke Car Ctrs., Inc.*, 423 Fed. App'x at 281). To show its entitlement to future lost fees, a franchisor must establish that: "(1) [i]t is reasonably certain that such profits would have been realized but for the breach of contract; (2) [t]hose profits can be ascertained and measured with reasonabl[e] certainty; and (3) [t]hose profits may reasonably be supposed to have been contemplated . . . when the contract was made as the probable result of the breach." *Id.* (citation omitted). Franchisors may rely on "historical data" from when the franchisee operated the franchised business to show these factors. *Id.* Moreover, a franchisor need not prove lost future profits with absolute precision. Rather it need only do so with "reasonable certainty." *Mosley & Mosley Builders, Inc. v. Landin Ltd.*, 361 S.E.2d 608, 613 (N.C. Ct. App. 1987) ("To prove lost profits, the injured party 'must prove as part of his case both the amount and cause of his loss. Absolute certainty, however, is not required, but both the cause and the amount of loss must be shown with reasonable certainty.' " (citation omitted)). While the calculation of such lost fees may prove to be speculative, it also may not following discovery. Accordingly, Count Five will not be dismissed.

### d.    Count Six – Audit Rights

In Count Six, Mainstream asserts that Defendants All These Things, the Mitchells, and Parris breached their Franchise Agreements by failing to comply with Mainstream's audit rights, and requests an order permitting Mainstream to conduct an audit. (Compl. ¶¶ 118–123.) Defendants contend that the plain language of Article 12.5 of the Franchise

Agreements only grants Mainstream audit rights "during the term of the Franchise Agreement," and because Mainstream's demand for an audit came after it purportedly terminated the Franchise Agreements, it lacks the right to demand an audit. (Defs.' MTD Mem. at 31.) In response, Mainstream contends that the plain language of Article 12.5 does not state one way or the other that it applies only during the term of the Agreements, or beyond. (Pl.'s MTD Opp'n Mem. at 13 n.4.) Accordingly, Mainstream argues, there is nothing in the provision barring, as a matter of law, Mainstream's claims in Count Six. (*Id.*)

The Court finds that dismissal of Count Six is not appropriate at this time. Article 12.5 of the Franchise Agreements contains no language restricting Mainstream's audit rights to only the duration of the Agreements. (*See* Compl. Ex. A, Art. 12.5.) In fact, it states that "FRANCHISEE will, upon written request, make photocopies of all records MAINSTREAM requests and forward them to MAINSTREAM or its authorized representatives . . . at FRANCHISEE'S cost" and requires that the franchisees keep their "books and financial records for each fiscal year . . . in a secure place" so that they "will be available for audit by MAINSTREAM for at least the preceding five years." (*Id.*) Discovery regarding the intent of the parties will inform this question.

### e.    Count Seven – Civil Conspiracy

In Count Seven, Mainstream asserts that Defendants engaged in a civil conspiracy in an effort to evade the terms of their Franchise Agreements and steal Mainstream's customers. (Compl. ¶¶ 124–130.). Defendants argue that Count Seven should be dismissed because, contrary to Mainstream's allegations, they did not create a plan or work

together to implement a conspiracy to deprive Mainstream of financial benefits or its customers. (Defs.' MTD Mem. at 32.) Rather, Defendants contend that their choice to open their new stores were attempts to mitigate the damages caused by Mainstream's wrongful termination of the Franchise Agreements. (*Id.*) Moreover, Defendants argue that Mainstream's allegations that Defendants "developed a plan and scheme" or "created, planned, and implemented their conspiracy" do not allege sufficient facts supporting a claim of civil conspiracy to meet the plausibility standard. (*Id.*) Finally, Defendants assert that because Mainstream's prior material breaches require dismissal of its claims for violations of the Franchise Agreements' noncompete provisions, Count Eight too must be dismissed. (*Id.* at 33–34.)

In response, Mainstream argues that it has sufficiently stated a claim for civil conspiracy under North Carolina law because its claim is premised on the underlying "violation of the post-termination noncompetes and the prohibition on soliciting and diverting Mainstreams['] customers to Defendants' competing businesses." (Pl.'s MTD Opp'n Mem. at 24.) Defendants' other arguments, Mainstream contends, are merely disputes *with* the facts, not disputes about Mainstream's factual *allegations*, and accordingly cannot form a basis for dismissing Count Seven. (*Id.* at 24–25.)

The Court finds that fact issues preclude dismissal of Count Seven. In order to state a claim for civil conspiracy under North Carolina law, Mainstream needs to allege " '(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme.' " *Am. Air Filter Co., Inc. v. Price*,

No. 16 CVS 13610, 2018 WL 3466952, at *12 (N.C. Super. Ct. July 10, 2018) (quoting *Piraino Bros., LLC v. Atl. Fin. Grp., Inc.*, 712 S.E.2d 328, 333 (N.C. 2011)). Still, North Carolina does not recognize an independent action for civil conspiracy. *Toomer v. Garrett*, 574 S.E.2d 76, 92 (N.C. Ct. App. 2002), *rev. denied*, 579 S.E.2d 576 (N.C. 2003). Rather, civil conspiracy claims must be based on an underlying claim of unlawful conduct. *Id.* Notably, however, the North Carolina Court of Appeals has reversed district courts that dismissed claims for civil conspiracy where the plaintiff alleged that the defendant and at least one other person acted "in concert" to injure the plaintiff. *Id.* And North Carolina courts have analyzed civil conspiracy claims where the underlying wrongful conduct is a claim for "breach of contract." *See Pleasant Valley Promenade v. Lechmere, Inc.*, 464 S.E.2d 47, 53–54 (N.C. Ct. App. 1995) (addressing civil conspiracy claim stemming from purported agreement to breach a contract).

Here, Mainstream has alleged sufficient facts to state a claim for civil conspiracy. First, it has alleged that the Mitchells and Parris—i.e., two or more individuals—developed a plan and scheme to create two new business entities "for the specific purpose and intent of soliciting and diverting Mainstream's customers" to their new stores, and that they did this with full knowledge of the post-termination obligations contained in their Franchise Agreements. (*See* Compl. ¶¶ 125–26, 128.) Second, Mainstream has alleged that Defendants did so with the "purpose and objective" of making Mainstream's customers cease doing business with Mainstream, while at the same time "avoiding the obligations under the terms of the Franchise Agreements." (*Id.*, ¶ 127.) Third, Mainstream has alleged that Defendants conducted their actions in secret—indeed, Mainstream was allegedly

unaware of the purported scheme—in order to harm Mainstream's financial interests, deprive it of Franchise Agreements' benefits, and harm its ability to retain the customer goodwill developed under its business system. (*Id.*, ¶ 129.) Under North Carolina law, such allegations state a claim for civil conspiracy. *See Am. Air Filter Co., Inc.*, 2018 WL 3466952, at *12.

Defendants' assertions that Mainstream mischaracterizes the facts is a dispute *with the facts*; it does not address whether Mainstream has sufficiently *alleged* facts stating a claim for civil conspiracy. Disputing the facts, and not the sufficiency of the factual allegations, does not provide a basis to dismiss under Rule 12(b)(6). *See Pay Child Support*, 2002 WL 31748612, at *2; *see also supra* § II(A)(1)(a). Finally, Defendants' argument that Mainstream's civil conspiracy claim should be dismissed because the noncompete provisions are overbroad and unenforceable fails because, on this record, the Court is not yet able to assess the merits of that claim. Accordingly, the Court finds that Mainstream has stated a claim for civil conspiracy, and denies Defendants' motion to dismiss Count Seven.

### f. Count Eight – Attorneys' Fees

Finally, in Count Eight, Mainstream asserts that Defendants All These Things, the Mitchells, and Parris are obligated, under their Franchise Agreements, to pay Mainstream's costs and attorneys' fees incurred in pursuing this action. (Compl. ¶¶ 131–133.) Defendants' primary argument for dismissal of this count is that Mainstream's material breaches of the Franchise Agreements render it unable to recover attorneys' fees. (Defs.' MTD Mem. at 34–35.) Fact issues preclude dismissal on that basis. *See supra*

§ II(A)(1)(a).  Defendants also argue that the attorneys' fees provisions of the Franchise Agreements are "unconscionable one-way fee shifting provisions[.]"  (Defs.' MTD Mem. at 34.)  Mainstream responds that Defendants have cited no authority in support of that claim.  Moreover, such an inquiry is fact-based.  (Pl.'s MTD Opp'n Mem. at 25.)

The Court finds that fact issues preclude dismissal of Count Eight.  In summary, for the reasons noted above, Defendants' motion to dismiss Count Eight is denied.

### B.    Plaintiff's Motion for a Preliminary Injunction

The Court now turns to Plaintiff's motion for a preliminary injunction.  When determining whether to grant a preliminary injunction, the Court weighs four familiar factors: "(1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between that harm and the harm that granting the injunction will inflict on the other parties; and (4) the public interest."  *Virtual Radiologic Corp. v. Rabern*, No. 20-cv-0445, 2020 WL 1061465, at *1 (D. Minn. Mar. 5, 2020) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)).

Because " '[a] preliminary injunction is an extraordinary remedy," the Eighth Circuit has held that "[t]he party seeking injunctive relief bears the burden of proving' these factors weigh in its favor."  *Mgmt. Registry, Inc. v. A.W. Co., Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).  As a general matter, before a court can grant a preliminary injunction, the movant must establish "that it had 'no adequate remedy at law' because 'its injuries [could not] be fully compensated through an award of damages.' "  *Id.* (quoting *Gen. Motors Corp. v. Harry*

*Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). Moreover, "[t]he core question is whether the equities 'so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.' " *Am. Mortg. & Equity Consultants, Inc. v. Everett Fin., Inc.*, No. 20-cv-426 (ECT/KMM), 2020 WL 968534, at *3 (D. Minn. Feb. 28, 2020) (quoting *Dataphase*, 640 F.3d at 113 (footnote omitted)). The decision to issue a preliminary injunction rests within the Court's discretion. *CDI Energy Servs., Inc. v. West River Pumps, Inc.*, 567 F.3d 398, 401 (8th Cir. 2009). Moreover, the Court may grant a preliminary injunction motion in part if the movant establishes entitlement to more limited injunctive relief. *See Novus Franchising v. Oksendahl*, Nos. 07-cv-1964 (JRT/FLN), 07-cv-1965 (JRT/FLN), 2007 WL 2084143, at *6 (D. Minn. July 17, 2007) (granting preliminary injunction motion only to the extent it barred defendants from using plaintiff's marks and copyrights).

### 1.     Threat of Irreparable Harm

"The threshold inquiry" when considering a motion for a preliminary injunction "is whether the movant has shown the threat of irreparable injury." *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). Failure to show irreparable harm "is, by itself, a sufficient ground upon which to deny a preliminary injunction, [because] '[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' " *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (internal citations omitted) (internal quotation marks omitted)). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of

damages." *Gen. Motors Corp.*, 563 F.3d at 319.  The irreparable harm must be "likely in the absence of an injunction," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citations omitted), "great[,] and of such imminence that there is a clear and present need for equitable relief," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996) (citation omitted).  "Possible or speculative harm is not sufficient." *Anytime Fitness, Inc. v. Family Fitness of Royal, LLC*, No. 09-cv-3503 (DSD/JSM), 2010 WL 145259, at *2 (D. Minn. Jan. 8, 2010).  Put another way, any irreparable harm must be actual and "immediate," as opposed to a "future risk[.]" *Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (citation omitted) (internal quotation marks omitted).

Here, Mainstream asserts three types of irreparable harm stemming from Defendants' alleged violations of their Agreements.  First, it asserts that Defendants' operation of their competing businesses harms Mainstream's goodwill and unfairly diverts customers and business away from Mainstream in violation of the terms of Defendants' non-compete provisions in their Franchise Agreements.  (Pl.'s PI Mem. at 25.)  Second, it asserts that its entire franchise system will be harmed if a preliminary injunction is denied because it will be nearly impossible to refranchise the area in which the Franchised Businesses are located, and because customers will be confused by the operation of a competing business by a former franchisee in the same exact location as the former franchise.  (*Id.* at 25–26.)  Finally, it contends that without a preliminary injunction, this case will send a message to other Mainstream Boutique franchisees that they can abandon

their franchise agreements without consequences, further damaging the Mainstream franchise system. (*Id.* at 26.)

Defendants respond that Mainstream's purported harm can be remedied through money damages because this case essentially boils down to "a financial dispute based on a breach of contract action." (Defs.' PI Opp'n Mem. at 37.) Defendants also argue that there is "no concern" that their actions will "send a message to other Mainstream Boutique franchisees that franchisees can abandon their franchise agreements, stop paying fees, and convert their franchises to competing businesses" because the Defendants did not do that; they acted within their legal rights to mitigate damages caused by Mainstream's prior material breaches. (*Id.* at 38 (emphasis removed).)

The Court finds that Mainstream has demonstrated a threat of irreparable harm with respect to any use by Defendants of Mainstream's Marks or exclusive products, but has not done so with respect to Defendants' overall operation of their purportedly competing businesses. Courts have held that customer confusion surrounding the use of exclusive marks and copyrights can give rise to irreparable harm because it reflects negatively on the owner of the exclusive marks. *See Oksendahl*, 2007 WL 2084146, at *4 (concluding that defendants' "continued use of [franchisor's] marks and products in violation of the Franchise Agreement" causes irreparable harm to the franchisor). Mainstream has alleged that Defendants are "brazenly" selling Mac and Me products in their stores (*see* Compl. ¶ 4), and Defendants admit that there was at least one instance in which a Mac and Me product was for sale in their stores. (*See* Defs.' PI Opp'n Mem. at 13.) While Defendants assert that they have since remedied that mistake (*see id.*) and have represented

to Mainstream that they have removed all Mainstream Marks and signage, (*see* Compl. H), clearly at least one instance of improper use has occurred. Indeed, Defendants' concession that it impermissibly used a Mainstream-exclusive product means Mainstream has shown an immediate threat of irreparable harm in the form of customer confusion that likely would arise if a product exclusive to Mainstream was found in a non-Mainstream business. *Oksendahl*, 2007 WL 2084146, at *4 (concluding that franchisor had shown "irreparable harm only with respect to the goodwill that is associated with [its] marks and products"). As such, Mainstream has shown irreparable harm with respect to the goodwill associated with its Marks and products.

However, Mainstream's contention that the mere operation of a purportedly competing business constitutes irreparable harm to its entire franchise system is too speculative, at this stage in the proceedings, because the record remains undeveloped on this issue. Furthermore, Mainstream has offered no evidence that it is "nearly impossible" to refranchise the Winston-Salem and Mooresville areas. Indeed, Mainstream Boutique has a presence throughout North Carolina, and it appears that prior to the closure of the Winston-Salem location, another Mainstream Boutique location was operating only ten miles away. Moreover, while Mainstream has alleged that customers are confused by the Winston-Salem and Mooresville locations' closure, (*see* Compl. ¶ 80), it appears that customers are nonetheless reaching out to *other* Mainstream Boutique stores in the area. Finally, Mainstream's speculation that other franchisees will follow Defendants' example and abandon their franchises is just that—speculation—and cannot support a finding, at this time, of irreparable harm.

The Court acknowledges that the Eighth Circuit has noted that "loss of intangible assets such as reputation and goodwill *can* constitute irreparable injury . . . [because it] is difficult, if not impossible, to quantify in terms of dollars." *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (citations omitted) (internal quotation marks omitted) (emphasis added). However, a more recent Eighth Circuit decision has expressed some skepticism at this idea, explicitly questioning whether a franchisor's purported " 'loss of customers or customer goodwill' . . . are truly 'irreparable' in the sense that they could not be addressed through money damages if [the franchisor] is successful following a trial on the merits." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). In that decision, the Eighth Circuit cited to *General Motors Corp. v. Harry Brown's, L.L.C.*, 563 F.3d 312, 319 (8th Cir. 2009), in which it affirmed a district court's denial of a preliminary injunction because the district court "did not clearly err" by finding harm from "lost customer relationships was equivalent to a claim of lost profits" and "could therefore be compensated" as money damages. 725 F.3d at 895.

The Eighth Circuit has also held that district courts "may choose to require more than a loss of goodwill to demonstrate irreparable harm," and, with respect to the loss of goodwill itself, may also determine " 'whether an alleged harm requires more substantial proof.' " *Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d 784, 790 (8th Cir. 2010) (citation omitted). The Court finds that "more substantial proof" is required here to establish irreparable harm. Based on this undeveloped record, the Court cannot find that Defendants' business is, in fact, competitive with Mainstream's franchises, nor can it find that, even if competitive, its claims could not be remedied by money damages.

Accordingly, the Court finds that, while Mainstream has shown irreparable harm with respect to the goodwill associated with its Marks and exclusive products, it has not done so, at this stage, with respect to Defendants' operation of allegedly competing stores.

## 2. Mainstream's Likelihood of Success on the Merits

Beyond the threshold issue of irreparable harm, "the probability of success factor is the most significant" of the *Dataphase* factors. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). In a franchisor-franchisee dispute, this factor "requires the movant to show that it has a 'fair chance of prevailing' on its claims." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citation omitted).

Mainstream argues that it is likely to prevail on the merits on its breach of contract claims—specifically, that Defendants have failed to comply with post-termination obligations and the noncompete provisions—because (1) it properly terminated the Franchise Agreements, either because Defendants failed to migrate to the new POS system, or because they abandoned their franchises; (2) the covenants not to compete are enforceable; and (3) Defendants have breached several other post-termination obligations. (Pl.'s PI Mem. at 15–25.) Defendants respond that Mainstream is unlikely to succeed because (1) Mainstream improperly terminated the Franchise Agreements; (2) Mainstream breached the implied covenant of good faith and fair dealing as noted above; and (3) the noncompete provisions of the Franchise Agreements are overbroad and unenforceable as a matter of law. (Defs.' PI Opp'n Mem. at 22–31.)

The Court finds that Mainstream has shown a "fair chance" of prevailing on the merits of its breach of contract claims to the extent they seek to prohibit Defendants from

using Mainstream's Marks and exclusive Mac and Me products. Defendants do not dispute this point. However, fact issues preclude this Court from finding, at this stage of the proceedings, that Mainstream has a "fair chance" of succeeding at trial with respect to its other breach of contract obligations. As noted above, the Court has already found that the lack of a developed record precludes the Court from determining whether the noncompete provisions are enforceable at this time. *See supra* § II(A)(1)(c). Finally, the Court is unable to evaluate whether the businesses are competing without a fuller record. After all, there are numerous kinds of women's clothing stores that market to wide variety of different age groups, interests, and style preferences. On the current record, the Court cannot find that Mainstream has any more or less of a chance than Defendants at succeeding on its claims.

### 3.    Balance of the Harms

This factor "involves 'assess[ing] the harm the movant would suffer absent an injunction,' as well as the harm other interested parties 'would experience if the injunction issued.' " *Am. Mortg. & Equity Consultants, Inc.*, 2020 WL 968354, at *6 (quoting *Katch, LLC v. Sweetser*, 143 F. Supp. 3d. 854, 875 (D. Minn. 2015)). The Court's balancing consists of " 'flexibly weigh[ing] the case's particular circumstances to determine whether . . . justice requires the court to intervene to preserve the status quo.' " *Wood v. Kapustin*, No. 13-cv-1495 (DSD/AJB), 2013 WL 3833983, at *4 (D. Minn. July 23, 2013) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)).

Mainstream argues that its harm—i.e., lost customers and goodwill—outweighs any harm that a preliminary injunction would cause to Defendants, even to the extent it would shut down Defendants' businesses, because the harm to Defendants is a natural

consequence of their decision to breach their Franchise Agreements and start purportedly competing businesses.  (Pl.'s PI Mem. at 28–29.)  Defendants, in turn, argue that this factor tips in their favor because if a preliminary injunction is granted, it will completely shut down their businesses, rendering them without a livelihood for at least the duration of this lawsuit.  (Defs.' PI Opp'n Mem. at 39–40.)

The Court's findings as to the balance of harms are twofold.  First, the Court finds that the harm facing Mainstream from Defendants' purported use of its Marks and exclusive products outweighs any harm Defendants may suffer from a preliminary injunction barring such use.  However, the Court finds that the balance of the harms weighs in favor of Defendants with respect to Mainstream's request for a preliminary injunction barring Defendants from operating their businesses.

Mainstream's primary argument—that Defendants' harm is "self inflicted"—is problematic as applied to this case.  Certainly, the Eighth Circuit has acknowledged that in considering this *Dataphase* factor, harm that is "self inflicted" can be entitled to less weight.  *See Sierra Club v. U.S. Army Corp. of Eng'rs.*, 645 F.3d 978, 997 (8th Cir. 2011) (finding defendant-intervenor's harm was "self inflicted" where party chose to proceed with $800 million construction despite being warned numerous times that doing so would be at its own risk).  But that does not mean that a plaintiff seeking a preliminary injunction can always label the other party's actions as "self inflicted" as a matter of course.  The Fourth Circuit has explained this problem:

> The harm to a defendant . . . *could almost always* be described as of the defendant's own making.  If self-made harm is given substantially less weight . . . then the balance of the harms *will almost always favor the*

*plaintiff*, thus transforming a preliminary injunction from an extraordinary remedy into a routine occurrence. And when the purpose behind the requirement that the court balance the harms is recognized, it becomes apparent that it is error to dismiss as self-inflicted the harms that might be suffered by a defendant if an injunction were to issue.

*Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) (emphasis added).

Indeed, the court noted that to label a defendant's harm "self inflicted" necessarily presumes—on an undeveloped record at stage in the case where the chances for mistake are substantial—that the defendant will go on to lose the case. *Id.* As the court noted:

> By dismissing outright or giving less weight to the harm that would be suffered by a defendant on the grounds that the harm was self-inflicted, a court is effectively considering the harms that would flow from a *properly entered* injunction (that is, an injunction entered against a defendant who would go on to lose) rather than considering the harms that would flow from an injunction entered in error (an injunction entered against a defendant who would go on to win). We therefore believe that it is error for a district court to conclude that any harm that would be suffered by a defendant was self-inflicted and thus entitled to lesser weight in the balancing-of-the-harms portion of the preliminary injunction calculus.

*Id.* at 285.

The Court agrees. Labeling Defendants' harm as "self inflicted" requires the Court to necessarily assume that Defendants' position in this lawsuit is wrong. Yet doing so on such a sparse record is an unfounded presumption about the merits of the case.

It is not seriously contested that, if a preliminary injunction is granted, Defendants will be required to shut down their businesses completely. Defendants note that their businesses are their sole livelihood. (Defs.' PI Opp'n Mem. at 40.) In considering these harms, the balance tips in favor of Defendants because the forced shutdown of one's business is itself an irreparable harm, particularly where the business constitutes the sole

livelihood of the owner. *See Ryko Mfg. Co. v. Eden Services*, 759 F.2d 671, 673 (8th Cir. 1985) (affirming district court's conclusion that "[manufacturer] could be compensated by money damages for any losses it suffered whereas money damages could not fully compensate [distributor] for the loss of its business"). *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (concluding that "the right to continue a business in which [a party] has engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; [the party] want[s] to sell automobiles, not to live on the income from a damages award"). Mainstream suffers little comparatively. It has over eighty other operating locations, including locations near the areas in which the Winston-Salem and Mooresville businesses operated (*see* Aff. of Corey DeNicola [Doc. No. 8] at ¶ 8). Accordingly, in " 'flexibly weigh[ing] the case's particular circumstances to determine whether . . . justice requires the court to intervene to preserve the status quo[,]' " the Court concludes that the harm to Defendants outweighs any harm to Mainstream. *Wood*, 2013 WL 3833983, at *4 (quoting *United Indus. Corp.*, 140 F.3d at 1179).

### 4.    Public Interest

Finally, the "public interest" factor requires the Court to consider the interests of the public when deciding whether a preliminary injunction should issue. *Dataphase*, 640 F.2d at 114. In the franchise context, courts in this district have acknowledged that "it is in the public interest to ensure that parties to franchise agreements can contract on issues such as non-competition and then expect each other to abide by agreed upon terms." *Anytime Fitness, LLC v. Edinburgh Fitness, LLC*, No. 14-cv-348 (DWF/JJG), 2014 WL 1415081,

at *8 (D. Minn. Apr. 11, 2014). Still, other courts in this district have held that the public interest factor "does not favor one party over the other" in the context of a dispute over franchise agreement non-compete provisions and contract obligations because while "[t]here is a strong public interest in upholding contractual agreements[,]" there is "also a public interest in unrestrained competition." *Anytime Fitness, Inc.*, 2010 WL 145259, at *4. And others have observed that where the case "implicates primarily business interests," the "public interest seems insubstantial[.]" *Am. Mortg. & Equity Consultants, Inc.*, 2020 WL 968354, at *6. Given the disputes over the reasonableness of the Agreements' noncompete provisions, the Court concludes that this factor favors neither side because either there is little public interest in this dispute, *see Am. Mortg. & Equity Consultants, Inc.*, 2020 WL 968354, at *6, or there is equal public interest in ensuring that both sides have their rights vindicated. *See Anytime Fitness, LLC*, 2014 WL 1415081, at *8; *Anytime Fitness, Inc.*, 2010 WL 145259, at *4. Accordingly, this factor does not alter the Court's ruling.

In summary, Mainstream has shown a threat of irreparable harm and a likelihood of success on the merits with respect to its claims regarding its Marks and exclusive products. Moreover, it has shown that the balance of the harms favors it with respect to those claims, and although the public interest does not necessarily favor it, neither does it disfavor a preliminary injunction for such claims. Accordingly, Mainstream has proven its right to a preliminary injunction with respect to its claims regarding its Marks and exclusive products. However, Mainstream has failed to show a threat of irreparable harm, the likelihood of success on the merits, or that the balance of the harms tips in its favor, with

respect to its other claims regarding the Franchise Agreements' noncompete provisions and other post-termination obligations, primarily because of the lack of a factual record before the Court. As such, Mainstream is not entitled to a preliminary injunction barring Defendants from continuing to operate their businesses, or requiring performance at this time of other post-termination obligations.

## III. CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss for Failure to State a Claim (Doc. No. 21) is **DENIED.** Plaintiff's Motion for a Preliminary Injunction (Doc. No. 5) is **GRANTED IN PART** and **DENIED IN PART,** as follows:

1. Defendants are enjoined from using or displaying Mainstream Marks, including its trademarks, copyrights, and exclusive products (i.e., Mac and Me). This injunction shall be in effect for a two-year period from the date of this Order, or until further modified by order of this Court. No bond is required.

2. Mainstream's motion is **DENIED** in all other respects.

**IT IS SO ORDERED.**

Dated: April 9, 2020

s/Susan Richard Nelson
Susan Richard Nelson
United States District Judge